

## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

# FELONY

### INDICTMENT FOR
### CONSPIRACY TO COMMIT HEALTH CARE FRAUD AND WIRE FRAUD,
### HEALTH CARE FRAUD, CONSPIRACY TO DEFRAUD THE UNITED STATES AND
### TO PAY AND RECEIVE ILLEGAL HEALTH CARE KICKBACKS AND BRIBES,
### AND FORFEITURE ALLEGATION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL NO.** 19-197 |
| **VERSUS** | * | **SECTION:** SECT.☐MAG.4 |
| **KHALID AHMED SATARY** | * | **VIOLATIONS:** 18 U.S.C. § 1349 |
| | | 18 U.S.C. § 1347 |
| | * | 18 U.S.C. § 371 |
| | | 18 U.S.C. § 1956(h) |
| | * | 18 U.S.C. § 2 |
| | | 18 U.S.C. § 982 |
| | *   *   * | |

The Grand Jury charges that:

### BACKGROUND

**A.   AT ALL TIMES RELEVANT HEREIN:**

#### The Medicare Program

1.      The Medicare Program ("Medicare") was a federally funded program that provided

free or below-cost health care benefits to certain individuals, primarily the elderly, blind, and

disabled.  The benefits available under Medicare were governed by federal statutes and regulations.

X Fee_____ USA
___ Process_____
X Dktd_____
___ CtRmDep_____
___ Doc. No._____

2.      The United States Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare and Medicaid Services ("CMS"), oversaw and administered Medicare.  Individuals who received benefits under Medicare were commonly referred to as Medicare "beneficiaries."

3.      Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), and a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f).

4.      Medicare covered different types of benefits, which were separated into different program "parts."  Medicare "Part A" covered health services provided by hospitals, skilled nursing facilities, hospices, and home health agencies.  Medicare "Part B" was a medical insurance program that covered, among other things, medical services provided by physicians, medical clinics, laboratories, and other qualified health care providers, such as office visits, minor surgical procedures, and laboratory testing, that were medically necessary and ordered by licensed medical doctors or other qualified health care providers. The Medicare Advantage Program, formerly known as "Part C" or "Medicare+Choice," is described in further detail below.

5.      Physicians, clinics, and other health care providers, including laboratories (collectively, "providers"), that provided services to beneficiaries were able to apply for and obtain a "provider number."  Providers that received a Medicare provider number were able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries.

6.      When seeking reimbursement from Medicare for provided benefits, services, or items, providers submitted the cost of the benefit, service or item provided together with a description and the appropriate "procedure code," as set forth in the Current Procedural Terminology ("CPT") Manual or the Healthcare Common Procedure Coding System ("HCPCS").

Additionally, claims submitted to Medicare seeking reimbursement were required to include: (a) the beneficiary's name and Health Insurance Claim Number ("HICN"); (b) the date upon which the benefit, item, or service was provided or supplied to the beneficiary; and (c) the name of the provider, as well as the provider's unique identifying number, known either as the Unique Physician Identification Number ("UPIN") or National Provider Identifier ("NPI"). Claims seeking reimbursement from Medicare could be submitted in hard copy or electronically.

## Medicare Part B

7.      Medicare, in receiving and adjudicating claims, acted through fiscal intermediaries called Medicare administrative contractors ("MACs"), which were statutory agents of CMS for Medicare Part B. The MACs were private entities that reviewed claims and made payments to providers for services rendered to beneficiaries. The MACs were responsible for processing Medicare claims arising within their assigned geographical area, including determining whether the claim was for a covered service.

8.      Novitas Solutions Inc. ("Novitas") was the MAC for consolidated Medicare jurisdictions JH and JL, which included Louisiana, Mississippi, Oklahoma, Texas, and Pennsylvania. Regardless of where services were provided within jurisdictions JH and JL, Novitas received and adjudicated claims in, and paid claims from, Mechanicsburg, Pennsylvania. Claims submitted electronically from providers in Louisiana, Oklahoma, and elsewhere, to Novitas necessarily traveled in interstate commerce.

9.      Palmetto GBA ("Palmetto") was the MAC for consolidated Medicare jurisdictions JJ and JM, which included Georgia, Alabama, Tennessee, South Carolina, North Carolina, Virginia, and West Virginia. Regardless of where services were provided within jurisdictions JJ and JM, Palmetto received and adjudicated claims in, and paid claims from, Columbia, South

3

Carolina.  Claims submitted electronically from providers in Georgia, and elsewhere, to Palmetto necessarily traveled in interstate commerce.

10.     To receive Medicare reimbursements, providers needed to have applied to the MAC and executed a written provider agreement.  The Medicare provider enrollment application, CMS Form 855B, was required to be signed by an authorized representative of the provider.  CMS Form 855B contained a certification that stated:

> I agree to abide by the Medicare laws, regulations, and program instructions that apply to this provider.  The Medicare laws, regulations, and program instructions are available through the Medicare contractor.  I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including, but not limited to, the federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

11.     In executing CMS Form 855B, providers further certified that the provider "w[ould] not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare and w[ould] not submit claims with deliberate ignorance or reckless disregard of their truth or falsity."

12.     Payments under Medicare Part B were often made directly to providers rather than to beneficiaries.  For this to occur, beneficiaries would assign the right of payment to providers. Once such an assignment took place, providers would assume the responsibility for submitting claims to, and receiving payments from, Medicare.

### Medicare Advantage Plans

13.     The Medicare Advantage Program, formerly known as "Part C" or "Medicare+Choice," provided beneficiaries with the option to receive their Medicare benefits through a wide variety of private managed care plans, including health maintenance organizations

("HMOs"), provider sponsored organizations ("PSOs"), preferred provider organizations ("PPOs"), and private fee-for-service plans ("PFFS") (collectively, "Medicare Advantage Plans"), rather than through Medicare Parts A and B.

14.     Private health insurance companies offering Medicare Advantage Plans were required to provide beneficiaries with the same services and supplies offered under Medicare Parts A and B.  To be eligible to enroll in a Medicare Advantage Plan, a person had to have been entitled to receive benefits under Medicare Parts A and B.

15.     A number of private health insurance companies, including UnitedHealth Group, Inc. ("UnitedHealth"), Humana Inc. ("Humana"), WellCare Health Plans, Inc. ("WellCare") and CVS Health Corporation ("CVS Health"), along with their related subsidiaries and affiliates, contracted with CMS to provide managed care to beneficiaries through various Medicare Advantage Plans.

16.     UnitedHealth, Humana, WellCare and CVS Health were "health care benefit programs," as defined by Title 18, United States Code, Section 24(b).

17.     These health insurance companies, through their respective Medicare Advantage Plans, adjudicated claims in locations throughout the United States, specifically, outside the states of Louisiana, Georgia, and Oklahoma, and often made payments directly to providers, rather than to beneficiaries that received the health care benefits, items, and services.  This occurred when the provider accepted assignment of the right to payment from the beneficiary.

18.     To obtain payment for services or treatment provided to beneficiaries enrolled in Medicare Advantage Plans, providers had to submit itemized claim forms to the beneficiary's Medicare Advantage Plan.  The claim forms were typically submitted electronically, via the internet.  The claim form required certain important information, including the information

described above in Paragraph 5 of the Indictment.

19.     When providers submitted claim forms to Medicare Advantage Plans, providers certified that the contents of the forms were true, correct, complete, and that the forms were prepared in compliance with the laws and regulations governing Medicare. Providers also certified that the services being billed were medically necessary and were, in fact, provided as billed.

20.     The private health insurance companies offering Medicare Advantage Plans were paid a fixed rate per beneficiary per month by Medicare, regardless of the actual number or type of services the beneficiary receives. These payments by Medicare to the health insurance companies were known as "capitation" payments. Thus, every month, CMS paid the health insurance companies a pre-determined amount for each beneficiary who was enrolled in a Medicare Advantage Plan, regardless of whether the beneficiary utilized the plan's services that month. CMS determined the per-patient capitation amount using actuarial tables, based on a variety of factors, including the beneficiary's age, sex, severity of illness, and county of residence. CMS adjusted the capitation rates annually, taking into account each patient's previous complaints, diagnoses, and treatments. Beneficiaries with more illnesses or more serious conditions would rate a higher capitation payment than healthier beneficiaries.

### Cancer Genomic Testing

21.     Cancer genomic testing ("CGx testing") used DNA sequencing to detect mutations in genes that could indicate a higher risk of developing certain types of cancers in the future. CGx testing was not a method of diagnosing whether an individual presently had cancer.

22.     Medicare did not cover diagnostic testing that was "not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed

6

body member." Title 42, United States Code, Section 1395y(a)(1)(A). Except for certain statutory exceptions, Medicare did not cover "examinations performed for a purpose other than treatment or diagnosis of a specific illness, symptoms, complaint or injury." Title 42, Code of Federal Regulations, Section 411.15(a)(1). Among the statutory exceptions Medicare covered were cancer screening tests such as "screening mammography, colorectal cancer screening tests, screening pelvic exams, [and] prostate cancer screening tests." *Id.*

23.     If diagnostic testing was necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, Medicare imposed additional requirements before covering the testing. Title 42, Code of Federal Regulations, Section 410.32(a) provided, "All diagnostic x-ray tests, diagnostic laboratory tests, and other diagnostic tests must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem." "Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary." *Id.*

24.     Because CGx testing did not diagnose cancer, Medicare only covered such tests in limited circumstances, such as when a beneficiary had cancer and the beneficiary's treating physician deemed such testing necessary for the beneficiary's treatment of that cancer. Medicare did not cover CGx testing for beneficiaries who did not have cancer or lacked symptoms of cancer.

25.     In submitting claims to Medicare and Medicare Advantage Plans, providers used a variety of CPT codes to indicate CGx testing had been performed, including CPT code 81292, gene analysis (mutL homolog 1, colon cancer, nonpolyposis type 2) full sequence; and CPT Code 81162, gene analysis (breast cancer 1 and 2) of full sequence and analysis for duplication or deletion variants.

## Telemedicine

26.     Telemedicine provided a means of connecting patients to doctors and other medical professionals ("licensed provider") by using telecommunications technology, such as the internet or telephone.

27.     Medicare deemed telemedicine an appropriate means to provide certain health care related services ("telehealth services") to beneficiaries, including, among other services, consultations and office visits, only when certain requirements were met. These requirements included, among others: (a) that the beneficiary was located in a rural area (outside a Metropolitan Statistical Area or in a rural health professional shortage area); (b) that the services were delivered via an interactive audio and video telecommunications system; and (c) that the beneficiary was at a licensed provider's office or a specified medical facility—not at a beneficiary's home—during the telehealth service furnished by a remote provider.

28.     Telehealth services could be covered by and reimbursable under Medicare, but only if telemedicine was generally appropriate, as outlined above, and only if the services were both ordered by a licensed provider and were reasonable and medically necessary to diagnose and treat a covered illness or condition.

29.     Legitimate telemedicine companies employed licensed providers to furnish telehealth services, including consultations, to individuals, often paying salaries to these employees. Telemedicine companies, typically, in turn, submitted claims to Medicare for telehealth services provided by employees to beneficiaries.

8

## The Defendant and Related Individuals and Entities

30.     **KHALID AHMED SATARY**, a resident of Lawrenceville, Georgia, owned and controlled various diagnostic laboratories, including laboratories in Louisiana, Oklahoma, Georgia, and elsewhere, capable of performing CGx testing.

31.     Lazarus Services, LLC ("Lazarus Services"), a Delaware limited liability company, registered in Louisiana in June 2016, with its principal place of business located at 2239 Poydras Street, Suite 217, New Orleans, Louisiana, within the Eastern District of Louisiana, purported to provide diagnostic laboratory services, including CGx testing. Lazarus Services applied for and was enrolled in Medicare as a provider, and, in or around January 2019, upon **SATARY** acquiring ownership and control of Lazarus Services, Lazarus Services ultimately notified Medicare of a change in ownership, specifically identifying a family member of **SATARY** ("Family Member 1") as the purported owner.

32.     Performance Laboratories, LLC ("Performance Laboratories"), formed in April 2013 as an Oklahoma limited liability company, with its principal place of business located at 500 N. Walker Avenue, Suite 150, Oklahoma City, Oklahoma, purported to provide diagnostic laboratory services, including CGx testing. In or around October 2018, **SATARY** acquired ownership and control of Performance Laboratories, and Family Member 1 was added as a signer on a Performance Laboratories business account. Performance Laboratories applied for and was enrolled in Medicare as a provider, and in or around December 2018, Performance Laboratories notified Medicare of the change in ownership, specifically identifying Family Member 1 as the purported owner.

33.     Clio Laboratories, LLC ("Clio Laboratories"), formed in June 2015 as a Florida limited liability company, purportedly owned by an associate of **SATARY** ("Individual 1"), and

upon registering in Georgia in January 2016 and becoming a Georgia limited liability company in September 2018, with its principal place of business located at 1130 Hurricane Shoals Road, Lawrenceville, Georgia, purported to provide diagnostic laboratory services, including CGx testing. Clio Laboratories applied for and was enrolled in Medicare as a provider in January 2017. **SATARY** owned and controlled Clio Laboratories through others.

34.     Alpha Medical Consulting Inc. ("Alpha Medical Consulting") incorporated in Georgia in January 2018, with its principal place of business located at 1130 Hurricane Shoals Road, Lawrenceville, Georgia, purported to provide legal, compliance, marketing and operational support to laboratories. **SATARY** owned and controlled Alpha Medical Consulting through others.

35.     Company 1, a limited liability company formed in South Carolina in or around 2016, was a purported marketing company that identified and solicited beneficiaries to receive CGx testing. Co-conspirator 1, a resident of South Carolina, owned and controlled Company 1.

36.     Company 2, a limited liability company formed in Georgia in or around 2014, was a purported marketing company that identified and solicited beneficiaries to receive CGx testing. Co-conspirator 2, a resident of Georgia, owned and controlled Company 2.

37.     Company 3, a company incorporated in Florida in or around 1999, was a purported marketing company that identified and solicited beneficiaries to receive CGx testing. Co-conspirator 3, a resident of Florida, owned and controlled Company 3.

38.     Company 4, a company incorporated in Florida in or around 2017, was a purported marketing company that identified and solicited beneficiaries to receive CGx testing. Co-conspirator 4, a resident of Florida, owned and controlled Company 4, and Co-conspirator 5, a resident of Florida, was an employee of Company 4.

**B.     THE FRAUDULENT SCHEME:**

39.     **SATARY** and his co-conspirators, through the entities identified above, established a business plan to artificially increase demand for CGx testing.  **SATARY** did so by paying co-conspirators to target and solicit beneficiaries to receive CGx testing regardless of whether the beneficiaries were being treated for cancer or symptoms of cancer.  **SATARY** understood that if beneficiaries contacted by his co-conspirators agreed to receive CGx testing, then his co-conspirators would: (a) send to beneficiaries CGx testing kits, and ultimately receive from beneficiaries DNA samples; and (b) pay telemedicine companies to obtain orders from telemedicine providers authorizing medically unnecessary CGx testing, irrespective of whether these telemedicine providers actually spoke with or evaluated the beneficiaries for whom CGx testing was ordered ("fraudulent orders").

40.     **SATARY**, through Lazarus Services, Performance Laboratories, Clio Laboratories, and other laboratories (collectively, "Satary Labs") paid kickbacks and bribes to these co-conspirators in exchange for these fraudulent orders and DNA samples.  Despite knowing that the CGx testing was medically unnecessary and that kickbacks and bribes were paid to procure the fraudulent orders and DNA samples, nevertheless, the Satary Labs performed CGx testing on the DNA samples and, with **SATARY's** knowledge and at **SATARY's** direction, subsequently submitted false and fraudulent claims to Medicare and Medicare Advantage Plans.  Between January 2017 and September 2019, the Satary Labs submitted approximately $547 million in false and fraudulent claims to Medicare and Medicare Advantage Plans and were reimbursed approximately $134 million.

**C.     PURPOSE OF THE SCHEME:**

41.     It was a purpose of the scheme and artifice for the defendant and his co-conspirators

to unlawfully enrich themselves and others by, among other things: (a) paying and receiving kickbacks in exchange for the referral of beneficiaries, DNA samples, and the accompanying fraudulent orders for CGx testing to the Satary Labs, without regard to any medical necessity for the ordered CGx testing; (b) paying kickbacks to telemedicine companies in exchange for ordering and arranging for the ordering of CGx testing for beneficiaries, without regard for any medical necessity for the ordered CGx testing; (c) submitting and causing the submission, via interstate wire communication, of false and fraudulent claims to Medicare and Medicare Advantage Plans, through the Satary Labs for CGx testing that was not medically necessary, not billed as ordered by physicians, and not eligible for reimbursement; (d) concealing the submission of false and fraudulent claims to Medicare and Medicare Advantage Plans; and (e) diverting fraud proceeds for their personal use and benefit, the use and benefit of others, and to further the fraud.

### D. **MANNER AND MEANS OF THE SCHEME:**

42. The manner and means by which the defendant and his co-conspirators sought to accomplish the object of the scheme included, among others, the following:

a. **SATARY** falsely and fraudulently failed to disclose to Medicare that he was the true owner of the Satary Labs, or that he was an individual who exercised operational or managerial control over, or who directly or indirectly conducted, the day-to-day operations of the Satary Labs.

b. **SATARY**, Co-Conspirator 1, Co-conspirator 2, Co-conspirator 3, Co-conspirator 4, and Co-conspirator 5, and others, known and unknown to the Grand Jury, obtained access to thousands of beneficiaries by targeting them with telemarketing campaigns and health fairs, and inducing them to accept CGx tests regardless of medical necessity.

c. **SATARY**, through the Satary Labs, paid illegal kickbacks and bribes to: (a) Co-conspirator 1, through Company 1; (b) Co-conspirator 2, through Company 2; (c) Co-conspirator 3; and (d) others, known and unknown to the Grand Jury, in exchange for fraudulent orders and DNA samples collected from beneficiaries that would be used to support false and fraudulent claims from the Satary Labs to Medicare and Medicare Advantage Plans for CGx testing.

d. **SATARY**, through the Satary Labs, Co-Conspirator 1, Co-conspirator 2, Co-conspirator 3, and others, known and unknown to the Grand Jury, created sham contracts and documentation that disguised the illegal kickbacks and bribes as payments from the Satary Labs for purported marketing services. In the contracts, **SATARY**, through the Satary Labs, agreed to pay Co-Conspirator 1, Co-conspirator 2, Co-conspirator 3, and others, known and unknown to the Grand Jury, a set dollar amount—as high as $1,800—for each beneficiary, DNA sample, and fraudulent order they referred to the Satary Labs for CGx testing, or a percentage—as high as 40%—of the gross revenues paid by Medicare and Medicare Advantage Plans in exchange for their recruitment and referral of beneficiaries, DNA samples, and fraudulent orders to the Satary Labs, all regardless of whether the CGx testing was medically necessary.

e. **SATARY**, Co-Conspirator 1, Co-conspirator 2, Co-conspirator 3, and others, known and unknown to the Grand Jury, obtained fraudulent orders for the CGx testing by paying telemedicine companies for fraudulent orders written by licensed providers contracted with the telemedicine companies, even though those licensed providers were not treating the beneficiaries for cancer or symptoms of cancer, did not use the test results in the treatment of the beneficiaries, and did not conduct a proper patient visit or consultation, via telemedicine.

f.     **SATARY**, Co-Conspirator 1, Co-conspirator 2, Co-conspirator 3, Co-conspirator 4, Co-conspirator 5, and others, known and unknown to the Grand Jury, caused Lazarus Services to submit false and fraudulent claims to Medicare and Medicare Advantage Plans, in at least the approximate amount of $13 million, via interstate wire communication.

g.     **SATARY**, Co-Conspirator 1, Co-conspirator 2, Co-conspirator 3, Co-conspirator 4, Co-conspirator 5, and others, known and unknown to the Grand Jury, caused Performance Laboratories to submit false and fraudulent claims to Medicare and Medicare Advantage Plans, in at least the approximate amount of $413 million, via interstate wire communication.

h.     **SATARY**, Co-Conspirator 1, Co-conspirator 2, Co-conspirator 3, Co-conspirator 4, Co-conspirator 5, and others, known and unknown to the Grand Jury, caused Clio Laboratories to submit false and fraudulent claims to Medicare and Medicare Advantage Plans, in at least the approximate amount of $121 million, via interstate wire communication.

i.     **SATARY**, Co-Conspirator 1, Co-conspirator 2, Co-conspirator 3, Co-conspirator 4, Co-conspirator 5, and others, known and unknown to the Grand Jury, used the fraud proceeds received from the Satary Labs to benefit themselves and others, and to further the fraud.

### COUNT 1
(18 U.S.C. § 1349 – Conspiracy to Commit Health Care Fraud and Wire Fraud)

**A.     AT ALL TIMES RELEVANT:**

43.     The allegations in Paragraphs 1 through 37 of the Indictment are re-alleged and incorporated by reference as if fully set forth herein.

**B.     THE CONSPIRACY:**

44.     Beginning in or around January 2017, and continuing through in or around September 2019, in the Eastern District of Louisiana, and elsewhere, defendant **KHALID**

14

**AHMED SATARY**, did conspire and agree with Co-Conspirator 1, Co-conspirator 2, Co-conspirator 3, Co-conspirator 4, Co-conspirator 5, and others, known and unknown to the Grand Jury, to commit certain offenses against the United States, that is:

        a.    to knowingly and willfully execute a scheme and artifice to defraud a healthcare benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare and Medicare Advantage Plans, and to obtain, by means of material false and fraudulent pretenses, representations, and promises, money owned by and under the custody and control of Medicare and Medicare Advantage Plans, in connection with the delivery of and payment for health care benefits and services, in violation of Title 18, United States Code, Section 1347; and

        b.    to knowingly and with the intent to defraud, devise and intend to devise a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing the pretenses, representations, and promises were false and fraudulent when made, and for the purpose of executing the scheme and artifice, did knowingly transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, certain writings, signs, signals, pictures and sounds, in violation of Title 18, United States Code, Section 1343.

## C.    <u>PURPOSE OF THE CONSPIRACY</u>:

45.    It was a purpose of the conspiracy for **SATARY** and his co-conspirators to unlawfully enrich themselves and others, as described in Paragraphs 38 through 40 of the Indictment, and re-alleged and incorporated by reference as though fully set forth herein.

**D.     MANNER AND MEANS OF THE CONSPIRACY:**

46.     In furtherance of the conspiracy and to accomplish its objects and purpose, the methods, manner, and means that were used are described in Paragraph 41, are re-alleged and incorporated by reference as thought fully set forth herein.

All in violation of Title 18, United States Code, Section 1349.

**COUNTS 2 - 4**
(18 U.S.C § 1347 – Health Care Fraud)

**A.     AT ALL TIMES MATERIAL HEREIN:**

47.     The allegations in Paragraphs 1 through 37 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

**B.     HEALTH CARE FRAUD:**

48.     Beginning in or around January 2017, and continuing through in or around September 2019, in the Eastern District of Louisiana, and elsewhere, defendant **KHALID AHMED SATARY**, aided and abetted by others, known and unknown to the Grand jury, in connection with the delivery of and payment for health care benefits, items, and services, did knowingly and willfully execute, and attempt to execute, a scheme or artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare and Medicare Advantage Plans, and obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of Medicare and Medicare Advantage Plans.

49.     The scheme to defraud is more fully described in Paragraphs 38 through 41 of the Indictment and is re-alleged and incorporated by reference as if fully set forth herein.

**C.     ACTS IN EXECUTION OF THE SCHEME:**

50.     On or about the dates specified below, in the Eastern District of Louisiana, and

16

elsewhere, aided and abetted by others, and aiding and abetting others, known and unknown to the Grand Jury, **SATARY** submitted and caused the submission of false and fraudulent claims from Lazarus Services to Medicare for CGx testing that was not medically necessary, not billed as ordered by physicians, and not eligible for reimbursement, in an attempt to execute, and in execution of the scheme, as described in Paragraph 41 of the Indictment, with each execution set forth below forming a separate count:

| COUNT | Beneficiary | Approx. Date of Claim Submission | Claim Number | First CGx Test Listed in Claim; CPT Code | Total Approx. Amount Claimed |
|---|---|---|---|---|---|
| 2 | E.G. | 06/03/2019 | 531119154241510 | Gene analysis (mutL homolog 1, colon cancer, nonpolyposis type 2) full sequence; CPT Code 81292 | $14,847 |
| 3 | C.G. | 07/8/2019 | 531119189305220 | Gene analysis (mutL homolog 1, colon cancer, nonpolyposis type 2) full sequence; CPT Code 81292 | $14,847 |
| 4 | R.G. | 07/15/2019 | 531119196012702 | Gene analysis (breast cancer 1 and 2) of full sequence and analysis for duplication or deletion variants; CPT Code 81162 | $14,847 |

Each of the above is a violation of Title 18, United States Code, Sections 1347 and 2.

**COUNT 5**
(18 U.S.C. § 371 – Conspiracy to Defraud the United States
and to Pay and Receive Illegal Health Care Kickbacks)

**A.    AT ALL TIMES MATERIAL HEREIN:**

51.    The allegations in Paragraphs 1 through 39 of the Indictment are re-alleged and incorporated by reference as if fully set forth herein.

**B.    THE CONSPIRACY:**

52.    Beginning in or around July 2017, and continuing through in or about September 2019, in the Eastern District of Louisiana, and elsewhere, defendant **KHALID AHMED SATARY** did willfully, that is with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate and agree with others, known and unknown to the Grand Jury,

a.    to defraud the United States by impairing, impeding, obstructing, and defeating through deceitful and dishonest means, the lawful government functions of the HHS in its administration and oversight of Medicare, in violation of Title 18, United States Code, Section 371; and to commit certain offenses against the United States, that is:

b.    to violate Title 42, United States Code, Section 1320a-7b(b)(1)(A) by knowingly and willfully soliciting and receiving remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, in return for referring individuals for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part by a Federal health care program, that is, Medicare and Medicare Advantage Plans; and

c.    to violate Title 42, United States Code, Sections 1320a-7b(b)(2)(B) by knowingly and willfully offering and paying remuneration specifically, kickbacks and bribes,

directly and indirectly, overtly and covertly, in cash and in kind, to a person in return for purchasing, leasing, ordering, and arranging for and recommending purchasing, leasing, and ordering any good, facility, service, and item for which payment may be made in whole and in part under a Federal health care program, this is, Medicare and Medicare Advantage Plans.

## C.    PURPOSE OF THE CONSPIRACY:

53.    It was the purpose of the conspiracy for defendant **KHALID AHMED SATARY**, and his co-conspirators to unlawfully enrich themselves and others by: (a) soliciting, receiving, offering, and paying kickbacks and bribes in return for recruiting and referring beneficiaries to the Satary Labs; (b) offering and paying kickbacks and bribes to telemedicine companies to obtain fraudulent orders for CGx testing for beneficiaries; (c) submitting and causing the submission of claims to Medicare and Medicare Advantage Plans for CGx testing that the Satary Labs purportedly provided to beneficiaries; (d) concealing the submission of false and fraudulent claims to Medicare and Medicare Advantage Plans; and (e) diverting fraud proceeds for their personal use and benefit, the use and benefit of others, and to further the fraud.

## D.    MANNER AND MEANS OF CONSPIRACY:

54.    The manner and means by which the defendant and his co-conspirators sought to accomplish the object of the scheme included, among others, the following:

a.    Co-conspirator 1, Co-conspirator 2, Co-conspirator 3, and other co-conspirators solicited and received kickbacks, including from **SATARY**, in exchange for recruiting and referring beneficiaries to the Satary Labs, knowing that the Satary Labs would bill Medicare and Medicare Advantage Plans for CGx testing purportedly provided to the recruited beneficiaries.

19

b.      **SATARY** offered and paid kickbacks to Co-conspirator 1, Co-conspirator 2, Co-conspirator 3, and others in exchange for the recruitment and referral of beneficiaries that Co-conspirator 1, Co-conspirator 2, Co-conspirator 3, and others in turn referred to the Satary Labs.

c.      Co-conspirator 3 offered and paid kickbacks to Co-conspirator 4, Co-conspirator 5, and others in exchange for the recruitment and referral of beneficiaries that Co-conspirator 3 in turn referred to the Satary Labs.

d.      Co-conspirator 1, Co-conspirator 2, Co-conspirator 3, and others offered and paid kickbacks to telemedicine companies and others in exchange for the ordering and arranging for ordering CGx testing for beneficiaries, who were paid, at least in part, to authorize the CGx testing.

e.      **SATARY**, Co-conspirator 1, Co-conspirator 2, Co-conspirator 3, Co-conspirator 4, Co-conspirator 5, and other co-conspirators caused Clio Laboratories to submit false and fraudulent claims to Medicare and Medicare Advantage Plans, in at least the approximate amount of $121 million.

f.      **SATARY**, Co-conspirator 1, Co-conspirator 2, Co-conspirator 3, Co-conspirator 4, Co-conspirator 5, and other co-conspirators caused Performance Laboratories to submit false and fraudulent claims to Medicare and Medicare Advantage Plans, in at least the approximate amount of $413 million.

g.      **SATARY**, Co-conspirator 1, Co-conspirator 2, Co-conspirator 3, Co-conspirator 4, Co-conspirator 5, and other co-conspirators caused Lazarus Services to submit false and fraudulent claims to Medicare and Medicare Advantage Plans, in at least the approximate amount of $13 million.

h.      As the result of these false and fraudulent claims, Medicare and Medicare Advantage Plans, made payments to Clio Laboratories in at least the approximate amount of $16 million, to Performance Laboratories in at least the approximate amount of $115 million, and to Lazarus Services in at least the approximate amount of $3 million.

i.      **SATARY**, Co-conspirator 1, Co-conspirator 2, Co-conspirator 3, Co-conspirator 4, Co-conspirator 5, and other co-conspirators used the fraud proceeds received from the Satary Labs to benefit themselves and others, and to further the fraud.

**E.      OVERT ACTS:**

55.      In furtherance of the conspiracy, and to accomplish its purposes and objects, at least one of the conspirators committed, or caused to be committed, in the Eastern District of Louisiana, and elsewhere, the following overt acts, among others:

a.      On or about October 25, 2017, **SATARY** sent a text message to Co-conspirator 3 stating, "We got paid for Clio $8000 each." Co-conspirator 3 replied, "How many were pa[i]d. That's amazing." **SATARY** responded, "5=$41000."

b.      On or about December 13, 2017, **SATARY** sent a text message to Co-conspirator 3 stating, "Wire routing . . . $23,687 . . . will be done as soon as the bank opens at 9," which payment was in exchange for Co-conspirator 3 referring beneficiaries to Clio Laboratories for CGx testing.

c.      On or about January 5, 2018, **SATARY** caused an email to be sent to Co-conspirator 1, which attached a contract in which Clio Laboratories agreed to pay Co-conspirator 1 approximately $1,200 for each "comprehensive" CGx test that Co-conspirator 1 referred to Clio Laboratories.

d.     In or around May 2018, Co-conspirator 2 referred beneficiary G.T. to Clio Laboratories for a CGx testing.

e.     In or around May 2018, **SATARY** caused Clio Laboratories to submit approximately $23,982 in claims to Medicare for CGx testing purportedly rendered to beneficiary G.T., of which Medicare paid approximately $9,495.

f.     On or about June 27, 2018, **SATARY** caused Clio Laboratories to transfer approximately $69,550 from an account ending in 2276, held at Wells Fargo Bank in the name of Clio Laboratories, to an account ending in 0343, held at Wells Fargo Bank in the name of Company 2, in exchange for Co-conspirator 2 referring beneficiaries to Clio Laboratories for CGx testing.

j.     On or about January 2, 2019, **SATARY** caused Lazarus Services to submit an updated CMS Form 855B that failed to disclose that **SATARY** was the true owner of Lazarus Services, or that **SATARY** was an individual who exercised operational or managerial control over, or who directly or indirectly conducted, the day-to-day operations of Lazarus Services.

g.     In or around April 2019, Co-conspirator 1 referred beneficiary E.G. to Lazarus Services for CGx testing.

h.     On or about April 10, 2019, **SATARY** caused Lazarus Services to submit approximately $14,847 in claims to Medicare for CGx testing purportedly rendered to beneficiary E.G., of which Medicare paid approximately $6,983.

i.     On or about May 16, 2019 **SATARY** caused a company he controlled to transfer approximately $300,000 from an account ending in 5309, held at PNC Bank, to an account ending 9750, held at Grand South Bank in the name of Company 1.

All in violation of Title 18, United States Code, Section 371.

**COUNT 6**

(18 U.S.C. § 1956(h) – Conspiracy to Launder Monetary Instruments)

**A.    AT ALL TIMES MATERIAL HEREIN:**

56.    The allegations in Paragraphs 1 through 39 of the Indictment are re-alleged and incorporated by reference as if fully set forth herein.

**B.    THE CONSPIRACY:**

57.    Beginning in or around January 2017, and continuing until at least September 2019, in the Eastern District of Louisiana, and elsewhere, **KHALID AHMED SATARY** did conspire and agree with other persons, known and unknown to the Grand Jury:

a.    to knowingly conduct, attempt to conduct, and aid and abet others in conducting financial transactions affecting interstate and foreign commerce, which transactions involved the proceeds of specified unlawful activity, that is, conspiracy to commit health care fraud and wire fraud, in violation of Title 18, United States Code, Section 1349, and health care fraud, in violation of Title 18, United States Code, Section 1347, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of the specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i); and

b.    to knowingly engage and attempt to engage, in monetary transactions by, through, and to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, that is the items listed in Part D of this section, such property having been derived from a specified unlawful activity, that is, conspiracy to commit health care fraud and wire fraud, in violation of Title 18, United States Code, Section 1349, and

23

health care fraud, in violation of Title 18, United States Code, Section 1347, in violation of Title 18, United States Code, Section 1957.

## C.   PURPOSE OF THE CONSPIRACY:

58.    It was a purpose of the conspiracy to conduct wire transfers and issue and deposit checks representing the proceeds of conspiracy to commit health care fraud and health care fraud in order to (i) conceal and obscure the nature and source of the payments to telemedicine companies and doctors, namely that the Satary Labs were the source of funds paid to telemedicine companies and telemedicine doctors, and (ii) conceal and obscure **SATARY**'s ownership of and control over the fraudulent proceeds.

## D.   MANNER AND MEANS OF THE CONSPIRACY:

59.    The manner and means by which **SATARY** and other co-conspirators sought to accomplish the object and purpose of the conspiracy included, among other things, the following:

a.    It was a part of the conspiracy that **SATARY** opened or caused to be opened bank accounts in the names of the Satary Labs, namely: Clio Laboratories at PNC Bank, account ending in 2757, and Wells Fargo Bank, account ending in 2276; Performance Laboratories at BNY Mellon, account ending in 6124, and Grand South Bank, account ending in 5534; and Lazarus Services at Hancock Whitney Bank, account ending in 9387, and Frost Bank, account ending in 1196, both held in the Eastern District of Louisiana.  These accounts were used to deposit the proceeds obtained from the conspiracy to commit health care fraud and wire fraud and the scheme to commit health care fraud.

b.    It was a part of the conspiracy that **SATARY** opened or caused to be opened bank accounts in the name of the Alpha Medical Consulting, namely, account ending in 0619 at SunTrust Bank, and account ending in 2749 at PNC Bank.

24

     c.     It was a part of the conspiracy that **SATARY** opened or caused to be opened bank accounts in the name of Family Member 1, namely, account ending in 6453 at Bank of America.

     d.     **SATARY** caused Clio Laboratories to execute checks and wire transfers constituting proceeds derived from the above-mentioned specified unlawful activity, into bank accounts controlled by Co-Conspirator 2 and Co-Conspirator 3, or companies Co-Conspirator 2 controlled.  Co-Conspirator 2 and Co-Conspirator 3 then transferred the proceeds to telemedicine companies.

     e.     **SATARY** caused Performance Laboratories and Clio Laboratories to execute checks and wire transfers constituting proceeds derived from the above-mentioned specified unlawful activity, into bank accounts in the name of Alpha Medical Consulting. **SATARY** then caused Alpha Medical Consulting to execute checks and wire transfers constituting proceeds derived from the above-mentioned specified unlawful activity, into bank accounts controlled by Company 1 and Co-Conspirator 3.  Co-Conspirator 1 and Co-Conspirator 3 then transferred the proceeds to telemedicine companies.

     f.     **SATARY** caused Lazarus Services to execute checks and wire transfers constituting proceeds derived from the above-mentioned specified unlawful activity, including from an account held in the Eastern District of Louisiana, into bank accounts in the name of Family Member 1.

     g.     **SATARY** caused Performance Laboratories to execute checks and wire transfers constituting proceeds derived from the above-mentioned specified unlawful activity into bank accounts in the name of Family Member 1.

h.      On or about August 15, 2018, **SATARY**, through Clio Laboratories, sent a wire transfer from its account at PNC Bank ending in 2757, to the account in the name of Company 3 at Wells Fargo Bank, account ending in 0343, in the approximate amount of $30,000.  On or about August 29, 2018, **SATARY**, through Company 3, made an electronic transfer to the account in the name of a telemedicine company at JP Morgan Chase, account ending in 9375, in the approximate amount of $10,000.

i.      On or about April 15, 2019, **SATARY**, through Performance Laboratories, sent a wire transfer from its account at BNY Mellon, account ending in 6124, to the account in the name of Performance Laboratories at Grand South Bank, account ending in 5534, in the approximate amount of $2,257,253.  On or about April 16, 2019, **SATARY**, through Performance Laboratories, sent a wire transfer from its account at Grand South Bank, account ending in 5534, to the account in the name of Family Member 1 at Bank of America, account ending in 6453, in the approximate amount of $75,000.

j.      On or about July 2, 2019, **SATARY**, through Lazarus Services, sent a wire transfer from its account at Frost Bank, account ending in 1196, to the account in the name of Family Member 1 at Bank of America, account ending in 6453, in the approximate amount of $689,700.

All in violation of Title 18, United States Code, Section 1956(h).

### **NOTICE OF FORFEITURE**

60.      The allegations contained in Paragraphs 1 through 58 are incorporated by reference as though set forth fully herein for the purpose of alleging forfeiture to the United States.

61.      As a result of the offenses alleged in Counts 1 through 6, the defendant **KHALID AHMED SATARY** shall forfeit to the United States, pursuant to Title 18, United States Code,

Section 982(a)(7), any and all property, real and personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of said offenses.

62.     As a result of the offense alleged in Count 6, the defendant **KHALID AHMED SATARY** shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any property, real or personal, involved in said offense, and any property traceable to such property.

63.     The above-described property includes, but is not limited to, the following:

> Real property, together with all the buildings and improvements thereon, and all the rights, ways, privileges, servitudes, appurtenances and advantages thereunto belonging or in anywise appertaining, described as follows:  All that tract or parcel of land lying and being in Land Lots 53 and 54 of the 6th Land District of Gwinnett County, Georgia, containing 0.7953 acre, according to Plat of Survey, dated July 23, 1986, prepared by Michael A. Royston, GRLS No. 1731, and recorded in Plat Book 54, Page 223A, Clerk's Office, Gwinnett Superior Court.  Said plat by this reference is incorporated herein for all purposes.  This is the same property described in a Warranty Deed dated September 1, 1986, from H. Frank Moon to George C. Brown, recorded in Deed Book 5935, Page 158, Said Clerk's Office.  Said tract of land contains one brick and frame house and one concrete block shop which are attached to said property and conveyed herewith.  Said property also bears the municipal addresses 3901 U.S. Highway 78 West, Snellville, GA 30039; and 3901 Stone Mountain Highway, Snellville, GA 30039;

> Real property, together with all the buildings and improvements thereon, and all the rights, ways, privileges, servitudes, appurtenances and advantages thereunto belonging or in anywise appertaining, described as follows:  All that tract or parcel of land lying and being in Land Lot 233 of the 7th District, Gwinnett County, Georgia, containing 5.0 acres as per Plat of Survey for Joey Garner and Amy Garner by Tyson & Associates, Inc., registered surveyors, dated February 16, 1984, and more particularly described as follows:  Beginning at a point on the land lot line dividing Land Lots 214 and 233 located 1,028.3' along such land lot line from the intersection of Land Lots 214, 213, and 234; thence N 13 degrees 86' E 755.5' to the centerline of Westbrook Road; thence N 71 degrees 44' E 243.5' along the centerline of Westbrook Road;

27

thence S 89 degrees 23' E 204.6' to a point; thence S 04 degrees 51' 350.2' to an iron pin in the center of a creek; thence 60 degrees 42' W 534.0' along the land lot line dividing Land Lots 214 and 233 to the iron pin and the point of beginning. Said property also bears the municipal address 3920 Westbrook Road, Suwanee, GA 30024;

Real property, together with all the buildings and improvements thereon, and all the rights, ways, privileges, servitudes, appurtenances and advantages thereunto belonging or in anywise appertaining, described as follows: Being a tract of land in Reserve "C", in Block 17, of Briarmeadow, Section one (1), a Subdivision in Harris County, Texas, according to the map thereof recorded in Volume 54, pages 4-8 of the Map Records of Harris County, Texas, and with the said tract being more fully described by metes and bounds as follows: Beginning at a 5/8 inch iron rod found for the southwesterly corner of the herein described tract, which point is also the southwesterly corner of the tract referred to previously as Reserve "C" and with the said beginning point being also on the northerly line of a 60 foot wide street known as Pagewood Lane at a distance of 250.00 feet westerly along said northerly line of Pagewood Lane from its intersection with the westerly line of Hillcroft Street, an 80 foot wide street; thence with the westerly line of Reserve "C", same also being the westerly line of the herein described tract and bearing north 00 degrees 17 minutes 15 seconds west a distance of 250.00 feet to a 5/8 inch iron rod found for the northwesterly corner of this tract; thence with a line bearing north 89 degrees 42 minutes 45 seconds east a distance of 250.00 feet to a 5/8 inch iron rod found for the northeasterly corner, which point is also on the westerly line of Hillcroft Street, an 80 foot wide street; thence with the westerly line of Hillcroft Street, which line is also the easterly line of this tract and bearing south 00 degrees 17 minutes 15 seconds east a distance of 100 feet to a 1/2 inch iron rod found marking the most easterly corner of this tract; thence with the easterly portion of the southerly boundary with a line bearing south 89 degrees 42 minutes 45 seconds west a distance of 150.00 feet to a 5/8 inch iron rod set for an interior corner of the herein described tract; thence with a line bearing south 00 degrees 17 minutes 15 seconds east a distance of 150.00 feet to a 5/8 inch iron rod set for corner of the northerly line of Pagewood Lane; thence with the northerly line of Pagewood Lane, same also being the westerly portion of the southerly boundary of this tract, and bearing south 89 degrees 42 minutes 45 seconds west a distance of 100.00 feet to the place of beginning of the herein described tract containing 40,000 square feet of land, more or less. Said property also bears the municipal address 3504 Hillcroft Street, Houston, TX 77057.

64.     If any of the above-described property, as a result of any act or omission of the

defendant:

- a.     cannot be located upon the exercise of due diligence;

- b.     has been transferred or sold to, or deposited with, a third party;

- c.     has been placed beyond the jurisdiction of the Court;

- d.     has been substantially diminished in value; or

- e.     has been commingled with other property which cannot be divided without
        difficulty;

the United States shall seek a money judgment and, pursuant to Title 21, United States Code,

Section 853(p), forfeiture of any other property of the defendant up to the value of said property.

A TRUE BILL:

GRAND JURY FOREPERSON

PETER G. STRASSER
UNITED STATES ATTORNEY

TIMOTHY P. LOPER
JARED L. HASTEN
TRIAL ATTORNEY
CRIMINAL DIVISION, FRAUD SECTION
UNITED STATES DEPARTMENT OF JUSTICE

New Orleans, Louisiana
September 26, 2019

29

FORM OBD-34

No.

# UNITED STATES DISTRICT COURT

Eastern _____ *District of* _____ Louisiana

Criminal _____ *Division*

---

## THE UNITED STATES OF AMERICA

vs.

### KHALID AHMED SATARY

## INDICTMENT

**FOR CONSPIRACY TO COMMIT HEALTH CARE FRAUD AND WIRE FRAUD, HEALTH CARE FRAUD, CONSPIRACY TO DEFRAUD THE UNITED STATES AND TO PAY AND RECEIVE ILLEGAL HEALTH CARE KICKBACKS AND BRIBES**

**VIOLATION:**   18 U.S.C. § 1349
18 U.S.C. § 1347
18 U.S.C. § 371
18 U.S.C. § 1956(h)
18 U.S.C. § 2
18 U.S.C. § 982



Foreperson

*A true*

---

*Filed in open court this* _____ *day of* _____

_____ *A.D.*

2019.

_____ *Clerk*

---

*Bail, $* _____

**JARED L. HASTEN**
**Trial Attorney**