```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA

**************************************************************
UNITED STATES OF AMERICA,

                              Criminal Action No. 19-197
VS.                           Section "D"
                              New Orleans, Louisiana
                              October 4, 2019

KHALID AHMED SATARY,
**************************************************************

            TRANSCRIPT OF ARRAIGNMENT AND DETENTION HEARING
             HEARD BEFORE THE HONORABLE KAREN WELLS ROBY
                    UNITED STATES MAGISTRATE JUDGE
```

<u>APPEARANCES:</u>

| | |
|---|---|
| FOR THE GOVERNMENT: | Timothy P. Loper |
| | Jared Hasten |
| | US Department of Justice |
| | Criminal Division |
| | 1400 New York Avenue, NW |
| | Suite 10100 |
| | Washington, DC 20005 |
| | |
| FOR THE DEFENDANT: | Arthur W. Leach |
| | Law Office of Arthur W. Leach |
| | 4080 McGinnis Ferry Road |
| | Suite 401 |
| | Alpharetta, GA 30005 |
| | |
| | Richard W. Westling |
| | Epstein Becker & Green, P.C. |
| | 1227 25th Street, NW |
| | Suite 700 |
| | Washington, DC 20037 |
| | |
| Official Court Reporter: | Nichelle N. Drake, RPR, CRR |
| | 500 Poydras Street, B-275 |
| | New Orleans, Louisiana 70130 |
| | (504) 589-7775 |

    Proceedings recorded by mechanical stenography,
transcript produced via computer.

I N D E X


E X A M I N A T I O N S

Witness                                                      Page
IRIS CONTRARES
    DIRECT EXAMINATION BY MR. LEACH                            27
    CROSS-EXAMINATION BY MR. LOPER                             32
    REDIRECT EXAMINATION BY MR. LEACH                          35

1      **P R O C E E D I N G S**

2                  (Call to order of the court.)

3          THE CASE MANAGER:  Criminal Action 2019-197, *United*

4      *States of America versus Khalid Ahmed Satary*, set for an

5      arraignment and a detention hearing on an indictment.

6          MR. LEACH:  Art Leach and Rich Westling here for

7      Mr. Satary and my *pro hac* has been granted.

8          MR. LOPER:  Tim Loper and Jared Hasten on behalf of

9      the United States, Judge.

10         MR. HASTEN:  Good morning, Your Honor.

11         THE COURT:  Good morning.  I believe this is the

12     government's request.  Actually, it's the defendant's motion

13     for a bond, correct?

14         MR. LEACH:  And they move for detention, so I move

15     for bond.

16         THE COURT:  Okay.  So -- oh, okay.  Well, let's do

17     the arraignment.  Let me catch up with my paperwork first.

18             How do you pronounce your last name, sir?

19         MR. SATARY:  Satary.

20         THE COURT:  Satary.  Mr. Satary, sir, have you

21     received a copy of the indictment that's been filed in this

22     matter, sir?

23         MR. SATARY:  Yes, Your Honor.

24         THE COURT:  Do you wish for the Court to summarize it

25     or do you wish to waive the reading at this time?

1        MR. SATARY:  Will waive it.

2        THE COURT:  Counsel for the government, please advise

3  Mr. Satary of the maximum penalties that he faces if he

4  pleads guilty or is found guilty as charged.

5        MR. LOPER:  Yes, Judge.

6        It's a six count indictment.  Count I is a conspiracy

7  to commit healthcare fraud and wire fraud which carries a

8  maximum statutory penalty of 20 years' imprisonment followed

9  by 3 years' supervised release and a fine of $250,000 or

10  twice the pecuniary gain or loss, whichever is greater.

11        Counts II, III, and IV are violations of Title 42,

12  United States Code 1327(b), also known as the Anti-Kickback

13  Statute.  Each violation carries a maximum statutory penalty

14  of 19 years' imprisonment followed by 3 years of supervised

15  release and a fine of the greater of $250,000 or twice the

16  pecuniary gain or loss of the amount of the bribe.

17        Count V is conspiracy to defraud the United States

18  and to receive -- pay and receive kickbacks in violation of

19  Title 18, United States Code, Section 371 which carries a

20  statutory maximum penalty of 5 years' imprisonment followed

21  by 3 years' supervised release and the same fine that I've

22  described before of $250,000 or twice the pecuniary gain or

23  loss, whichever is greater.

24        And then Count VI is conspiracy to commit money

25  laundering in violation of Title 18, United States Code,

1    Section 1956, which carries a maximum statutory penalty of

2    20 years' imprisonment and again a fine of $250,000, or twice

3    the amount of the money that's been laundered, along with 3

4    years of supervised release.

5           I just want to make sure.  Mr. Hasten, did I get that

6    right?

7           MR. HASTEN:  I believe the 1956 conspiracy, Your

8    Honor, that's a maximum penalty of up to $500,000.

9           MR. LOPER:  $500,000.  I apologize.

10          MR. HASTEN:  There's a special assessment of $100 per

11   conviction, for each count, Mr. Satary.

12          THE COURT:  All right.  Mr. Satary, you understand

13   the maximum penalties that you face, correct?

14          MR. SATARY:  Yes, Your Honor.

15          THE COURT:  Thank you, sir.

16          How do you plead?

17          MR. SATARY:  Not guilty.

18          THE COURT:  Thank you, sir.  Your pretrial conference

19   is set for November the 13th, 2019, at 2:00 p.m. before Judge

20   Vitter, and your trial is set on December the 2nd, 2019, at

21   9:00 a.m. before that same judge.

22          I believe also we have a request to detain by the

23   government and a corresponding motion for bond by the

24   defendant; is that correct?

25          MR. LOPER:  That's correct, Judge.  The United States

1   is moving pursuant to Title 18, United States Code,

2   Section 3142(f)(2) and (g) on the basis that the defendant

3   poses a serious risk of flight.  We are not pursuing under a

4   theory of danger to the community.

5           THE COURT:  All right.  Present your witness.

6           MR. LOPER:  If I may pursue by proffer to begin,

7   Judge.

8           THE COURT:  Sure.

9           MR. LOPER:  The three circumstances or the three

10  things that the statute tell the Court to consider are the

11  nature and circumstances of the offense charged, the weight

12  of the evidence against the defendant and the characteristics

13  of the defendant.  A fourth category is danger, but we're not

14  presenting any evidence today that the defendant poses a

15  danger to the community.  So I'll be focusing -- my proffer

16  will focus on the first three.

17          Starting with the nature and offenses of the offense

18  charged, the defendant is charged with a complex

19  sophisticated scheme to defraud Medicare out of hundreds of

20  millions of dollars.  Specifically, Mr. Satary owned three

21  labs, at least three labs, that are identified in the

22  indictment.  One is called Clio Labs located in Georgia.  One

23  is called Performance Labs in Oklahoma and a third one called

24  Lazarus Services here in New Orleans.  And in just two years,

25  between 2017 and 2019, these three labs went from literally

1    not having ever submitted a claim to Medicare of any

2    substance, basically zero, to over $500 million billed in

3    just two years and almost $200 million being paid by

4    Medicare.  And this was -- this tremendous growth was fueled

5    by Mr. Satary paying illegal bribes in exchange for tests

6    that his lab could run and bill to Medicare in exchange for

7    doctors' orders that authorized those tests.

8          Specifically, the indictment focuses on a test called

9    cancer genetic screening tests, and what these are are DNA

10   tests that will look at your DNA for a mutation that shows an

11   increased chance of cancer.  It doesn't actually detect

12   cancer.  It tells you if you have a mutation that might get

13   you an enhanced risk in the future, and Medicare will only

14   pay for these tests under very specific circumstances.  You

15   don't just get it because you're curious if you have --

16          THE COURT:  The doctor has to order it?

17          MR. LOPER:  The doctor has to order it.  It has to be

18   a doctor who is treating you for a specific illness, a doctor

19   who thinks you have cancer, that you might have some symptoms

20   of cancer or you've been diagnosed with cancer.  It can't

21   just be, you know, your family members have cancer, we want

22   to know.  It's a doctor who's treating a patient for a

23   specific medical problem.  Those are the tests that these

24   labs were billing at such an extreme rate that allowed this

25   explosion of billing.

1          The bribes that Mr. Satary was paying were being made

2     to what the labs called sales representatives, what I call

3     patient recruiters.  These patient recruiters use

4     telemarketing to harass elderly people, exploited their fears

5     of cancer to sell them on the promise of this test, that it

6     would help their families, convince these elderly people that

7     were being telemarketed to to accept the test, and then

8     through mail, these patient recruiters would obtain a DNA

9     sample from the patient.  So they would send a package to the

10    Medicare beneficiary that had a tube or a Q-tip.  The

11    beneficiary would spit into the tube or swab the inside of

12    their cheek and send it back to the patient recruiter.

13         Now, Mr. Satary, in order to bill Medicare, needed

14    both the DNA sample and the doctor's order.  So what the

15    patient recruiters did is they paid something called a

16    telemedicine company in order to get the doctor's order.  The

17    telemedicine company, there's nothing inherently wrong with

18    it if it's done correctly, but in this case, it was not done

19    correctly.

20         THE COURT:  What did they do wrong?

21         MR. LOPER:  So in this case, the doctors were

22    authorizing these tests without talking to the patients,

23    hundreds and hundreds -- there are doctors that Mr. Satary's

24    labs billed CGx tests for who were doing hundreds and

25    hundreds and hundreds of these tests without ever speaking to

1   a single patient, without conducting a visit, without having

2   ever known anything about this patient other than what the

3   patient recruiters had collected on the phone calls, and

4   those patient recruiters were not medical professionals.  The

5   patient recruiters pay the telemedicine company for the

6   doctor's consultation.  They get their doctor's order, and

7   now the patient recruiter has the DNA sample and the doctor's

8   order and that's what Mr. Satary is paying for.  He's paying

9   them on a per swab basis about $1,200 for each swab, up to

10  $1,800, $2,000 for each swab, and those are all illegal

11  kickbacks.  You are not allowed under the Anti-Kickback

12  Statute to pay someone for the referral of an item or a

13  service that Medicare will reimburse.

14         Now, the evidence that we've collected in this case

15  has demonstrated that Mr. Satary absolutely understood how

16  the patient recruiters were obtaining the DNA swabs, that the

17  patient recruiters were using telemarketing to contact these

18  Medicare beneficiaries, that the patient recruiters were

19  paying the telemedicine companies for the prescriptions, that

20  the telemedicine companies were not billing insurance

21  companies and independent third parties for these

22  consultations.  This was something the patient recruiters

23  were paying out of the money Mr. Satary paid them that he got

24  from Medicare.

25         So there's an inherent conflict built into this

Page 9

1   system where if the doctors don't authorize the test, the

2   patient recruiters can't pay -- can't send something to Mr.

3   Satary, Mr. Satary can't bill Medicare, and so the whole

4   system falls apart.  And so there's an inherent bias to

5   approve these tests because the patient recruiters are paying

6   the telemedicine companies.  Mr. Satary knew that.  And how

7   do we know that Mr. Satary knew that?

8         Well, in this investigation, we executed over a dozen

9   search warrants including on all three labs that Mr. Satary

10  owned.  We seized multiple e-mail accounts and cell phones

11  from various witnesses.  We have numerous cooperating

12  witnesses that have signed plea agreements, acknowledged

13  their criminal conduct in connection with Mr. Satary's

14  operations, and they've explained to us how the enterprise

15  worked.  We've interviewed former and current employees who

16  have explained Mr. Satary's knowledge of how the operation

17  worked, and I don't even know how many beneficiaries we've

18  interviewed who have said exactly how this scheme worked.  I

19  got a phone call.  I got this thing in the mail.  If I had

20  known -- by the way, these tests cost up to $6,000, $10,000

21  to Medicare.  Medicare is paying out $6,000 to $10,000 for

22  each test.

23        These Medicare beneficiaries say, if I had known it

24  was going to cost $6,000, I wouldn't have gotten it, I didn't

25  need it, I was just curious.  And that's explicitly what

1   Medicare will not pay for.

2          We've done undercover recordings including with Mr.

3   Satary himself.  So there is a mountain of evidence that we

4   are prepared to produce to defense counsel that establishes

5   the facts that I just went over.  This was a massive fraud,

6   and the evidence points to Mr. Satary as being the king pin

7   of this organization.

8          So I think what I'd like to talk about next is Mr.

9   Satary himself.  As defense notes in their motion --

10          THE COURT:  Go ahead.

11          MR. LOPER:  -- Mr. Satary is a convicted felon.  In

12   November of 2004, he was sentenced to five years'

13   imprisonment for running a pirated music scheme.  The factual

14   basis is under seal, but news reports show that it was about

15   a $50 million fake CD scheme he was running.  He did three

16   years of supervised release, and to his credit, Mr. Satary --

17   I found no evidence that he ever violated the terms of his

18   supervised release, but it is a crime of fraud.  And that's

19   something that I think tells us a little bit about what kind

20   of person Mr. Satary is.

21          Mr. Satary, the facts that we developed in this

22   investigation also shows he's extremely adept at hiding his

23   assets and his ownership over these companies.  When a lab

24   gets enrolled with Medicare, they have to fill out an

25   application.  And in that application, Medicare asks for

1   anybody who is a greater than five percent direct or indirect
2   owner of the lab and anybody who exercises managerial or
3   operational control.  Mr. Satary, when these labs enrolled
4   with Medicare, never disclosed his involvement in these labs.
5   Instead Clio Labs, there was an individual named Youssef
6   Satary who signed the Medicare application as being the
7   owner.  Performance Labs in Oklahoma and Lazarus down here in
8   New Orleans, it was Mr. Satary's wife, Syma Mustafa who
9   identified herself as the owner.  Witnesses we've interviewed
10  in this case, nobody knows who Ms. Mustafa is.  They have
11  never seen her.  They've never talked to her.  They've never
12  taken direction from her.  The person that they consistently
13  point to is Mr. Satary.  He's the guy who called the shots.
14  And it was never disclosed on these Medicare applications.
15  If Medicare had known that Mr. Satary lied in those
16  applications, it would have never paid a single dime to any
17  of these labs, much less almost $200 million.
18        Now, Mr. Satary also hid his ownership of bank
19  accounts that were receiving the money from Medicare.  So a
20  great example is Performance Labs in Oklahoma.  Performance
21  Labs, the account that receives the Medicare money, it's an
22  account at Bank of New York Mellon.  Mr. Satary is not a
23  signatory on that account.  There are two people that Mr.
24  Satary purchased the lab from who are the signatories, but
25  there is a standing order at the bank that that money gets

1    swept into an account at a bank called Grand South Bank.

2    It's a small community bank in South Carolina.  Mr. Satary is

3    the signatory on that account.  And over $20 million moves

4    from that Performance account at Grand South Bank to a

5    personal account at Bank of America in the name of

6    Ms. Mustafa.  So Mr. Satary knows how to hide money.  He

7    knows how to hide his control of companies, and he knows how

8    to hide from this investigation.

9           Specifically, in August of this month -- of this

10   year, the government executed a search warrant on a lab that

11   was a competitor of Mr. Satary's, and through our undercover

12   recordings, we know that Mr. Satary became -- started

13   becoming suspicious that he was under investigation as well

14   and he started moving evidence.  And we know that he's moved

15   evidence from Lazarus back to Atlanta, that things that used

16   to be there, computers that used to be in that location are

17   no longer there.  We know that changes were made at the Clio

18   headquarters where once you could walk through the doors from

19   one office to the next, they started installing locks.  They

20   started doing things to try to make it more difficult for us

21   to conduct our investigation and I think significantly Mr.

22   Satary also started closing accounts.

23          On September 10th, there were three accounts at a

24   bank called Veritext Bank where Mr. Satary's son was the

25   signatory of those accounts.  They were in the name of a

1    company called Souq Markets.  On September 10th, those

2    accounts had by the way received over $3 million out of this

3    scheme.  On September 10th, those accounts were closed and

4    that money is gone.  So Mr. Satary knows how to hide money.

5         We asked Mr. Satary to self-surrender last Friday

6    with the day that the arrest warrant was made public.  I was

7    in contact with his defense counsel.  I did not know where he

8    was, but I assumed there was a courthouse nearby he could

9    show up at.  He declined to show up on Friday.  The agents

10   spent the weekend scouring Houston looking for him.  He

11   ultimately self-reported Monday morning here in New Orleans.

12        In 2016, Mr. Satary went to the FBI office in Atlanta

13   and he gave a snippet --

14        THE COURT:  When was that?  I'm sorry --

15        MR. LOPER:  In 2016.  October of 2016.  And Mr.

16   Satary described a scheme that he was purportedly a victim

17   of, which was he had tried to buy a Jordanian passport

18   because he's a citizen of Israel.  Israel had withdrawn his

19   citizenship, and he was looking for a new passport so he

20   could travel to Qatar where he wanted to reside with his

21   family.  This is according to the 302 which I produced to

22   defense counsel.

23        Mr. Satary said, I found somebody who I could buy a

24   Jordanian passport from and I gave him money and,

25   essentially, he became the victim of a shake down scheme

1    where this individual requested more and more money,

2    threatened his family.  This is according to Mr. Satary's

3    statements to the FBI, and, ultimately, he never got that

4    Jordanian passport.  But, again, this shows this is a man who

5    knows how to cross international borders if he has a reason

6    to do so.

7         He is looking at decades in prison after trial based

8    on the loss amount, and he's going to be deported according

9    to those offenses.  These are deportable offenses.  He's

10   going to have to leave the country anyway.

11        And because of the missing money, I would submit,

12   Judge, part of my proffer is that there are tens of millions

13   of dollars that remain unaccounted for, specifically the

14   account at Bank of America in the name of his wife.  It

15   received almost well over $20 million out of this fraud,

16   $21 million from Performance Laboratories, 6.8 --  $600,080

17   from Lazarus and over $2 million from Clio Labs.  We have not

18   been able to locate a significant portion of that money.

19   Specifically, like I said, about $4.1 million was transferred

20   to these accounts in the name of Souq Markets that were

21   closed on September 10th of 2019.  We haven't been able to

22   find that money.  There was a $1.1 million withdrawal from

23   the account that we don't -- that is a cashier's check, but

24   we don't know where that cashier's check went.

25        There was -- there's a number of individuals who

1    received large sums of cash, an individual with the initials

2    MT who gets $630,000.  When you add up all the individuals

3    who receive money in excess of $100,000, it's another

4    $5 million that we haven't been able to locate, and there's

5    no justification that we can see for these individuals

6    receiving this money, several of whom have submitted

7    declarations in support of his bond package.

8         I know there was a little bit of argument in there.

9    I tried not to, but those are the facts that I would like to

10   rely upon in making my argument for detention.

11        THE COURT:  All right.

12        MR. LOPER:  I'm sorry.  I think I mentioned he's a

13   citizen of the United States.  He has not been naturalized

14   here in the United States.

15        MR. LEACH:  He's not a citizen.

16        THE COURT:  No, I thought he was formerly a citizen

17   of Israel, taken away --

18        MR. LOPER:  Taken away --

19        THE COURT:  Trying to find a place to land sounds

20   like to me.  I don't know.

21        MR. LOPER:  Right.  Right.  That is true.  But he is

22   not a naturalized citizen of the United States.

23        THE COURT:  Do you have any witnesses you want to

24   call?

25        MR. LOPER:  I do have an agent available, but I was

1   happy to proceed by proffer.

2           THE COURT:  Okay.  Your call.

3           MR. LOPER:  So I will not be calling a witness.

4           THE COURT:  All right.

5           MR. LEACH:  Do you rest?

6           MR. LOPER:  I rest the factual proffer.

7           MR. LEACH:  Okay.  Judge, obviously, you can tell by

8   what we have submitted, the first point is, we want to adopt

9   Ms. Contreras' recommendation to the court, which is

10  basically a personal recognizance bond.  But through my

11  conversations with Mr. Loper and understanding to some

12  extent, not to this level of detail, the position that the

13  government intended to take, we determined to put together a

14  package so that the Court would have many options before it

15  in terms of what could happen, what you could do in terms of

16  a bond here.

17          Judge, we understand what the indictment says.

18  Frankly, listening to counsel and the proffer that was made,

19  I've got several different indictments here, Judge, that I

20  could submit to you so that you could look at what I intended

21  is the cookie-cutter nature of what is being alleged here.

22  And the point that I want to make to the Court is that we

23  have defenses.  And there are differences in what happened

24  through Ms. -- the labs that are charged in this indictment

25  as opposed to the other -- other cases.  You've got cases

1   where there is absolutely zero effort in compliance, no

2   effort whatsoever.

3          I have shared in my conversations with Mr. Loper

4   leading to today the efforts that these labs made towards

5   compliance, and Mr. Loper has acknowledged to me that he is

6   aware of those efforts.  It is those efforts, Judge, that set

7   us apart.

8          Additionally, a huge and I mean a huge portion of the

9   business that is done by these labs are brick and mortar

10  doctor's offices, things of that nature.  They're not

11  telemarketers.  They're not connected to marketing, all that

12  other material that has been discussed here.

13         So the question is, of the dollars that we're talking

14  about, what would be legitimate claims against Medicare and

15  what would be telemarketing claims.  On the telemarketing

16  side, which is what this case is all about, is the

17  telemarketing side, is where our compliance and defense

18  becomes important in this case.  And I'm asserting to the

19  Court and I've told Mr. Loper it will come as no surprise and

20  his co-counsel that we believe that we have defenses that we

21  can assert when it comes to this.

22         What's happening here, Judge, just so that you can

23  get a broader overview of the way that I'm seeing this, is

24  that what the government is doing in our case, it is

25  conflating the lab's responsibilities with the doctor's

1    responsibilities.  And I heard his proffer where he's saying

2    that the doctors are in on the deal, and that is true on the

3    other cases.  The other cases are straight up frauds.  We

4    have defenses when it comes to that.  That's what I want to

5    assert to the Court.

6         Now, just in terms of the strength of the case, all

7    this business about undercover recordings -- and, you know, I

8    don't have access to any of that material right now.  So I

9    have no way to judge or meter what's going on there.

10        In terms of his prior conviction, Judge, 15 years

11   ago.  And I honestly think that the events in his conviction,

12   when we're just talking about a bond situation, totally

13   nonviolent, there's never been any allegation of violence.

14   This is not a presumption case.  It was 15 years ago.  He

15   went through his confinement phase.  He went through

16   supervised release.  He was completely compliant.

17        And there's another step that Ms. Contreras mentions,

18   and that is because of his status, his immigration status,

19   he's stateless.  He has no passport.  He has nothing.  He has

20   to go and meet with immigration every six months.  He has

21   never missed a single one of those visits to immigration

22   where he has to go and check in with them.  So I just think

23   the entire prior conviction because of the age of it -- and

24   that is something that the rules of evidence also recognized

25   that these things do get old over time.  You know, I think it

1    cuts to our side in terms of the issue that's before the

2    Court right now, which is bond.

3         Now, I heard an awful lot about money and accounts,

4    but I didn't hear where anything was done outside of the

5    $1.1 million cashier's check where money goes to cash.  These

6    are all transactions.

7         Additionally, he talks about a bank account that was

8    suddenly closed by Mr. Satary.  That bank account wasn't

9    closed by Mr. Satary.  It was closed by the bank.  And I'll

10   bet you anything, Judge, the reason why the bank closed that

11   account is because they issued a subpoena to the bank.  I

12   don't know what the Court's experience is on the defense

13   side, but this happens all the time where you've got a

14   client, the client has a flurry of subpoenas that go out to

15   the banks and suddenly all the accounts are closed because

16   they don't want the liability associated with it.  They don't

17   want the work associated with that kind of case.

18        The real bottom line in terms of whether or not what

19   happened in 2016 with the FBI was any effort to cross the

20   border is totally a red herring, Judge.  Think about what

21   we're talking about here.  Mr. Satary was defrauded of

22   millions of dollars.  Many of those millions of dollars he

23   borrowed from friends in an effort to do an investment.  Not

24   to get a passport.  He got defrauded.  He went to the FBI,

25   Judge.  We're talking about a 302.  We're talking about a

1   report from the FBI, an interview of Mr. Satary where he's

2   telling them what's happened and he's asking for their help.

3       Additionally, Judge, to the extent you're interested

4   in hearing it, we can talk at sidebar about Mr. Satary's

5   relationship with the FBI.  That wasn't his first contact

6   with the FBI.  Let's just put it that way.

7       As far as the money is concerned, I think outside of

8   the $1.1 million, it's all traceable and we can probably

9   trace the $1.1 million.

10      Judge, there are many reasons why I think bond should

11  be granted in the case.  Mr. Satary has got friends and

12  family in the courtroom.  They traveled from Atlanta to be

13  here in front of you.  I want to discuss those reasons

14  briefly with the Court.  Should I do that now?  Should I

15  wait?

16      THE COURT:  Proceed.

17      MR. LEACH:  Okay.  Judge, Mr. Satary has known about

18  this investigation since December of 2018.  In December of

19  2018, he received a communication from the government giving

20  him a grand jury subpoena.  So for that entire period of

21  time, he has known that the government has been investigating

22  him.  Did he take any effort to run, to hide?  No.

23      Within the last two weeks, we have known that

24  indictments were coming down.  It wasn't that we had some

25  sort of special inside intel or anything.  The government was

1   telling the world that these indictments were coming down.

2   So in a series of indictments, in a series of searches over

3   days, we knew what was happening.  Mr. Satary did not run.

4        So the idea that he is going to run when he's being

5   investigated by the District of New Jersey, Southern District

6   of Florida and Main Justice and doesn't take off, his best

7   occasion to go.  They seized these accounts.  He could have

8   taken millions of dollars and taken off, but he didn't.

9        Counsel wants to make a big deal about the fact that

10  he asked him to report last Friday.  He was on a business

11  trip.  I was out of town.  I was in town, but I was on my way

12  out of town.  And I got to speak to Mr. Loper when the

13  searched occurred.  I went to the site.  They connected me

14  with him.  And I just said, we'll show up in New Orleans on

15  Monday, which is exactly what we did, Judge.  We turned it

16  right around.  We ended up here in New Orleans before you on

17  Monday.

18       Now, it's an important point, Judge, that the

19  subpoena that was issued in December of 2018 was a grand jury

20  subpoena.  Mr. Satary had sophisticated criminal counsel.

21  They know what a grand jury subpoena means.  And he clearly

22  knew the government's inquiry was criminal in nature.

23       The allegations in the indictment that Mr. Satary is

24  associated with Clio and the other labs that were mentioned

25  are all about genetic testing.  What counsel didn't mention

1    is that these labs, many of the labs that are involved do

2    other forms of testing, like blood testing, urine testing,

3    all these different types of tests.  They do all this kind of

4    work.  I get it that counsel only wants to focus on genetic

5    testing and that's fine.  But there is a lot -- when they

6    come in and seize wholesale accounts, they're seizing

7    untainted assets as well, both tainted and untainted, by

8    their reading of what's going on.  So the fact that he is

9    throwing around these large numbers does not mean that

10   everything that's involved in that number is improper.

11        I've already mentioned to you the compliance that we

12   will utilize as a defense.  I think one other factor that,

13   Judge, you need to consider here is that counsel mentioned

14   the fact that there were searches that occurred.  Those

15   searches occurred last Friday.  They are -- I asked counsel

16   how many terabytes of information.  It's approximately eight

17   terabytes of information.  I am sure that you have had

18   situations where you got these massive kind of seizures.  A

19   terabyte is approximately 900 million pages of pages, a

20   single terabyte, and we got nine of them, or eight or nine of

21   them.

22        So what happens, Judge, is that the government has to

23   do a privilege review.  Once they do the privilege review,

24   they're going to do a word search.  Once they do the word

25   search, they're going to figure out what's going to be

1    seized, which means somebody is going to have to put eyes on

2    every one of those documents that they're looking at.  This

3    entire process, to the point at which we receive the items

4    that are actually seized pursuant to the search warrant that

5    they executed last Friday -- and be mindful, we had no role

6    in the decision of arresting Mr. Satary last Friday.  They

7    could have conducted those searches and left him out.  They

8    would have had plenty of time.  But now they want to detain

9    him and have him in jail, and my best estimate, having done

10   some of these cases, Judge, is we're talking about the better

11   part of a year.  The better part of a year before we even get

12   to file our motion to suppress based on what is actually

13   seized as a result of it.  Mr. Satary has no passport.  He

14   has no driver's license.  He is stateless.

15          THE COURT:  How does he get around?

16          MR. LEACH:  He has people drive him.  That's how he

17   gets around.  He does not drive a car.

18          So, Judge, in a case like this, the government has

19   the burden of proof.  It is clear by their statement here,

20   the danger to the community is not an issue.  But when you

21   look at all the declarations that I provided to the Court,

22   the reason why I was doing that, Judge, is because Mr. Loper

23   indicated to me that any assets that my client has didn't

24   impress him in terms of a bond.  So I wanted to find in his

25   community people who would stand up, and I said from $100 to

1    whatever it is you'll contribute, I would like the Court to

2    see, you know, what kind of support he has got within his

3    community.  And there's about $2.8 million worth of assets

4    that are there.  I think based upon probation's

5    recommendation, that's exceedingly high and unnecessary.

6         And think about the logistical difficulty.  I mean,

7    it's over 40 and less than 50 people that I've got on

8    declarations and committed to present bond money to the

9    court.  You know, I would have to do that in Atlanta.  I know

10   you're familiar with that process.  You do it for other

11   courts I'm sure.  I think that you should set a bond we can

12   post.  I think there are restrictions that you can apply to

13   this case.

14        He resides at home with his wife and his family.  His

15   wife owns the house.  They're willing to post the house.

16   Mr. Loper told me he's not impressed with that.  I understand

17   that, but that is still an asset that would be lost.  Judge,

18   all this money that they've seized out of all these accounts

19   in other cases that I've had, we posted that money as well.

20   Granted the government wants to forfeiture that money, I'm

21   sure that's what we're going to see eventually, but for our

22   purposes right now, if there was, say, $20 million sitting in

23   the government's hand and he leaves, the government gets all

24   that money, right now today.  So, I mean, I just think if you

25   look at the declarations and you look at his history to

1   include his conviction, his supervised release, all the

2   contacts with immigration, this is not a situation where he

3   should be detained.

4         The other point that I'll make, Judge, is with regard

5   to this thing in 2016.  We have differing views on what that

6   302 says.  Obviously, they were focused on this passport

7   situation.  But if you go to the bottom of page 4, you will

8   see that the agent actually did report the fraud that I'm

9   talking about, which is the reason Mr. Satary went to the

10  FBI.  So I think when you look at the nature and

11  circumstances of the crime here, I think because it's not a

12  crime of violence, because it's not a presumption case, for

13  our purposes here today, that bends our way in terms of

14  whether we should get a bond.

15        When you look at the weight of evidence, Judge,

16  there's nothing I can do with an indictment like this because

17  they got all the information.  I have no discovery from the

18  government whatsoever.  But I can tell you, that as I've

19  already argued, we're different and I think our compliance is

20  going to make out a defense.  His history and

21  characteristics, I think that based on everything you see in

22  the probation report, everything that you see in the

23  declarations that we've submitted, he is fine in terms of

24  being released on bond.  Danger is not an issue.

25        The only thing that I would like to do is I would

1    like to call Ms. Contreras so that she can talk about her

2    effort since she undertook that effort.

3            THE COURT:  That's fine.

4            MR. LEACH:  Iris.

5            Can he sit, Your Honor?

6            THE COURT:  Of course.

7            MR. LOPER:  Judge, should I be seated during the

8    direct?

9            THE COURT:  Yes, please.

10           THE CASE MANAGER:  Please raise your right hand.

11               (Witness administered oath.)

12           State your name and spell it for the record, please.

13           THE WITNESS:  Iris Contreras, I-r-i-s

14   C-o-n-t-r-e-r-a-s.

15                       IRIS CONTRARES,

16   called as a witness, being first duly sworn, examined and

17   testifies as follows:

18                   DIRECT EXAMINATION

19   BY MR. LEACH:

20     Q.  Ms. Contreras, we're looking at a pretrial services

21   report.  Are you the author of this report?

22     A.  Yes, I am.

23     Q.  And was this report approved by your supervisor?

24     A.  Yes, it was.

25     Q.  And that's Cheryl Robert?

1      **A.**  Correct.

2      **Q.**  I want to talk to you about the defendant, his

3   history, specifically, how he came to the United States.  Did

4   you investigate that aspect of it?

5      **A.**  Yes, I did.

6      **Q.**  And tell me what you learned about how he came to be

7   in the United States of America.

8      **A.**  From what I learned from Mr. Satary and his previous

9   presentence investigation out of the Northern District of

10  Georgia was that Mr. Satary came at the age of 5 -- I believe

11  he left from Gaza and then went to Dubai with his family.  I

12  believe his father had some kind of accident and passed away

13  into which he relocated again to Dubai I believe.  From Dubai

14  I believe he also registered for a visa to become a student

15  and then went to school here in the United States and it

16  appears he never left.

17     **Q.**  And did you find that he came to the United States on

18  Israeli travel documents?

19     **A.**  I did not get that information.

20     **Q.**  And when you say you got the report from Atlanta,

21  you're talking about the report prior to sentencing?

22     **A.**  No, that was -- yes, the report prior to sentencing,

23  yes.

24     **Q.**  So that's a detailed sentencing report?

25     **A.**  Yes.

1      **Q.**  Okay.  Thank you.

2          How long has he been in the United States?

3      **A.**  I believe he has been here since the age -- he's been

4   here for 28 years.

5      **Q.**  And you mentioned in the report -- and I'm looking at

6   defendant's history, residence, family ties -- that he is a

7   stateless citizen.  Can you explain that to us, please?

8      **A.**  Yes.  When I was discussing the interview with Mr.

9   Satary, I asked him where he was born into which he told me

10  Gaza and Palestine.  Palestine is not a country, so it's not

11  recognized as a country.  He also told me that he did not

12  have a passport, that it was taken away from him and that he

13  is currently stateless.

14         Upon hearing this information in places where he's

15  lived like Dubai, I further reached out to customs --

16  Immigration Customs Enforcement for thorough information on

17  any reporting status that he might have there, deportation

18  status, any, you know, concerns that he has with ICE.

19  BY MR. LEACH:

20     **Q.**  And did ICE confirm the information that you gathered

21  from Mr. Satary and from your investigation?

22     **A.**  Yes, they did.

23     **Q.**  Okay.  Did your investigation show that he has no

24  passport presently?

25     **A.**  Correct, and he has no citizenship status.

1    **Q.**   Right.  Now, I see that you ran a PTRA risk score --

2    **A.**   Correct.

3    **Q.**   -- on Mr. Satary.  What was the result of that?

4    **A.**   His score was a 5 and he was in a Category II of a

5    sample size of one thousand -- I'm sorry.  One second.

6    181,739 defendants, he fell within 29 percent of the

7    Category II which predicts a 3 percent failure to appear, a 3

8    percent of new criminal arrests and a 5 percent of both a

9    failure to appear and new criminal arrests, and a 4 percent

10   that he will commit a technical violation, and a 9 percent

11   that he would engage in a combination of failure to appear,

12   new criminal arrest or technical violations.

13   **Q.**   Did the result on the PTRA risk score go into the

14   recommendation you made to this court?

15   **A.**   Yes, it did.

16   **Q.**   And what was your recommendation for the Court?

17   **A.**   My recommendation not only was the risk assessment,

18   it was also the fact that he has successfully completed

19   probation while he was in Georgia and he has been reporting

20   for 10 years to customs enforcement and he will probably be

21   reporting for another 10 years.

22          What was not discussed or I'm not sure if anybody is

23   aware is that if he were to be deported, a country has to

24   accept him back, which at this time is not the case.  So he's

25   not -- I mean, it does not appear that he's going to be

1    deported any time soon and would probably be reporting the

2    next 10 years to Immigration Customs Enforcement as it was

3    discussed to me by them.  So given the fact that he is

4    extremely compliant with probation and reporting with customs

5    immigration and enforcement and he is a low risk for

6    nonappearance or flight, it was recommended that he be

7    released on bond without supervision.

8    BY MR. LEACH:

9        Q.  And you specifically recommended a personal

10   recognizance bond?

11       A.  Yes.

12       Q.  And you spoke with his family members; is that

13   correct?

14       A.  Correct.

15       Q.  Did you speak with Jordan Satary?

16       A.  Yes, I did.

17       Q.  And Jordan Satary's English is conversing; isn't that

18   correct?

19       A.  He's more than -- I would say he's fluent.

20       Q.  He's fluent, yes.

21           Okay.  And did you also endeavor to speak to Syma?

22       A.  No, I did not.

23       Q.  You did not?

24       A.  No.

25       Q.  Syma is the wife?

1    **A.**  Yes.  But Mrs. Satary did mention that she may be

2    conversational, but not fluent in English.

3        **Q.**  And Jordan told you that?

4        **A.**  No.  Well, yes, he also mentioned to me.

5        **Q.**  How did you know that?

6        **A.**  Through Mr. Satary himself.

7        **Q.**  Through Mr. Satary.

8            MR. LEACH:  Tender the witness.

9                        CROSS-EXAMINATION

10   BY MR. LOPER:

11       **Q.**  When you prepared your report, did you have access to

12   Medicare enrollment records?

13       **A.**  No.

14       **Q.**  Did you have access to the bank records for these

15   companies?

16       **A.**  No.

17       **Q.**  Did you have access to the Medicare data for these

18   companies?

19       **A.**  No.

20       **Q.**  The incorporation records that they filed with the

21   Secretary of State?

22       **A.**  No.

23       **Q.**  So in your report, you weren't aware that Mr. Satary

24   hid his control of these companies through lies in those

25   documents; is that correct?

1    **A.**   I was only based on writing this report with the

2    indictment only, so whatever was on the indictment is what is

3    based.

4    **Q.**   What about the account in Ms. Mustafa's name at Bank

5    of America that received $20 million that is directly

6    traceable to this fraud?  Were you aware of that account when

7    you wrote this report?

8    **A.**   No.

9    **Q.**   Was the fact that this account existed incorporated

10   in the PTRA score that was calculated for Mr. Satary?

11   **A.**   No.

12   **Q.**   What about the fact that he tried to get a Jordanian

13   passport in 2016?  Is that part of that score?

14   **A.**   No.

15   **Q.**   What about the fact that Mr. Satary when he went into

16   the FBI in 2016 was actually under investigation for running

17   a different lab called Confirmatrix?  Was that part of this

18   score?

19   **A.**   No.

20   **Q.**   And the fact that the Eastern District of Tennessee

21   conducted a search warrant of that lab in 2016, the month

22   after Mr. Satary came in, that's not part of your report; is

23   it?

24   **A.**   No.

25   **Q.**   All right.  You mentioned that no country will accept

1   him back.  Do you know that for a fact?

2       A.  Yes.

3       Q.  Have you talked to representatives from other

4   countries about whether or not they might take him back?

5       A.  I spoke to a supervisor with customs immigration and

6   enforcement who had told me unless that country gives us

7   orders that they'll take him back, they're not taking him

8   back.

9       Q.  But if a country agrees they will take him back?

10      A.  Yes.

11      Q.  Do you know for a fact no country will take him back?

12      A.  At this time, as per Immigration Customs Enforcement,

13  no country has taken him back.

14      Q.  No country has taken him back.

15      A.  Uh-huh.

16      Q.  You mentioned that Mr. Satary came to the United

17  States in 1991, so he's been here for approximately 28 years?

18      A.  Yes.

19      Q.  He's spent a couple of those years committing a

20  piracy fraud?  Do you remember that as the crime --

21      A.  Uh-huh.

22      Q.  -- he pled guilty to?  Spent five years of that time

23  in jail, three years of that time under supervised release,

24  and then in 2016 he was part of a new criminal investigation.

25  Then he's now done the indictment alleged in 2017 to 2019.

1    That's another two years of criminal conduct, so that's about

2    -- out of that 28 years, more than a decade of that time he's

3    either been under criminal investigation or in jail; is that

4    fair to say?

5        A.   I can only discuss what we found, not anything

6    regarding 2016.

7            MR. LOPER:  All right.  No further questions.

8                        REDIRECT EXAMINATION

9    BY MR. LEACH:

10       Q.   A couple followups, did you ever see any charges

11   relating to Confirmatrix?

12       A.   No.

13       Q.   Did you know the name of that lab Confirmatrix --

14       A.   No.

15       Q.   -- prior to counsel mentioning it to you?

16            Did you talk to the government --

17       A.   No.

18       Q.   -- in relation to your report?

19            Is that something that you do from time to time?

20       A.   This is a -- we do but this is an independent

21   investigation and assessment based on our department whether

22   the defendant is a flight risk or danger to the community.

23            MR. LEACH:  That's all I have.

24            That's all I have, Judge.

25            THE COURT:  All right.

1              MR. LOPER:  Judge, if I may be heard on a few points

2    in rebuttal to counsel's presentation.

3              I just want to point out that I am the person

4    responsible, I am the lead prosecutor on the other cases or

5    at least some of the other cases counsel referred to, in

6    particular Minal Patel who was indicted for running a $500

7    million scam -- fraud, alleged fraud, involving this cancer

8    genetic testing.  I did not see pretrial detention in that

9    case because Mr. Patel is a completely different kind of

10   person.  He didn't have the background that Mr. Satary has in

11   this case.  We were able to seize virtually all of

12   Mr. Patel's assets.  In this case, there is this personal

13   account that got over $20 million, and we weren't able to

14   recover, I mean, less than 5 of that money.  We don't know

15   where it's at.  That is a grave concern to the government in

16   this case.

17             You know, the notion that the subpoena that we issued

18   back in December of last year put him on notice that he was

19   under criminal investigation, I would respectfully disagree

20   with that.  It was a very targeted subpoena of what we asked

21   for, records relating to one telemarketer.  Nothing from the

22   face of that subpoena would have told anybody that we were

23   looking at the labs themselves.  So I don't know how much

24   credence to put into that.

25             In terms of the burden of proof, you know, it's the

1   government's burden to prove by a preponderance of the

2   evidence that the defendant is a serious risk of flight, and

3   I think that when you look at the combined amount of money

4   that we can't find with the kind of history of deceit and the

5   allegations in this case of hiding his ownership of these

6   companies combined with the kind of prison sentence he's

7   looking at and his lack of ties to both New Orleans and his

8   ability to kind of work outside of the borders of this

9   country, by which I mean that he's not a citizen of this

10  country, his family members could easily leave the country.

11  It's not that difficult when you have $20 million at your

12  disposal to get out of this country when you're looking at

13  decades in prison.  I think there's a serious motivation,

14  there's a means to do so, and there's a history of conduct

15  that shows that he is the kind of person that might try to do

16  that and that's why the government has such concerns.

17          THE COURT:  Let me ask you a question.

18          MR. LOPER:  Yes, Judge.

19          THE COURT:  That earlier conviction that he had, what

20  was that for?

21          MR. LOPER:  The technical charge was a conspiracy to

22  defraud the United States.

23          THE COURT:  All right.  And when he was charged with

24  that, was he placed on bond?

25          MR. LOPER:  He did receive a bond if my memory serves

1    correctly.

2          THE COURT:  How much?  Do you know?

3          MR. LOPER:  I don't have that off the top of my head.

4          THE COURT:  Did he comply with the conditions of the

5    bond?

6          MR. LOPER:  As far as I'm aware, yes.

7          I would say that this case is very different.  The

8    guideline range of this case -- there is no five-year prison

9    sentence in this case, Judge.  This is a $500 million fraud,

10   and the guidelines put his guideline range in excess of

11   30 years if he goes to trial and he's convicted.

12         Finally, I promised defense counsel that I would do

13   this at sidebar due to the family members that Mr. Satary has

14   here.

15         THE COURT:  Well, let's do the sidebar.

16         MR. LOPER:  Thank you, Judge.  May I have a sidebar?

17         (WHEREUPON, the following proceedings were held at

18   the bench:)

19         MR. LOPER:  I just wanted to take this opportunity to

20   address the multiple declarations that were supported --

21   offered in support of him, describing him as a family man.

22   Part of my factual proffer would that be in the cell phones

23   that we've recovered, it paints a very different picture of

24   who Mr. Satary is.

25         THE COURT:  What does that mean?

1        MR. LOPER:  It means that he is -- there are

2  discussions of him purchasing Viagra that's not prescribed by

3  any doctors for the purpose of coming down to south Florida

4  for extramarital --- and I'm not the moral police.  I don't

5  care about that.

6        THE COURT:  Sounds like the wife has a problem.  How

7  does the wife's problem weigh in on the issue that I have to

8  decide?

9        MR. LOPER:  So the reason I mention it is just that

10 he is described repeatedly in these declarations as a family

11 man.

12       THE COURT:  He could be both.  I've seen it.

13       MR. LOPER:  All right.  It was just the character --

14       THE COURT:  Whether you improve on it or not is a

15 different issue.

16       MR. LOPER:  That's why I raised it, Judge.

17       MR. LEACH:  One more point I would like to make at

18 sidebar is the 302 that Mr. Loper provided to me indicates

19 that Mr. Satary was an FBI source and that dramatically

20 changes his relationship with the government.

21       MR. LOPER:  We have not been able to confirm that.

22       MR. LEACH:  Oh, it's in there.  It's on the first

23 page.

24       MR. LOPER:  What it says is that Mr. Satary says he

25 was a source.

1          MR. LEACH:  No.  No.  No.

2          MR. LOPER:  I've got a copy of it.  We can take a

3   look at it.

4          THE COURT:  May I see it?

5          MR. LOPER:  Yes, Judge.

6          MR. LEACH:  The other thing I think you will find

7   when you read this is that the agent who wrote this report,

8   if you read it carefully -- English is not his first

9   language.  What the FBI has got -- they got, you know, agents

10  that are fluent in all the Arabic languages and that's what's

11  going on in this report.

12          And since you have it, Judge, you might want to go to

13  page 4 of the bottom where he's talking about the fraud that

14  I say is the real reason why he ended up going to the FBI.

15  He wanted to get their assistance in trying to get that money

16  back.  Never happened, but he's going to the FBI --

17          MR. LOPER:  And a month later the FBI executed a

18  search warrant on his lab Confirmatrix.

19          MR. LEACH:  Confirmatrix never got indicted because

20  there was no problem there.  So, I mean, these are all things

21  we'll iron out when the day comes.

22          THE COURT:  Okay.  Anything else?

23          MR. LEACH:  Not from me.

24          MR. LOPER:  Nothing further from the government,

25  Judge.

1           (Discussion held off the record.)

2                (In open court.)

3       THE COURT:  Anything further from counsel?

4       MR. LEACH:  Judge, I just have one more thought if I

5  can just give you this.  On the cashier's check, on the $1.1

6  million, I mean, they can get a copy of it when it clears.

7  They're going to know where that money went eventually.  So I

8  think every bit of that, all that money is traceable over

9  time.

10      THE COURT:  So it seems to me -- and I'm directing

11 this to counsel for the government.  What I hear you tell me

12 is, pre-punish him because of what we believe we can prove,

13 but I haven't heard evidence of what I'm supposed to consider

14 which is whether or not he will comply and show up in court.

15 I have learned that with his prior conviction that he was on

16 a bond and that there were no -- there was no suggestion that

17 he was noncompliant.

18      I asked my PO what was the bond then.  I think she

19 said he might have been on a 25,000 unsecured bond, but no

20 other restrictions.  She also pointed out that he's currently

21 being supervised by immigration given his current status and

22 has to report, and according to my officer's concern about

23 the risk of over-supervising -- I do have a financial crime,

24 right?  And I don't see any -- certainly, I don't see any

25 immediate danger to the public.

1      Certainly, Mr. Satary, if what they're saying is

2 true, you can stop doing what you're doing.

3      But other than that, I think my officer's

4 recommendation is the appropriate one to -- for the Court to

5 accept.  And I'll ask her to read it into the record at this

6 time.  I will release him on the bond as recommended.

7      And there has been no issue, right, with compliance

8 with immigration's supervision?

9      MS. CONTRERAS:  Not one, Your Honor, for the past 10

10 years.

11      United States Pretrial Services recommends for the

12 bond, recommends that the defendant does not appear to pose a

13 risk of nonappearance nor of any danger to the community.

14 Based on these factors, we recommend a release under personal

15 recognizance bond without supervision as respectfully

16 recommended.  And if the Court -- and it is also recommended

17 that he return back to his residence in Georgia with his

18 family.

19      THE COURT:  I'll adopt that as the Court's order.

20      MR. LEACH:  Your Honor, one other issue on that.  He

21 will need to have the ability to travel back and forth.  I

22 just want to make sure that's included --

23      THE COURT:  Travel back and forth to?  From Georgia

24 to Louisiana?

25      MR. LEACH:  From home to here obviously.

1          THE COURT:  Yes, that should be added to it.  There

2     are no travel restrictions.

3          MR. LEACH:  I just wanted to confirm.

4          MR. LOPER:  Judge, before we recess, just wanted to

5     ask a couple things.

6          THE COURT:  Certainly.

7          MR. LOPER:  One I would request a stay while we

8     appeal this decision to the district court judge.

9     Respectfully, I understand your position, but we take a very

10    different view of --

11         THE COURT:  Who is your district court judge?

12         MR. LOPER:  Judge Vitter.

13         THE COURT:  Judge Vitter.  What does that mean, "a

14    stay"?

15         MR. HASTEN:  That he would stay in custody --

16         THE COURT:  No.  I'm sorry.  That was a bad question.

17         How long are you anticipating and will you file your

18    request this afternoon?

19         MR. LOPER:  Yes, Judge.

20         THE COURT:  I will stay it this afternoon, but I'll

21    call Judge Vitter and let her know it's coming.  I will also

22    walk over all this stuff that I've looked at so she'll have

23    it in advance of your filing and she maybe can handle it

24    today.

25         MR. LOPER:  And I know you ruled, but I'd ask for

1    some special conditions on bond also in the event --

2         THE COURT:  You didn't ask me for any before.  You

3    just told me to lock him up.  And now you're asking me for

4    special conditions after the fact.  What's that about?

5         MR. LOPER:  Judge, respectfully, I was asking for

6    pretrial detention.  That request was denied, and now we're

7    talking about bond.  So I would like an opportunity to --

8         THE COURT:  Yeah, but they always -- talk.  Go ahead.

9    Talk.

10        MR. LOPER:  Judge, I would just ask that he not be

11   employed in the healthcare field.  That means -- that is a

12   standard condition in Medicare fraud cases that we request

13   that he not be allowed to work for an entity that submits

14   claims to insurance companies.

15        THE COURT:  I don't have any issue with that.

16        MR. LOPER:  And also that his travel -- I just want

17   to make sure the travel is restricted between the Northern

18   District of Georgia and the Eastern District of Louisiana and

19   that he not be allowed to travel outside of those districts

20   without prior notification to probation.

21        MR. LEACH:  I thought he already lost that one,

22   Judge.

23        THE COURT:  Why?

24        MR. LOPER:  I know the defendant has business

25   dealings in Houston.

1        THE COURT:  Where he gonna flee?

2        MR. LOPER:  Judge, there's --

3        THE COURT:  Where he gonna flee?

4        MR. LOPER:  Judge, any place in the world I have had

5    defendants flee.

6        MR. LEACH:  Judge, he has restaurants and a grocery

7    store.  I mean, surely --

8        THE COURT:  Work in the restaurant and the grocery

9    stores.  Stay the heck away from the medical stuff.  I'm not

10   restricting, no.

11       MR. LOPER:  Those are the two conditions I wanted to

12   --

13       THE COURT:  I'm going to call Judge Vitter to let her

14   know you're coming, stay pending that.  I don't know if

15   she'll deal with it today or when, but I'll alert her.

16       MR. LOPER:  Thank you, Judge.

17       THE COURT:  Court's in recess.

18                        *  *  *  *

19       (WHEREUPON, the proceedings were adjourned.)

20                        *  *  *  *

21

22

23

24

25

1                    REPORTER'S CERTIFICATE

2          I, Nichelle N. Drake, RPR, CRR, Official Court
   Reporter, United States District Court, Eastern District of
3  Louisiana, do hereby certify that the foregoing is a true and
   correct transcript, to the best of my ability and
4  understanding, from the record of the proceedings in the
   above-entitled and numbered matter.

5

6                       /s/ Nichelle N. Drake
                        Official Court Reporter

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25