## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| | ) | **Criminal No. 2:19-CR-00197** |
| **v.** | ) | |
| | ) | **Section "D"** |
| | ) | **Judge Wendy B. Vitter** |
| **KHALID AHMED SATARY,** | ) | |
| | ) | **Magistrate (4)** |
| **Defendant.** | ) | **Magistrate Judge Roby** |

### DEFENDANT KHALID SATARY'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO COMPEL DISCOVERY PURSUANT TO FED. R. CRIM. P. 16 AND *BRADY* AND *GIGLIO*

As required by the Court's most recent scheduling order, (Doc. 48), Defendant Khalid Satary ("Satary") has filed this motion to compel discovery.  Satary seeks multiple forms of relief including: 1) the identification of "irrelevant" discovery materials and any exculpatory material of which the government is currently aware; 2) the elimination of inappropriate and unnecessary redactions of the discovery materials by the government; 3) the prompt disclosure of *Giglio* materials; 4) the "claw back" of Satary's and his family's personal financial information; and 5) the identification of basic information regarding the government's privilege filtering process and a ban on the sharing of any information seized pursuant to the search warrants with the prosecution team.[1]  These requests are not mere "boiler plate."  Rather, their fulfillment is essential to the preparation of a defense in this complex matter as well as moving this case forward to a potential resolution.

---

[1] The defense continues to negotiate on all of these points with the government and will advise the Court if a successful resolution is reached on any of these issues.

As described herein, the government's discovery in Mr. Satary's case has been at once too broad and too narrow.  Counsel has been inundated with millions of pages of materials, much of which have nothing to do with Defendant Satary's prosecution.  At the same time, while sifting through these materials, it has become glaringly apparent to defense counsel that the government has intentionally and maliciously redacted from documents crucial information, hampering defense efforts to conduct an investigation of the charges.  Similarly, while the government has, commendably, provided interview reports for multiple cooperating witnesses, it has withheld documents shown to cooperators or those provided to the government by the cooperators as described in the interviews.  Further, though several of the government's cooperators candidly admit in their interviews to histories of either civil or criminal fraud, the government has not provided the defense with any of this information.  Other flaws in the discovery process involve the government's failure to provide copies of grand jury subpoenas, the unauthorized disclosure of Satary's and his family's personal financial information to multiple unrelated defendants and their counsel, and the lack of disclosure regarding the government's filtering process to identify attorney-client privileged material from the wholesale taking of all documents from companies purportedly associated with Mr. Satary.

To be sure, Mr. Satary appreciates the Court's order which requires the government to disclose its exhibits and witness lists 60 days prior to trial and Jencks Act materials 30 days prior to trial.  Amended Scheduling Order (Doc. 48) at 2, 4.  However, these rulings do not remove the prejudice to the defendant of the government's defective discovery process.  In a complex matter such as this, the defense's investigation cannot wait until 60 days prior to trial.  *See United States v. Coppa,* 267 F.3d 132, 146 (2d Cir. 2001) (due process requires the disclosure of exculpatory and impeachment evidence in sufficient time for defendant to make effective use of same).

Moreover, and perhaps more importantly, if a resolution of this matter is to be negotiated, the defense needs to first completely evaluate the evidence and strength of the government's case. An unreasonable discovery process needlessly increases the expenditure of time and resources by all concerned and simultaneously violates Mr. Satary's rights.

### Factual Background

In a 30-page indictment returned on September 25, 2019, Khalid Satary is charged alone with a series of counts related to a scheme to defraud the Medicare program. The government alleges that, beginning in January 2017, through a web of companies he purportedly controlled, Mr. Satary obtained reimbursement for cancer genomic testing ("CGx testing") that was medically unnecessary. Satary Indictment (Doc. 1) at ¶¶ 21-22, 39-44. Allegedly, Mr. Satary and his web of companies improperly received $134 million from the Medicare program. *Id.* at ¶ 40.

That this is a complex matter can be gleaned from a reading of the indictment itself. The charges identify four separate companies, all uncharged and allegedly controlled by Mr. Satary, that were part of the charged scheme. *Id.* at ¶¶ 31-34. More disconcerting are the references in the indictment to a further web of unidentified participants including: one unidentified "associate," one unidentified "family member," four unidentified "companies," and five unidentified "co-conspirators."[2] *Id.* at passim.

As if the indictment against Mr. Satary alone did not pose enough challenges for defense counsel, the government has bundled Mr. Satary's case together with those of numerous other defendants, charged in federal districts from New Jersey to Texas. In a press release issued the

---

[2] The indictment is so permeated with references to unidentified companies and individuals purportedly involved in multiple illegal transactions that it is virtually incomprehensible. It is thus Mr. Satary's intention to file a motion for a Bill of Particulars to shed some light on the charged offenses.

day after Mr. Satary's indictment, the government boasted of having charged 35 individuals, including Satary, who allegedly caused $2.1 billion worth of unnecessary genetic testing. Declaration of Arthur W. Leach, Esq. ("Leach Dec.") Exh. 1 (DOJ press release).  In most instances, the only common thread amongst this disparate group of defendants is that they were involved in one way or another with CGx testing.  Many of these businesses/individuals were not linked to one another, did not communicate with one another and, in many cases, did not even know one another.  *See* Leach Dec.  ¶¶  2-3.  Mr. Satary is not charged with conspiring with any of these defendants.

In its investigation that went on for many months, if not years, the government employed multiple investigative techniques including, for example, email/telephone search warrants, subpoenas for financial and other information to third parties, and consensually recorded telephone conversations between cooperating individuals and various defendants.   As part of its discovery process with Mr. Satary, the government has disclosed not just materials pertinent to him and his companies but millions of pages of unrelated materials that involve defendants charged in other indictments, or their companies, who have nothing to do with Mr. Satary.

The amount of discovery to date has been enormous and the government has informed the defense that more is to come.  Various media, including thumb drives and hard drives, have been turned over to defense counsel.  The first installment was delivered on October 18, 2019, and contained approximately 119 gigabytes of information.  Leach Dec. ¶ 5.     According to LexisNexis, depending on the type of information, (i.e. word file, email, text, or spreadsheet), a single gigabyte can contain up to 677,963 pages of information.  Leach Dec.  Exh. 2 (Lexis/Nexis Fact Sheet).    Later installments from the government on approximately November 3, 2019; December 20, 2019; February 26, 2020; April 2, 2020; and April 3, 2020, contained altogether an

additional 2,319 gigabytes of data.  The sum total of 2,438 gigabytes – or 2.43 terabytes - produced thus far is estimated to contain upwards of several hundred million pages of materials.   Leach Dec. ¶ 5.

Lawyers from both the Law Firm of Arthur W. Leach and Epstein Becker & Green, P.C. ("EBG") have been reviewing discovery materials.  Additionally, to save costs, a document review team of independent contractors has been engaged to assist.  What has become clear during the review of these materials is that most of the information supplied to defense counsel has nothing to do with Mr. Satary or the companies he allegedly controls.  Thus, for example, defense counsel have had to listen to and analyze dozens of recordings that do not involve  Mr. Satary or even mention him or any of his alleged companies, Leach Dec. ¶ 4.  Similarly, the review team has had to sift through many thousands of pages of financial records, approximately 90% of which are neither from Satary nor his companies, nor do they reflect any payments to or from them.  *Id.* at ¶ 6.   The same can be said for the many thousands of pages of emails the review team has read to date.  *Id.*  Indeed, based on the review to date, only 4% of the documents produced have been determined to be remotely relevant by the defense review team – that is to say that 96% of the government's production is irrelevant and needlessly draining the defense team's time and resources.  *Id.*  Among the documents disclosed are multiple spreadsheets of other clinical labs with thousands of rows of data that do not mention Mr. Satary or any of the companies he allegedly controls.  *Id.* (see Relativity Document Control No. 01-00016759).  *See, also,* HLX_02-00017989 (294 page document listing clients of competing labs).

The government's strategy has been to provide Satary's lawyers with the results of any and all subpoenas and searches connected to the CGx testing investigation across the country regardless of their pertinence to the charges against Mr. Satary.  The indexes of the materials

provided by the government to date have been of extremely limited usefulness – and in some instances, entirely absent - thereby forcing the Defendant to expend precious resources wading through irrelevant material.  Typically, they will set out the name of a third party source of information, for example BB&T Bank, Regions Bank, with no indication of what individuals or entities the information relates to.  *See* Leach Dec. Exh. 3 (sample index pages) (submitted under seal).  Dozens of index pages simply refer to photos with no further description. *Id.*  In other instances, the government index simply provides a cryptic description such as "John email," or "Chris email" with nothing more.  *Id.*  Additionally, the government has neither disclosed copies of the grand jury subpoenas used to obtain much of this information, nor linked the discovery provided to specific subpoenas.  Leach Dec. ¶ 7.  In short the government has simply dumped on Satary the data from all of its sources, subpoenas, searches, recordings, etc. that arose out of the CGx testing investigation.[3]

Ironically, despite apparently not having bothered to streamline the discovery provided to Mr. Satary, the government chose to redact information from documents to hamper the Defendant's investigation as well as to selectively withhold pertinent information, apparently for tactical reasons.  For example, the government's theory of the case is that elderly individuals were solicited for CGx testing that was neither medically necessary nor beneficial.  Government investigators interviewed numerous doctors and patients involved. While the names of the individuals are discernable, their addresses, emails and phone numbers have been redacted so as to hamper any defense effort to contact them. *See, e.g.,* Leach Dec. Exh. 4 (sample doctor interview

---

[3] We also note, in passing, that the defense has attempted to limit the amount of materials reviewed via search term screening and other techniques.  This has been of limited success and raises the concern that the defense will miss significant or exculpatory materials of which only the government is aware.

reports) (submitted under seal), HLX_10-00012361; HLX_10-00012367; HLX_10-00012415; HLX_10-00012422. Moreover, in many instances it is impossible to determine from the interview report whether the patient involved had anything to do with one of Mr. Satary's alleged companies. Leach Dec. Exh. 5, (sample patient interview reports) (submitted under seal), HLX_10-00011971; HLX_10-00011980; HLX_10-00012019; HLX_10-00012285; HLX_10-00012577. Even when it is clear that one of Mr. Satary's alleged labs is involved, the government still redacted contact information. See, e.g., Leach Dec. Exh. 6 (submitted under seal); HLX_10-00011970 (interview report of primary care physician, contact phone number redacted despite reference to CLIO Laboratories).[4]

Similarly, while the government has commendably provided interview reports of cooperators, it has redacted any address or contact information for them. Moreover, it has not supplied the documents shown to or provided by the cooperators during their interviews or copies of their criminal/civil fraud histories even when mentioned in the interviews. See, e.g., Leach Dec. Exh. 8 (submitted under seal): HLX_10-00012295 (interview report of D.I., address redacted, mentions release from prison but no criminal record  or NCIC report provided; shown text messages during interview which are not provided);  HLX_10-00012159 (interview report of

---

[4] Similarly, in some of the testing documents disclosed by the government, such as test requisition forms, the names of the doctors and patients in question are disclosed.  Understandably, sensitive identifying information, such as the dates of birth and social security numbers of patients have been redacted.  However, in some instances the government went a step further, also redacting out addresses and telephone numbers for both the doctors and patients, thereby hampering any defense effort to interview these individuals.  See, e.g., Leach Dec. Exh. 7: HLX_10-00011848 (test requisition form indicating name of ordering physician but redacting all contact information, also redacting all patient contact information and name).  Indeed, in still other documents the government redacted even the patient's name.  See, e.g., Id. HLX_10-00011837 (test requisition redacting patient name and all contact information); HLX_10-00011736 (test requisition revealing physician information but redacting patient name and contact information); and HLX_10-00011735 (genetic testing consent form redacting patient name).

C.M., phone and address redacted, mentions company he controlled shut down by FTC, no further information provided); HLX_10-00012221 (interview report of D.B., address redacted, mentions SEC litigation over fraudulent conduct and imprisonment in an FCI in Alabama, no further information provided by government); HLX_10-00012257 (10 page D.B. report omitting numerous emails, texts and documents shown); HLX_10-00012108 (interview report of B.H., contact information redacted, mentions SEC fraud conviction, not provided); HLX_10-00012785 (interview report of K.Y., contact information redacted, mentions conviction for insider trading, no further information provided by government); HLX_10-00012520 (K.Y. report omitting documents he provided). It is our belief that the government already has NCIC reports on all of its cooperating witnesses.

The government's redacting at times approaches the bizarre. Mr. Satary was interviewed by the FBI in an unrelated investigation in 2016. While the government has, correctly, disclosed a copy of that interview report to the defense, it inexplicably redacted from it Mr. Satary's home address and other identifying information so that his own lawyers cannot see it. Leach Dec. Exh. 9; HLX_10-00012567 (Satary interview report, submitted under seal). Similarly, the government disclosed an employment contract between Performance Labs, LLC, allegedly controlled by Mr. Satary, and its lab director, Shareef Nahas. Inexplicably, the government redacted Mr. Nahas's address from the document. Leach Dec. Exh. 10; HLX_10-00012864 (Performance/Nahas contract).

During the course of its investigation of Mr. Satary the government obtained via subpoenas to various financial institutions, sensitive information of Mr. Satary, his family members, and corporations allegedly controlled by them. *See, e.g.,* Leach Dec. Exh. 11 (submitted under seal): Exh. 11a, HLX_02-00636791 to HLX_02-00636863 (Earnings record for Alpha Medical

Consulting); Exh. 11b, HLX_02-00687144 to HLX_02-00687172 (PNC Bank account statement

for Alpha Medical Consulting); Exh. 11c, HLX_02-00645596 to HLX_02-00645602 (Checking

account balance records of Performance Laboratories); Exh. 11d, HLX_10-00005827 to HLX_10-

00005834 (Bank of America account statement for Khalid Satary and Samiya Mustafa); Exh. 11e,

HLX_02-00381669 to HLX_02-00381712 (Sun Trust Bank account statement of Jordan Satary);

Exh. 11f, HLX_02-00686931 to HLX_02-00687040 (BB&T Bank account statement of Khalid

Satary).  It is counsel's understanding that this information was shared with other CGx defendants

and their counsel and, accordingly, attorney Arthur W. Leach demanded that the government claw

back these materials which should not have been disclosed to unrelated defendants.  See Leach

Dec. Exh. 12 (Leach emails to Loper).  The government has not complied with this demand, and

has taken no position in response to requests to claw back.  It is ironic that the government has

disclosed Mr. Satary's sensitive information to individuals he has never met, while redacting his

home address from discovery produced to his own attorneys.

        In addition to all of the information described above, the government executed a series of

search warrants subsequent to the indictment of Mr. Satary.  On September 25, 2019, the

government submitted a 37 page affidavit to Magistrate Judge Justin S. Anand in the Northern

District of Georgia, obtaining authorization to search an office building in Lawrenceville, Georgia

which housed multiple testing laboratories and associated offices in addition to other businesses.

This warrant was executed on September 27, 2019 along with warrants to search Lazarus Services,

LLC in New Orleans, Louisiana, and Performance Laboratories, LLC in Oklahoma City,

Oklahoma based on similar affidavits.

        Pursuant to the above referenced warrants the government took vast quantities of hard copy

documents, servers, i-phones, thumb drives, desktop computers, and other materials.  Materials

were also taken from businesses not mentioned in either the search warrants or the underlying affidavits. Finally, at the Lawrenceville, Georgia location, government agents knowingly searched the office of the general counsel of the entities named in the underlying affidavit. Leach Dec. at ¶ 12.

The quantities of materials, both hard copy and electronic taken pursuant to the search warrants amount to many millions of pages. The government has, over defense objection, retained some of the original servers taken. After months of requests, the defense only received a copy of the server seized from Lazarus Services on April 3, 2020. Leach Dec. at ¶ 13. It is the defense's understanding that a Department of Justice "filter team," purportedly independent of the prosecution team in this matter, is presently reviewing materials seized pursuant to the search warrants for privilege. The government has yet to designate what documents/materials it deems "seized" from all of these searches.

## ARGUMENT

1.  **The Government's Document Dump on Satary Violates his Rights and it should be compelled to Identify Exculpatory Information and any and all Irrelevant Material.**

The government's strategy here is clear. It has created a "needle in the haystack" circumstance for the defense to the extent exculpatory material exists. Rather than withhold vital information, the government has buried it in a trove of millions of pages of documents, most of which is irrelevant to Mr. Satary's case. This allows the government to proclaim that it has "turned everything over" in satisfaction of *Brady v. Maryland,* 373 U.S. 83 (1963) while, at the same time, making it difficult or impossible for the defense to locate the information. The Court should not countenance this sharp practice.

As the Fifth Circuit noted in *United States v. Skilling,* 554 F.3d 529, 576 (5th Cir. 2009), *aff'd in part, vacated in part on other grounds,* 561 U.S. 358 (2010), there is no obligation on the

prosecution to point a defendant to specific exculpatory evidence within a large mass of material. However, the *Skilling* court also stated that a *Brady* violation would occur where the government has "[P]added an open file with pointless or superfluous information to frustrate a defendant's review…" and/or "Creat[ed] a voluminous file that is unduly onerous to access…" *Id.* at 577. This is precisely what has happened here. By combining the discovery materials from multiple unrelated cases into Mr. Satary's materials, the government has needlessly complicated the defense's review, not to mention increased its financial burden.

The prosecution avoided a *Brady* violation in *Skilling* by taking proactive steps to assist the defense's review of millions of pages of materials by, among other things, creating detailed and useful indices of the documents, providing the defense a set of "hot documents" that it thought relevant to the government's and Skilling's case and ensuring that all of the materials were properly searchable. *Id.* This is precisely what the defense demands here, an order forcing the government to identify irrelevant material (a detailed/useful index and copies of the grand jury subpoenas would help) and to identify exculpatory materials of which the government is presently aware.

A growing number of courts are recognizing that dumping hundreds of thousands of pages or, as in our case, millions, on a defendant with no guidance as to what is pertinent or exculpatory violates due process. Moreover, while we are not suggesting that the government must, at this stage of the case, affirmatively search all of this material for exculpatory evidence, to the extent it is currently aware of same it must be turned over now. *See, United States v. Saffarinia,* 424 F. Supp.3d 46, 85 (D.D.C. 2020) (in appropriate circumstances, courts can order identification of *Brady* materials in voluminous productions, government cannot hide "exculpatory needle in a haystack of discovery materials") (citations omitted); *United States v. Salyer,* 2010 WL 3036444

11

at  6 (E.D. Ca. 2010) ("duty to disclose may be unfulfilled by disclosing too much…in order to be meaningful, requires identification as well");  *United States v. Hsia,* 24 F. Supp. 2d 14, 30-31 (D.D.C. 1998) (government does not meet its *Brady* obligation by telling defendant to find exculpatory evidence amongst 600,000 documents, to the extent it is aware it must turnover *Brady* material immediately).

This is not a circumstance where the government and defense are on equal footing with respect to examining the contents of a voluminous database.  Rather the government has artificially increased the volume of material to be reviewed by knowingly combining materials pertinent to Mr. Satary with those related solely to other defendants in unrelated cases.  It has further exacerbated the situation by failing to provide a detailed and useful index to the materials, failing to provide copies of the grand jury subpoenas that led to the gathering of the materials, and failing to provide any sub-production of "hot" documents or exculpatory documents.  Moreover, the format in which the government has produced the, so far, approximately 2,438 gigabytes of data has been incompatible with any search system to the extent that it is impossible to integrate bates numbers, document identifiers, or any similar data for searching or cataloging purposes.  In some instances, the data cannot be accessed at all.  All of this violates Mr. Satary's due process rights and should be corrected via court order.

### 2.   The Government Should be Ordered to Reverse its Redactions of Witness Contact Information Which Violates Satary's Rights.

The government's intentional withholding of contact information (addresses, telephone numbers, and email addresses) of any and all potential witnesses in this matter is an inexcusable violation of Mr. Satary's due process rights.  This is especially so given that the government has already disclosed in discovery the identities of its cooperating witnesses as well as, in most instances, the names of the doctors/patients who were purportedly utilized to cheat the Medicare

Program.[5]  As the Supreme Court noted decades ago, the so-call "informer's privilege" disappears when their identities, as in the case at bar, are known.  *See, Roviaro v. United States,* 353 U.S. 53, 59-60 (1957).  Having identified all of these potential witnesses, there is no justification for the government to withhold their contact information.  The defense has a right to attempt to interview these individuals as part of its investigation in this matter.

No doubt the government will argue that most, if not all, of these people have advised it that they do not wish to be interviewed by defense counsel or that the defense can interview them once Satary's trial has commenced.  The Fifth Circuit has already rejected such arguments noting that it is for the witness, not the government to decide whether or not he/she wishes to be interviewed and that delaying any defense interviews until trial unduly prejudices the defense.  *See United States v. Opager,* 589 F.2d 799, 804 (5th Cir. 1979) (rejecting such arguments where witness's identity was known but government refused to disclose his address).

The only legitimate argument for withholding the contact information of witnesses whose identities are already known to the defense would be if there was a legitimate concern for the witness's safety.  Even in those circumstances, which is not the case at hand, the government is not automatically entitled to withhold contact information.  Rather a court must balance the potential danger to the witness against the need of the defense for information from the witness. *See, United States v. Cavallaro,* 553 F.2d 300, 304 (2d Cir. 1977).  *See, also, United States v. Trie,* 21 F. Supp. 2d 7, 22 n. 14 (D.D.C. 1998) (government showed no evidence of danger of witness tampering sufficient to avoid disclosure of identities of witnesses).

_____

[5] Based on negotiations to date, we believe the government might be agreeable to disclosing contact information for its cooperating witnesses but not others.

In the instant case there is no reason to fear any danger to the witnesses.  None of the charges against Mr. Satary involve acts of violence.  He has no record/history of violence and has abided by all the conditions of his pre-trial release.  Indeed, the government did **not** seek to detain Mr. Satary under a theory of dangerousness to the community. Transcript of October 4, 2019 Detention Hearing at 6.   By contrast, his need (through counsel) to interview cooperating witnesses, some of whom claim to have engaged in transactions with him without any corroboration is obvious.  So is the need for the defense, through its medical expert, to interview at least a sample of the doctors/patients at issue.  As argued at the bond hearing in this matter (with some agreement from the government) the labs allegedly associated with Mr. Satary were different from others charged in other districts.  The clinical labs at issue in this matter had substantive compliance programs in place to insure that CGx testing was medically justified. Transcript of October 8, 2019 Bond Hearing at 15-16; 20.   Mr. Satary is entitled to have his expert interview doctors/patients to gather evidence as to whether the CGx testing challenged in the indictment was indeed justified.

As described above, the government engaged in a wholesale redacting process without any reasonable justification.  This conduct has prejudiced Mr. Satary and hampered the ability of his counsel to conduct a defense investigation.  The government should be ordered to remove these redactions.

### 3. The Government has Improperly Withheld the Criminal and Civil Fraud Histories of its Cooperating Witnesses Which Should be Immediately Disclosed.

If the defense's analysis of the government's discovery to date is any guide, it appears that a substantial portion of the evidence to be presented by the government against Mr. Satary at trial will be testimony from a rogue's gallery of fraudsters and conmen.  As set forth in the interview memoranda attached as sealed Exhibit  8 to the Leach Declaration, the government's

cooperators have candidly admitted to an array of fraud-based felony convictions and/or civil judgements for fraud-based conduct obtained by federal agencies such as the  Securities and Exchange Commission and the Federal Trade Commission.

While the defense appreciates the early disclosure of these interview reports, as best as we can tell, the government has not provided the criminal/civil fraud histories, or even NCIC reports, alluded to in the interview reports.[6]  Neither has the government provided copies of documents shown to the cooperators during their interviews nor copies of documents the cooperators provided to the government during their interviews, all of which are referred to in the interview reports. These documents are logged into evidence by the FBI and/or OIG/HHS.  Having disclosed the interview reports, in order for the defense to understand and make use of same, the government should be ordered to disclose all documents referred to therein, as well as the criminal/civil fraud histories that are also referenced.   The government should be further ordered to produce the documents in a manner to connect them to the reports to which they are relevant.

It is beyond dispute that a cooperator's history of fraud-based conduct would constitute impeachment evidence that falls within the ambit of *Giglio v. United States,*  405 U.S. 150 (1972) and its progeny.   The defense properly demanded the disclosure of all *Brady* and *Giglio* materials from the government months ago.  Leach Dec. Exh. 13 (November 5, 2019 demand letter to government).  Once requested, the government must disclose such materials.  *See, United States v. Bagley,* 473 U.S. 667, 676 (1985) (impeachment evidence falls within the *Brady* disclosure rule); *United States v. Leung,* 40 F.3d 577, 582 (2d Cir. 1994) (government must turn over impeachment evidence relating to government witnesses when requested by a defendant).

---

[6] In at least one instance we believe that a cooperating witness has filed a *qui tam* action related to this criminal matter.  The government has yet to accomplish the unsealing of the *qui tam* complaint, at least for defense use.  Mr. Satary reserves the right to move to compel the *qui tam's* unsealing.

Moreover, **now** is the time to turn over impeachment materials such as criminal and civil fraud histories.  These cannot be withheld for disclosure with Jencks Act materials.  *See United States v. Coppa,* 267 F.3d at 146 (*Giglio* material may be ordered disclosed prior to trial despite the Jencks Act).  Indeed, this Court has already recognized as much by noting in its scheduling order that, to the extent *Giglio* materials exist, they must be disclosed as part of the Rule 16 discovery process, not pursuant to the Jencks Act.  Amended Scheduling Order (Doc. 48) at 2. *Giglio* materials do exist and thus they must be disclosed forthwith.

As for the documents mentioned in the disclosed interview reports that have been withheld by the government, the problem for the defense is that, particularly in those instances where the interview focuses on a cooperator's interpretation of texts/emails, it is difficult to understand the interview, much less assess the accuracy of the statements. *See, e.g.,* Leach Dec. sealed Exh. 8; HLX_10-00012257 (D.B. Report).  As the Fifth Circuit has ruled in a related context, FBI notes underlying a 302 Report need not be disclosed if the "…302 report … contains all of the information contained in the interview notes." *United States v. Brown,* 303 F.3d 582, 590 (5th Cir. 2002).   By contrast, in the case at bar, the interview reports/302s are simply incomplete without the documents they reference. These are *Giglio/*Rule 16 materials and, like the criminal/civil fraud histories discussed above, this information should be disclosed now as part of Rule 16 discovery.

4. **The Government Should be Ordered to Claw Back Satary's and Satary's Family's Personal Financial Information that has been Disclosed to Others.**

As discussed at length above, at least for discovery purposes, the government has bundled together multiple CGx cases wherein the defendants and/or their companies have nothing to do with one another.   Mr. Satary has received sensitive financial and other information pertaining to defendants he has nothing to do with and they, in turn, have received sensitive financial and other information related to Mr. Satary, his family and companies purportedly

associated with him.  This is improper and Satary demands that the government claw back his information disclosed to other defendants.

There is simply no justification for the government to "willy nilly" share Satary's sensitive financial information with other defendants, especially those who have nothing to do with the conduct he is accused of participating in.  Indeed, even if those other defendants were co-defendants of Satary in the same case, such disclosure would be improper absent the government establishing a proper basis for same.  *See, United States v. Metter,* 860 F. Supp. 2d 205, 215 (E.D.N.Y. 2012) (improper for government to share sensitive information of defendant with co-defendants without first conducting a review for relevance, privilege and privacy issues).  Mr. Satary is unaware of the government having undertaken any relevance, privilege or privacy analysis prior to making these wholesale disclosures.  There is no justification for it and the information should be clawed back from all of these unrelated defendants.

   **5.  The Government Should be Ordered to Provide a Detailed Explanation of its Filtering Process for Privileged Materials, and Nothing Should be Provided to the Prosecution Team.**

The Court's most recent scheduling order requires that the Defendant file any pre-trial evidentiary motions on or before November 9, 2020.  Amended Scheduling Order (Doc. 48).  Of immense concern to the defense is the legality of the searches which were conducted on September 27, 2019 in Lawrenceville, Georgia and elsewhere.  Putting aside for the moment whether the warrants themselves were properly obtained and/or overbroad, a central issue is whether they were properly executed, in particular whether privileged materials (from both in-house and outside counsel) have been improperly seized/reviewed by the government.

A cursory review of the inventory prepared on September 27, 2019 of the Lawrenceville search shows that the defense's concerns are justified.  Leading up to the searches, two of the clinical labs at issue had been served with grand jury subpoenas.  In-house counsel, Victoria

Nemerson, was leading the response.  Thus, the government knew for months prior to the searches that Victoria Nemerson had served as counsel for several of the entities under investigation. Nevertheless, the inventory reflects that, among other things, government agents took: Nemerson emails; a legal hold notice; "privileged documents;" and attorney retainer agreements.  Leach Dec. Exh. 14 (September 27, 2019 OIG Inventory Report) (submitted under seal).[7]

The Lawrenceville search is looking eerily similar to another search deemed improper in the Eastern District of Louisiana.   In *Heebe v. United States,* 2011 WL 2610946 (E.D. La. 2011), FBI agents searched an entire floor of an office building.  The Court held the search improper because the agents, amongst other things, seized documents from businesses not listed in the warrant, searched a law office, and made initial determinations as to whether documents were potentially privileged even though they were not on the government's "taint team."  *Id.* at 1, 6.

In the case at bar it is too early to tell whether the searches conducted in Oklahoma, Louisiana and Georgia were lawful.  The government has yet to advise the defense as to what documents/items during these searches it deems "seized."  Nor can the defense tell at this point whether the government has improperly invaded the attorney-client privilege.  The government does have a "filter" process in place but has provided no details of same other than to disclose to the defense a subset of the materials taken during the searches which are being reviewed.  See, Leach Dec. Exh. 16 (April 2, 2020 Letter from Filter Team) (submitted under seal).

---

[7] There are other issues with the execution of the warrants.  In particular whether government agents took materials from businesses that were not named in the search warrants or underlying affidavits and had nothing to do with the conduct under investigation.  *See, e.g.,* Leach Dec. Exh. 15 (October 3, 2019 OIG Inventory Report) (submitted under seal) noting seizure of Shefa International, LLC bank account documents, financial records of Souq International Markets, SI Holdings documents, and Shiraz Holdings documents.

While it is too early for a full blown suppression motion at this stage, it is imperative that both the Court and the defense understand what procedure the government is currently employing to determine which materials are privileged and should not be shared with the prosecution team. Indeed, it is not uncommon in this district for the government to submit its review protocol to the Court for approval. *See, e.g.,* In re *Investigation of Ingram,* 915 F. Supp. 2d 761 (E.D. La. 2012) (government submitted filter team protocol to court for approval). Most importantly, whatever the details of the protocol employed by the government, an essential feature must be that the defense has a right to review and object to privilege determinations made by the filter team and, if necessary, have them ruled on by the Court, **before** any documents are disclosed to the prosecution team. *Heebe v. United States,* 2012 WL 3065445 at 4 (E.D. La. 2012) (filter protocol must allow owner of documents to make objections as to privilege determinations prior to disclosure to prosecution team); *Ingram,* 915 F. Supp. 2d at 763 (same).

In order to ascertain what suppression motions, if any, are appropriate here, the defense needs to know at a minimum:

What filter protocol is the government using.

The date on which the government's filter team was formed.

A list of individuals on the filter team including their titles and employers.

A description of the education/qualifications of the members of the filter team.

A description of how the filter team members were selected.

Whether any third party vendors have been involved in the filter process.

Moreover, no documents should be disclosed by the filter team to the prosecution team unless and until the defense has had an opportunity to review and object to any of the filter team's privilege determinations.

## CONCLUSION

For the foregoing reasons, the Court should order the government to produce the *Brady, Giglio,* and Rule 16 materials immediately.

This 1st day of May, 2020

/s/ *Arthur W. Leach*
Arthur W. Leach
Ga. Bar No. 442025
(admitted pro hac vice)
The Law Office of Arthur W. Leach
4080 McGinnis Ferry Road, Suite 401
Alpharetta, Georgia 30005
Telephone: (770) 851-6718
Art@ArthurWLeach.com
*Trial Attorney for Defendant*
*Khalid Ahmed Satary*

/s/ *Richard W. Westling*
Richard W. Westling (#20027)
Epstein, Becker & Green, PC
1227 25th Street, NW, Suite 700
Washington, DC 20037
Tel: 202-861-1868
Fax: 202-861-3504
rwestling@egblaw.com
*Counsel for Defendant Khalid Ahmed Satary*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on May 1, 2020, I electronically filed the foregoing pleading with the Clerk of the Court using the CM/ECF system, which will send a copy of the pleading to all parties via email.

/s/ Richard W. Westling