## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL ACTION** |
| **VERSUS** | **NO:   19-197** |
| **KHALID AHMED SATARY** | **SECTION: "D" (4)** |

### ORDER

Before the Court is Defendant Khalid Ahmed Satary's **Motion to Compel Discovery Pursuant to Fed. R. Crim. P. 16 and *Brady* and *Giglio* (R. Doc. 52)** seeking an order compelling the Government to produce a variety of materials that he considers essential to the defense investigation of this matter and trial preparation. The Government opposes this motion. R. Doc. 67. The Court held oral argument on this motion via videoconference on July 22, 2020 and September 2, 2020. R. Docs. 85, 111.

### I.   Background

Defendant Khalid Ahmed Satary is charged with a series of counts related to a scheme to defraud the Medicare program including conspiracy to commit money laundering. Mr. Satary's alleged co-conspirators remain unindicted in this action.

The Government alleges that, beginning in January 2017, through a web of companies he purportedly controlled, Mr. Satary obtained reimbursement for cancer genomic testing ("CGx testing") that was medically unnecessary. Satary Indictment (R. Doc. 1) at ¶¶ 21-22, 39-44. The indictment identifies four separate companies, all uncharged and allegedly controlled by Mr. Satary, that were a part of the charged scheme. *Id.* at ¶¶ 31-34. Allegedly, Mr. Satary and his web of companies improperly received $134 million from the Medicare program. *Id.* at ¶ 40.

This is a complex matter as can be gleaned from a reading of the indictment itself. There are other genetic testing fraud cases, not involving Mr. Satary, that are pending in the Southern

District of Florida, the Middle District of Louisiana, the Western District of Pennsylvania, and the Northern District of Texas. As a result of this massive investigation, the Government obtained a copious amount of evidence.

As to this instant motion, Defendant Satary seeks an order compelling the Government to produce information to which he is entitled under Rule 16 and impeachment/exculpatory material pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972). R. Doc. 52. The Defendant's motion involves the review and adequacy of eleven different instances of Government production, which resulted in a sum total of 2.43 terabytes, approximately six million pages, worth of information.

In his original motion, Mr. Satary sought (1) the contact information for witnesses which the government has improperly redacted from the discovery materials provided to date, (2) the criminal and civil fraud histories of the numerous cooperating witnesses already identified by the government, (3) information regarding the Government's filter process including the protocol for same and identification of the filter team, (4) copies of the grand jury subpoenas used to acquire the discovery materials which have been disclosed to the defense, and (5) copies of documents the Government showed to cooperating witnesses already reflected in interview reports provided to the defense as well as copies of documents the witnesses provided to the Government during said interviews. *Id.*

Defendant Satary also contends the Government's production is best characterized as an improper document dump, in violation of his rights, and, as such, the Government should be compelled to identify exculpatory information and any and all irrelevant material by providing the defense a set of "hot documents" that the Government thought relevant to its case. R. Doc. 52-1,

p. 10-12. The Defendant also seeks the Government ensure that all the materials are properly searchable. *Id.*

Mr. Satary finally seeks the claw back of his and his family's personal information improperly disclosed to defendants and their counsel in other cases and the government's identification of irrelevant and/or exculpatory information from the millions of pages of discovery provided to date. R. Doc. 52.

Prior to the initial hearing on the matter, the Government informed the Court that it had produced both the unredacted reports of interview, the civil and criminal fraud histories of its cooperating witnesses, and copies of the documents shown to cooperating witnesses as reflected in the interview reports. R. Doc. 67, p. 5-8. As such, Requests Nos. (1), (2), and (5) are moot.

Subsequent to the filing of this motion, the Government's Filter Team, whose tasks is to review certain evidence; determine whether that evidence could potentially contain material protected by the attorney-client privilege, work-product doctrine, or other legally recognized privileges (hereinafter collectively referred to as "Potential Protected Material" or "PPM"); and segregate that evidence from the Prosecution Team, filed a Motion for a Discovery Protocol. *See* R. Doc. 62. The undersigned has since issued a recommended resolution to that motion, which addresses in totality Request No. (3) of this motion. R. Doc. 132.

As such, at the July 22, 2020 hearing, the Court addressed the sole pending items of dispute copies of the grand jury subpoenas, the request for a set of "hot documents," and the potential grand jury secrecy violation. Throughout the course of the hearing, it became abundantly clear to the Court that the Government's efforts to satisfy its discovery obligations, although well intentioned, seemed to have result in the electronic data being produced in inaccessible formats due to a lack of metadata, incompatible software, and large file sizes. R. Doc. 85, p. 3. It also

became clear that Defendant sought the grand jury subpoenas specifically for organizational purposes due the sheer volume of discovery produced. *Id.*

As a result, the Court instructed parties to develop a Protocol for the Discovery of Electronically Stored Information ("ESI Protocol') to govern the remaining discovery in this matter. R. Doc. 85, p. 3. The Court instructed the parties to participate in a meet-and-confer to address any labeling questions and index problems, as well as the completeness of the spreadsheets already produced by the Government in an attempt to obviate the need for the grand jury subpoenas. R. Doc. 85, p. 4. After that meet-and-confer process, the parties were to submit briefs to the Court outlining any outstanding issues. *Id.*

While the parties submitted a proposed ESI Protocol, it was not adapted to the needs of this case. As such the Court denied that proposed ESI Protocol. R. Doc. 102. Since then, the parties have failed to redraft and submit another proposed ESI Protocol.

On August 21, 2020, the parties submitted their briefs to address outstanding discovery issues. R. Docs. 103, 104. While not jointly submitted, both briefs addressed the need for an organizational structure, how far in advance the Government needed to produce its summary chart of exhibits to Defendant Satary, technological difficulties with the productions, and Defendant's request for "hot documents." *See id.*

These are the issues that the Court now addresses. The Court reserves ruling on whether there was a grand jury secrecy violation as well as possible remedies for that potential violation for a separate decision and order.

## II.    <u>Standard of Review</u>

Federal Rule of Criminal Procedure ("Rule") 16 provides that the government must disclose the defendant's oral statement; the defendant's written or recorded statement; and the

defendant's prior record. Fed. R. Crim. P. 16(a)(1)(A)-(B), (D). The government must also allow

the defendant to inspect and to copy or photograph books, papers, documents, data, photographs,

tangible objects, buildings or places, or copies or portions of any of these items, if the item is

within the government's possession, custody, or control and:

(i)     the item is material to preparing the defense;
(ii)    the government intends to use the item in its case-in-chief at trial; or
(iii)   the item was obtained from or belongs to the defendant.

*Id.* 16(a)(1)(E). Moreover, the government must allow the defendant to inspect any physical or

mental examination and any scientific test or experiment under certain conditions. *Id.* 16(a)(1)(F).

*Brady* material is any information in the possession of the government that relates to guilt

or punishment and that tends to help the defense by either bolstering the defense case or

impeaching potential prosecution witnesses. *United States v. Lee*, No. Crim. A. 15-2, 2015 WL

3466011, at *3 (E.D. La. June 1, 2015) (citing *Brady v. Maryland*, 373 U.S. 83, 87 (1963)). This

includes *Giglio* evidence that would impeach a government witness, *e.g.*, by showing bias or

interest. *Id.* (citing *Giglio v. United States*, 405 U.S. 150, 154 (1972); *United States v. Bagley*, 473

U.S. 667, 676 (1985)). The government generally has no obligation to turn over any exculpatory

material of which the defense is already aware. *Id.* (citing *Lovitt v. True*, 403 F.3d 171, 185 (4th

Cir.2005) ("*Brady* only applies when evidence is known to the prosecution but unknown to the

defense") (quoting *United States v. Agurs*, 427 U.S. 97, 103 (1976))). Furthermore, the government

has no obligation if the information is available to the defendant through the exercise of diligence.

*Id.* (citing *United States v. Willis*, 277 F.3d 1026, 1034 (8th Cir. 2002); *Rector v. Johnson*, 120

F.3d 551, 558 (5th Cir.1997) ("State has no obligation to point the defense toward potentially

exculpatory evidence when that evidence is either in the possession of the defendant or can be

discovered by exercising due diligence."); *United States v. Serfling*, 504 F.3d 672, 678–79 (7th

Cir. 2007) (no *Brady* violation when government made documents available for defendant's review)).

"The Fifth Circuit has stated, '[] *Brady* is not a discovery rule, but a rule of fairness and minimum prosecutorial obligation.'" *Id.* (citing *United States v. Beasley*, 576 F.2d 626, 630 (5th Cir. 1978) (citing *Agurs*, 427 U.S. at 107)). "To establish a Brady violation, a defendant must show: (1) the evidence at issue was favorable to the accused, either because it was exculpatory or impeaching; (2) the evidence was suppressed by the prosecution; and (3) the evidence was material." *United States v. Dvorin*, 817 F.3d 438, 450 (5th Cir. 2016).

When a *Brady* or *Giglio* standard is applied post-conviction, the Court is to apply the "materiality" standard. *United States v. George*, No. CR 17-201, 2019 WL 4982324, at *2 (E.D. La. Oct. 8, 2019). When a *Brady* or *Giglio* standard is implicated in a pre-trial motion, the favorability standard applies. *See id.* at n. 17 (noting "the distinction between the materiality standard applied to post-conviction appellate review of alleged *Brady* violations and the favorability standard applied to pretrial disclosure obligations."); *see also United States v. Safavian*, 233 F.R.D. 12, 16 (D.D.C. 2005) ("The prosecutor cannot be permitted to look at the case pretrial through the end of the telescope an appellate court would use post-trial. Thus, the government must always produce any potentially exculpatory or otherwise favorable evidence without regard to how the withholding of such evidence might be viewed-with the benefit of hindsight-as affecting the outcome of the trial. The question before trial is not whether the government thinks that disclosure of the information or evidence it is considering withholding might change the outcome of the trial going forward, but whether the evidence is favorable and therefore must be disclosed. Because the definition of 'materiality' discussed in . . . appellate cases

is a standard articulated in the post-conviction context for appellate review, it is not the appropriate one for prosecutors to apply during the pretrial discovery phase.").

### III.    <u>Analysis</u>

#### 1. **Grand Jury Subpoenas**

The Defendant contends that the amount of data produced in this case has been enormous. R. Doc. 52-1, p. 4. The Government has turned over to the Defendant millions of pages worth of information and still intends to produce more. *See id.* While the Defense Team has begun the laborious process of reviewing the documents produced, it is struggling to understand the importance of them and their relevance to Mr. Satary's case, as opposed to the entire conspiracy at large. R. Doc. 52-1, p. 5.

The Defendant further contends that while the Government has provided indices to the material, the indices of the materials provided by the Government have been limited in usefulness, or, in some instances, entirely absent—thereby forcing the Defendant to expend precious resources wading through irrelevant material. R. Doc. 52-1, p. 5-6. As such, the Defendant suggests that disclosure of the copies of the grand jury subpoenas used to obtain much of this information can linked the discovery provided to specific subpoenas, thereby providing context to the Defendant. *See* R. Doc. 52-1, p. 6. Defendant concedes, however, that a detailed index would also likely be helpful. *See* R. Doc. 52-1, p. 11.

The Government contends, in opposition, that the grand jury subpoenas are matters occurring before the grand jury and cannot be disclosed without a particularized need. R. Doc. 67, p. 14. The Government further contends that the Defendant has not shown a particularized need where the Government has been more than cooperative providing indices and spreadsheets to guide the document productions. R. Doc. 67, p. 15. As such, the Government maintains producing the

subpoenas to Defendant would add more documents to discovery productions he is claiming are already too voluminous, while being duplicative of other documents the Government has already produced. *Id.*

  "Federal courts long have recognized that secrecy is essential to maintaining the integrity of the grand jury system." *Johnson v. Lee*, No. CIV.A.07-3596, 2009 WL 24065, at *2 (E.D. La. Jan. 2, 2009) (citing *In re Grand Jury Testimony*, 832 F.2d 60 (5th Cir. 1987)). The proper functioning of the grand jury system depends upon the secrecy of the grand jury proceedings. *United States v. Miramontez*, 995 F.2d 56, 59 (5th Cir. 1993) (citing *Douglas Oil Co. of California v. Petrol Stops Nw.*, 441 U.S. 211, 217 (1979)).

  Federal Court have considered grand jury subpoenas are matters occurring before the grand jury. *See United States v. Diaz*, 236 F.R.D. 470, 479 (N.D. Cal. 2006); *see also United States v. Fieger*, No. 07-20414, 2007 WL 4098149, at *2 (E.D. Mich. Nov. 16, 2007). Federal Rule of Criminal Procedure 6(e)(3)(C)(i) "authorizes disclosure of matters occurring before a grand jury when so directed by a court preliminary to or in connection with a judicial proceeding." *In re Disclosure of Evidence Taken Before Special Grand Jury Convened on May 8, 1978*, 650 F.2d 599, 601 (5th Cir.), *amended*, 662 F.2d 362 (5th Cir. 1981). But the party seeking disclosure must show a "particularized need" and "compelling necessity" for the materials that outweighs the policy of secrecy. *See id.*; *see also United States v. Expose*, No. CRIM.A. 06-92, 2007 WL 956584, at *2 (E.D. La. Mar. 28, 2007) (citing *Miramontez*, 995 F.2d 59; *Pittsburgh Plate Glass Co. v. United States*, 360 U.S. 395, 400 (1959)).

  The Defendant has failed to show a particularized need or compelling necessity for the grand jury subpoenas. While the information may seem out of context without the grand jury

subpoenas, the Defendant has been given more than enough information to put together the evidence in this case.

First, the Defendant is in relatively better a position to determine which evidence is key to his defense. Second, the Government has produce search warrant affidavits, multiple indices and spreadsheets cataloguing the information, and has been committed to providing the Defendant with extensive appendixes and descriptions of the discovery provided to date, as well as explanations for why the Government produced the material to Defendant and the potential relevance of certain documents. *See* R. Docs. 124-1, p. 6-7, 124-2, 124-4, 124-5. Finally, the Government has committed to providing the Defendant further explanations of the evidence produced when requested. As such, the Court is of the opinion that policies of secrecy protecting matters occurring before the grand jury outweigh any need of the Defendant to the grand jury subpoenas. As such, the Court denies Defendant's motion to the extent it seeks the grand jury subpoenas.

### 2. Summary Chart Exhibits

Next, Defendant complains that it needs the Government's summary charts of exhibits more than sixty (60) days in advance of trial to sufficiently review, digest, and prepare counter summary exhibits. R. Doc. 103, p. 4.

The Government submits that providing summary exhibits thirty (30) days before trial will be more than sufficient for Defendant's purposes. R. Doc. 104, p. 6.

At the hearing, the Court directed the parties to the District Judge's scheduling order that governs the deadlines in this case, which provides that exhibits shall be submitted for review sixty (60) days in advance of trial. *See* R. Doc. 48. Since the hearing, the District Judge has amended the scheduling order, and specifically provided that exhibits, to include chart and summary

exhibits, shall be provided to the opposing party on March 29, 2021, ninety (90) days before trial. *See* R. Doc. 127.

The Court, again, directs the parties' attention to this order. This Court finds this issue already decided and need not address it further in respect to this motion.

### 3. Technological Difficulties

Next, the parties discussed the various technological issues encountered in the multiple voluminous productions. As these issues required explanation by an information technologist, the Court sought additional declarations from the parties' specialist discussing the accessibility and searchability of certain documents. *See* R. Doc. 111.

In response, Defendant provided an affadvit of Scott M. Taylor, Epstein Becker Green's National Practice Support Manager. R. Doc. 114-1. Taylor attested that the Government's form of production has presented numerous technical and organizational difficulties, largely related to: (i) the lack of load files for certain productions (causing an inability to load, search or organize by Bates numbers); (ii) the enormous volume of the production overall; (iii) the large volume of massive spreadsheets; and (iv) the large volume of multi-thousand page individual PDF files.

The Government concedes that certain subsects in its production lacked load files but contends that the Defendant has not been open to a reasonable solution. R. Doc. 124-1, p. 2.

The Court will address the issue of volume in the following section. So, this section is devoted to the request for a load file.

"A load file is a 'file that relates to a set of scanned images or electronically processed files, and indicates where individual pages or files belong together as documents, to include attachments, and where each document begins and ends,' and may also include 'data relevant to the individual documents, such as metadata, coded data, text, and the like.'" *Aguilar v. Immigration*

*& Customs Enf't Div. of U.S. Dep't of Homeland Sec.*, 255 F.R.D. 350, 353 (S.D.N.Y. 2008) (citing The Sedona Conference Glossary 31 (2d ed. 2007)). Load files are often used to export extracted metadata from a processing tool, so that it can be uploaded to a document review platform and also provide metadata and other information about produced ESI to another party. Load File, Practical Law Glossary Item 1-521-0511 (Westlaw).

Where ESI is produced as an image, such as a TIFF or PDF, the production might include both a Bates numbered images and a load file that: identifies the Bates numbers for each document; tracks the relationships among the documents; includes select metadata for each document; provides select reviewer coding (such as the discovery request to which the document is responsive or whether a document is designated as confidential under a controlling protective order); and contains text extracted from the documents. *Id.* The extracted metadata contained on the load file can be uploaded to a document review platform, which, in this case, is Relativity. *See id.*

Of the seven productions made thus far in this case, three did not include load files: October 18, 2019 (HLX_02, HLX_03, HLX_04, HLX_05, HLX_08); February 12, 2020 (HLX_12); and June 8, 2020 (HLX_22). R. Doc. 114-1, p. 4.[1] In addition, the April 3, 2020 production contained a load file for all files but HLX_20. The Defendant also generally contends that load files were not provided for the audio, video, and phone data files. R. Doc. 114-1, p. 4.

Mr. Scott states that in a case, such as this one, where the size and number of productions is so voluminous, that the scale of such review necessitates the use of a review platform such as Relativity. R. Doc. 114-1, p. 5. Scott further states that absent such a platform key word searching is impossible. *Id.* Scott also states that files produced in their native format cannot be key word

---

[1] The Court also notes that Defendant stated that the Government did not provide load file for certain portions of HLX_01-A, B, C, and D production made on December 20, 2020. *See* R. Doc. 114-1, p. 3. The Government maintains it did provide the load files and called the Defendant who confirmed he did in fact received a load file for that production but was mistaken his Defense Team's affidavit to the Court. *See* R. Doc. 124-2, p. 1-2.

searched and the review of such documents cannot be tracked. *Id.* As such, the use of such platform is key to searching, categorizing, coding, and sorting documents. *Id.*

Defendant contends that the productions made without load files are PDF files and Microsoft Excel Spreadsheet Files. *Id.* Defendant estimates the files to be 8.4 million pages in length. *Id.* Due to the lack of a load file, when the Defendant reviews the documents in Relativity, there is an inability to load, search, and organize the documents by Bates number. R. Doc. 114-1.

When reviewing the documents on the native file on the local hard drive, as the Government suggested, the Defendant complains that he does not have an ability to apply multiple search terms across multiple documents simultaneously and perform a smart advanced search or Boolean search. R. Doc. 114-1, p. 7. Instead, the Defense Team has to open the documents one by one and perform a manual search with a singular key term. *Id.* Scott finally states this makes it hard for the Defense team to filter, code, and organize the documents being reviewed. *Id.* As such, the Defendant's position is without the Government "creating"[2] a load file for these productions, their ability to review documents is inefficient and impractical.[3]

The Government contends that it provided Bates numbers for the documents produced. R. Doc. 124-1, p. 2. It is only the Defendant's viewing the documents on the Relativity platform that renders the Bates number not visible. *Id.* Notwithstanding, the Government has proposed to multiple solutions to the Defendant, *e.g.*, viewing the documents in native format, asking

___

[2] Defendant concedes that the Government has represented to him that no load files exist for these production sets. *See* R. Doc. 114-1, p. 6.

[3] Defendant also suggests, due to his inability efficiently to cull through information, that he risks surprise at trial where hypothetically the Government uses a document for cross-examination that it cannot find in its system, as it on the local hard drive, and cannot readily pull it up. The Court declines to provide an advisory comment on this hypothetical issue.

Defendant to run an optical character recognition ("OCR") software to capture the Bates number,[4] reproduce the documents with digitized Bates numbers, implementing an overlay process to import Bates number data. The Defendant has rejected these suggestions where it would require them to reprocess and rereview documents when the defense team has already made headway in the productions.

The Government further provides the total number of Bates stamped pages in these productions is 855,092.[5] 124-2, p. 4. The Government contends the documents produced in native format, outside of relativity consist of approximately 780 emails and approximately 100 pages of text messages, in addition to documents like search warrant affidavits, bank records, interview reports, plea agreements and criminal histories. R. Doc. 104, p. 15. The Government also highlights that Defendant's primary complaint, that he cannot for some reason link the bates number the Government gave to the document to the version of the document uploaded to Relativity, applies to a relatively small number of documents in comparison to the productions generally. R. Doc. 104, p. 14.

The Government further contends that approximately 750,000 pages, or over eighty-seven percent (87%), of the production is bank records.[6] R. Doc. 124-1, p. 5. The Government has provided indices cataloguing what bank account the records relate to, in whose name the account is held, and who the signatory on the account is to the Defendant. R. Doc. 124-1, p. 10. As such,

---

[4] The Government has previously stated that the Defendant's OCR software is better than the Government's which is why it sought the Defendant run the OCR process.

[5] Defendant suggests the production is 8.4 million pages, which is actually closer to the total number of documents produced and includes the production for which a load file has been provided although the Government contends that 8.4 million is also an inflated estimate for even those documents.

[6] The Government also contends that the Defendant improperly inflates the number of pages for review by using the print preview function in Microsoft excel estimate the number of spreadsheet data.

the Government maintains line-by-line analysis is not only unnecessary, but a waste of the Defendant's time.

In addition, the Government maintains is must also review the spreadsheets in native format, and not on Relativity. R. Doc. 124-1, p. 9.[7] As such, the Defendants and Government are on equal footing when it comes to the spreadsheets. *Id.*

Finally, the Government contends that at least thirty-seven (37) spreadsheets consist of Medicare claims data. *Id.* The Government told Defendant, in written correspondence dated August 3, 2020, that it intends to rely on summary exhibits to display this information to the jury. *Id.* Similarly, the Government told Defendant of the spreadsheets that contain claims data for the laboratories, that the Government only intends to use the he claims data for labs relating to the Defendant, *e.g.*, Lazarus, Pathway Diagnostics, 360 Labs, Clio Labs, Elite Medical, Performance. *Id.* As such, the Government contends that it has sufficiently narrowed the field of search for documents produce in native format outside the document review platform. *See id.*

In summary, the Government contends that its production is accessible and searchable, even if it is not accessible and searchable in Relativity as Defendant prefers. *Id.* The discovery rules do not require anything further absent an agreement among the parties.

The Court is not in the least bit surprised that the Government and Defendant have run into some technical difficulties. That is to be expected given the shear magnitude and complexity of a case like this which is ESI extensive. There has been no evidence that the Government has not complied with its discovery obligations despite the technical challenges.

---

[7] The Government also explains some of the spreadsheets were imaged from seized computers or are attachments to seized emails. R. Doc. 124-2, p. 9.

"The Federal Rules of Criminal Procedure 'are to be interpreted to provide for the just determination of every criminal proceeding, to secure simplicity in procedure and fairness in administration, and to eliminate unjustifiable expense and delay.'" *United States v. Meredith*, No. 3:12-CR-00143-CRS, 2015 WL 5570033, at *1 (W.D. Ky. Sept. 22, 2015) (citing Fed. R. Crim. P. 2). "The Court may order the government's manner of production to be in a format usable by the defendant." *Id.* (citing *United States v. Warshak*, 631 F.3d 266, 296 (6th Cir. 2010) (Federal Rule of Criminal Procedure "contains no indication that documents must be organized or indexed")). Similarly, Federal Rule of Criminal Procedure contains no indication that the government's manner of production must be compatible with the document review software preferred by the defendant.

"There is a dearth of precedent, however, suggesting what constitutes sufficiently usable discovery." *Meredith*, 2015 WL 5570033, at *1 (finding no *Brady* violation where Government produced voluminous discovery that was not unduly onerous to access in searchable format via common applications with indices to assist with searching the discovery). The Government is under no obligation to provide discovery that is searchable by a particular application or in a specific fashion favored by a party. *Id.* at *2 (noting the Government provided by common applicable in which the Government also uses for its own search purposes).

Here, like in the *Meredith* case, the Government produced documents in a searchable format, despite complaints from the Defendant that he cannot apply multiple search terms and connectors across multiple documents, and in common applications with indices to assist in the searching of discovery.[8] In addition to those efforts, the Government even provided indicators to

---

[8] The Court, here, notes that at the September 2, 2020 hearing it told Defendant it provide the Court a list of search terms for its eyes only, along with the source document for that key term, and a list of hits resultant from running that search to show that the terms applied did not sufficiently narrow the amount of documents for review. *See* R. Doc. 110, p. 42. The Defendant, however, never provided the Court with such information.

the Defendant as to which documents to focus his search on, which documents the Government is likely to use in trial, which documents he should disregard, and has provided Defendant with written and oral assistance in regard to finding specific documents.

The Government has stated that it does not have load files for the productions that the Defendant complains of and it too is viewing the documents in native format on the local hard drive, looking at the exact same PDF files and Excel Spreadsheets outside the Relativity platform, and is limited to the same single term/phrase search function. Despite this, the Defendant asks the Government to create a load file, even though the Government is facing similar technical limitations when reviewing the complained of documents.

Although the Government fails to explain why a load file was never created, the developers of Relativity have posted that users may run into difficulties when attempting to load and review certain sorts of documents to include spreadsheet and PDF documents—the same types of documents Defendant complains of now.[9] Based upon this knowledge and functional limitations of Relativity, there is no evidence that it was a tactical decision to not include load files with some of the productions.

Moreover, the Defendant fails to point to any case law that supports is position that producing information in its native format is improper. The rules require that the discovery be accessible and there is a consensus that the documents are accessible. There is no requirement for convenience. Again, issues like this could have been considered and addressed well before discovery began if the parties had taken the time and done the work to execute a proper ESI Protocol.

---

[9] *See, e.g.*, Defect Errors REL-32815, REL-171633, REL-135947, etc. located at https://help.relativity.com/9.3/Content/What_s_New_In_9.3/Known_issues_list.htm.

The Court stresses the technological issues that now plague the Defendant's case could have been best circumvented through the drafting and adoption of an ESI Protocol, which could have easily required the Government to produce discovery in a particular format. Despite a Court Order and repeated suggestions by the Court that the parties put the time into crafting an ESI Protocol adapted to the needs of this case, the parties refused to do the work and create an ESI Protocol.

The Court, therefore, will not require the Government to go out and create a load file for the benefit of Defendant. As such, the Defendant's request seeking an order requiring a load file for PDFs and spreadsheets is denied.

### 4. "Hot Documents"

Finally, Plaintiff contends that the amount of production is so voluminous that it warrants the Government's sub-production of "hot documents" or exculpatory material. R. Doc. 52-1, p. 10-12. Specifically, the Defendant argues that the Government has overproduced so much that it has rendered it impossible for the Defense Team to find relevant documents out of the millions of pages of material produced. *Id.* As such, requiring the Government to identify irrelevant material is necessary to identify what exactly is exculpatory. *Id.* In support of his position the Defendant cites to the Fifth Circuit decision *United States v. Skilling*, 554 F.3d 529 (5th Cir. 2009), *aff'd in part*, *vacated in part*, *remanded*, 561 U.S. 358 (2010), and various other cases from across the country.[10] *Id.*

The Government, in opposition, argues that the Defendant is not entitled to a sub-production of "hot documents." R. Doc. 67, p. 15. The Government argues that it has provided discovery in an organized, keyword searchable format, along with organized indices and

---

[10] While the Defendant cites cases out of the District Court for D.C. and the Eastern District of California, these cases do not have any binding precedential value upon this Court.

appendixes to the discovery to ease Defendant's burden in sieving through the productions. R. Doc. 67, p. 16. In addition, the Government has provided detailed descriptions of why certain documents were produced, as well as the search warrant affidavits which essential outline the Government's theory of the case. *Id.* As such, the Government argues such a production would be inapposite to binding Fifth Circuit precedent. *Id.*

In *Skilling*, the Fifth Circuit considered whether a voluminous open file discovery can violate *Brady*. *Skilling*, 554 F.3d at 577. In finding that it did not violate *Brady*, the Fifth Circuit noted that the open file was electronic and searchable, the government created indices, and the government produced a set of "hot documents" that it thought were important to the case or potentially relevant the defense. *Id.* As such, the Fifth Circuit determined that there was no evidence that the government found something exculpatory and hid it in the open file with hopes that the defendant would never find it. *Id.* The Fifth Circuit, however, cautioned, in situations where there is evidence that the government has intentionally padded an open file with pointless and superfluous information to frustrate a defendant's review of the file, that serious *Brady* issues could be raised. *Id.*; *see also United States v. Stanford*, 805 F.3d 557, 572 (5th Cir. 2015) (affirming *Skilling* decision that no *Brady* violation occurs without some showing that the government acted in bad faith by dumping data onto a defendant).

Subsequent to *Skilling*, district courts in the Fifth Circuit have considered the implications of the *Skilling*'s decision. For example, in *United States v. Simpson*, the court considered whether the additional steps taken in combination, as opposed to requiring each of the additional steps mentioned in *Skilling*, collectively met the government's obligation to comply with *Brady*. *United States v. Simpson*, No. 3:09-CR-249-D 06, 2011 WL 978235, at *9 (N.D. Tex. Mar. 21, 2011) (finding defendant not entitled to further relief, such as a comprehensible index or government

pointing out evidence favorable to his defense, where the government provided the evidence in usable searchable format, met with the defense to recommend where counsel should focus its review efforts, and suggested which hard drives or platforms should search for certain documents despite the 200 terabyte production), *United States v. Shafer*, No. 3:09-CR-249-D 05, 2011 WL 977891, at *3 (N.D. Tex. Mar. 21, 2011) (same); *see also United States v. Vujanic*, No. 3:09-CR-249-D (17), 2014 WL 3868448, at *2 (N.D. Tex. Aug. 6, 2014) (finding defendant not entitled to further relief where government had undertaken some additional steps mentioned in *Skilling* but not necessarily the creation of "hot documents").

Part of the challenge with these types of cases is that because of volume of documents is always inconvenient. Defendants and their counsel struggle with the volume, but that struggle with volume is not just on the Defendant's side. The Government is struggling with volume too.

In this case, while the Government has produced a tremendous amount of discovery, the Government has taken many of the additional steps cited in *Skilling* to reduce the Defendant's burden in reviewing that discovery as well as his need to review every document.[11] In fact, the Government in this case undertook steps beyond those that the *Skilling* court mentioned to center the Defendant's review, *e.g.*, detailed descriptions of why certain documents were produced and the production of the search warrant affidavits.

In finding that the Defendant is not entitled to a set of "hot documents," the Court directs the Defendant's attention to *United States v. Causey*, 356 F. Supp. 2d 681 (S.D. Tex. 2005) (district court case that considered the government obligation to point out exculpatory material to Jeffrey

---

[11] For example, the Government provided Defendant with a spreadsheet accountant schedule of bank records. The Government also provided a PDF version of all the bank statements and records. The Government told the Defendant it would be a waste of time to go through every bank statement but instead instructed the Defendant to utilize the spreadsheet it created and provided to the Defendant to filter through the bank records by date, or signatory, or bank account holder, etc. and review only the bank records he finds of importance.

K. Skilling, co-defendant of Causey). The court in *Causey* noted that the government had produced an open file with more than 80 million pages of information related to the Enron scandal. *Causey*, 356 F. Supp. 2d at 687. The *Causey* court also noted that the hot documents sub-production was not the exculpatory material, but the material the government viewed as central evidence for both the government and defense. *Id.*

In this case, the Government has produced 2.43 terabytes, approximately 6 million pages, worth of information.[12] That's approximately only 7.5% of the total production contemplated in the Skilling's case. The Government has provided to the Defendant detailed information on how the production was organized; what is included in each production; what entities to focus on, *e.g.*, Mr. Satary's four companies; has told Defendant what evidence it is likely to present at trial and how it intend to present some of that evidence, *e.g.*, summary charts; has indicated key terms and players with the Defendant; has provided indices and appendixes to the Defendant; and has provided the search warrant affidavits. In addition, the Defendant's IT specialist, Mr. Scott, has attested to the fact that in applying the 302 search terms provided by the Government it has narrowed its search to about 160,781 documents, or 4 million pages.[13] *See Causey*, 356 F. Supp. 2d at 684 (discussing narrowing 50 to 80 million documents to 5 to 7 million key documents).

Moreover, based on all the steps the Government has undertaken to assist the Defendant in culling through the data and honing his search, the Defendant has not shown that the Government has acted in bad faith requiring further action. That the productions have been voluminous has

---

[12] The Court notes that the Defendant is contending that the actual page count is 14 million pages. Notwithstanding, Defendant included in that page count and estimate total of spreadsheets. The Government created and provided to the Defendant much of the spreadsheet data at the Defendant's behest—*e.g.*, indices for organizational purposes. The Defendant cannot have his cake and eat it too. The Defendant asked for the indices, the Government gave him the indices, the Defendant cannot now complain about how much time it takes to go through the indices.

[13] This sharply contradicts Defendant's counsel Arthur Leach's statement at the September 2, 2020 hearing that the Defense Team has narrowed the documents to 26,000 that relate to the entities in the indictment. *See* R. doc. 110, p. 25-27.

more to do with the nature of the alleged crime and that the Government provided its investigative files for Mr. Satary's unindicted co-conspirator, which the Government has stated on more than one occasion that it plans on calling to testify against Satary.

Finally, the Defendant no longer suffers under the trial time constraints which he original complained of, as the District Judge presiding over the matter continued the trial an addition six months from its original date. *See* R. Doc. 127 (continuing trial from January 11, 20201 to July 12, 2021). This provides the Defense Team considerably more time to review the information that the Government has provided.

In summary, while the government in *Skilling*'s case voluntarily created a set of hot documents, this Court has found no precedent in the Fifth Circuit requiring the government to do so. As such, this Court finds that the Defendant is entitled no further relief. The Court, therefore, denies Defendant's request for a sub-production of "hot documents."

## IV.   Conclusion

Accordingly,

**IT IS ORDERED** that the Defendant's **Motion to Compel Discovery Pursuant to Fed. R. Crim. P. 16 and *Brady* and *Giglio* (R. Doc. 52)** is **DENIED.**

New Orleans, Louisiana, this 1st day of October 2020.

**KAREN WELLS ROBY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**