**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| | * | |
| **UNITED STATES OF AMERICA** | | **NO.  2:19-cr-00197-WBV-KWR** |
| | * | |
| **v.** | | **SECTION: "D" (4)** |
| | * | |
| **KHALID AHMED SATARY** | | |
| | *       *       * | |

**UNITED STATES' NOTICE OF ANTICIPATED EXPERT**
**WITNESS TESTIMONY AND NON-EXPERT WITNESS TESTIMONY**

The United States of America, by and through undersigned counsel, hereby provides its

Notice of Expert Witness Testimony and Notice of Non-Expert Witness Testimony ("Notice") in

accordance with Federal Rule of Criminal Procedure 16(a)(1)(G) and Federal Rules of Evidence

702, 703, and 705.  The United States may choose not to elicit the testimony outlined in this Notice

but provides this information in order to comply with the applicable rules.

In particular, the United States provides notice that it intends to qualify and introduce

testimony from one or more experts in: (1) the functioning of the Medicare program and its

attendant rules and regulations pertaining to billing and coding for Part B laboratory testing

services; (2) Medicare's rules and regulations pertaining to various forms of genetic testing,

including cancer genetic ("CGx") testing; and (3) the financial transactions at issue in this case.

Other than these experts, the United States plans to call fact witnesses to testify regarding

matters of which they have personal knowledge under Federal Rule of Evidence 602 and about

which they may opine under Federal Rule of Evidence 701.  This Notice summarizes some of the

areas about which those witnesses will testify as fact witnesses but is not intended to be a complete

summary of their potential testimony.  Each of these witnesses will testify pursuant to a trial

subpoena, and each witness may also receive coverage of regular expenses that the Government

and/or the witnesses' employing agencies may pay or reimburse for all witnesses.

The United States acknowledges its continuing duties to disclose evidence and provide notice to Defendant.  Should unexpected events arise between now and the trial which might require additional or different expert testimony, the United States will promptly supplement this disclosure.

The United States requests reciprocal disclosure from Defendant of any expert witnesses and the amounts of any contracts and/or payments to witnesses whom the defense may call to testify at trial.

## **LEGAL STANDARD**

Under Federal Rule of Evidence 702, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise" if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702.  "An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed."  FED. R. EVID. 703.

Under Federal Rule of Criminal Procedure 16(a)(1)(G), as relevant here, "the government must give to the defendant a written summary of any testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case-in-chief at trial." That summary "must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications."  *Id.*

<u>**NOTICE OF POTENTIAL EXPERT WITNESSES**</u>

1.      <u>**Medicare Testimony – Laurie McMillan**</u>

The Government intends to call Laurie McMillan to explain how Medicare works, Medicare's coverage for laboratory testing (including genetic testing and other testing conducted in this case), and the representations that providers, including laboratory owners, must make to enroll with Medicare.[1]

<u>Qualifications</u> – Laurie McMillan currently works as the Director of Healthcare Payment Integrity Policy with Advize Health, LLC.  From 2014 to 2021, Ms. McMillan was the Law Enforcement Coordinator and Project Manager for Medicare's Unified Program Integrity Contractor ("UPIC") governing Louisiana and other states.  In this role, Ms. McMillan coordinated medical reviews requested by law enforcement; collaborated with federal and state agencies to provide information on coding guidelines, Medicare rules and regulations, and indicators of fraud from clinical documentation and billing data; and provided fact and expert testimony in federal criminal prosecutions.  Ms. McMillan has been qualified in federal court as an expert witness.  Prior to her work for the UPIC, Ms. McMillan worked for several years for various Medicare Administrative Contractors.  Ms. McMillan was in active duty for the United States Air Force's Nurse Corps from 1985-1988 and worked in the medical field as a nurse for over two decades.  She is a Registered Nurse, a Certified Fraud Examiner, and a Certified Professional Coder.  Ms. McMillan obtained her Bachelor of Science in Nursing from the University of Nebraska.   A copy of Ms. McMillan's CV will be produced to Defendant.

---

[1] The Government reserves the right to call a different witness to provide testimony similar to that outlined herein.  In the event Ms. McMillan is unavailable, the Government tentatively plans to call Stephen Quindoza to provide similar testimony.  Mr. Quindoza is the Fraud Investigations Team Lead for SafeGuard Services LLC, which is Medicare's Southeast Unified Program Integrity Contractor.

Bases for Testimony – In the course of her many years in this industry, Ms. McMillan has become familiar with Medicare's coverage for laboratory testing services and has overseen numerous fraud investigations for Medicare contractors.  She has testified about Medicare's rules and regulations dozens of times.  Ms. McMillan's testimony is based upon her training, knowledge, skill, and experience in the area of Medicare.

Summary of Anticipated Expert Testimony – In summary, the Government anticipates that Ms. McMillan's testimony will cover the following topics and include the following opinions:

### A.   Background on Medicare

•   Ms. McMillan will testify that Medicare is a federally-funded program that provides free and below-cost health care benefits to people age 65 years or older, the blind, and the disabled.  The Centers for Medicare & Medicaid Services ("CMS") is responsible for the administration of the Medicare Program.  Ms. McMillan will explain that individuals who receive benefits under Medicare are referred to as Medicare "beneficiaries."  Beneficiaries are eligible to receive a variety of services, including laboratory, hospital, and physician services ("Part B").  Part B covers outpatient physician services, such as office visits, minor surgical procedures, and laboratory services, when certain criteria are met.

•   Ms. McMillan will explain what a claim for payment from Medicare is, and what must be included to submit a claim for payment from Medicare, including the following:  (1) the claim must pertain to a patient who was properly enrolled as a Medicare beneficiary; (2) the health care provider who furnished the services to the patient must be licensed in the state in which they practice and be properly enrolled with Medicare; (3) the services claimed must have been actually provided as reported on the claim; (4) the services claimed must be medically necessary and eligible for reimbursement under any applicable rules, regulations, or policies; and (5) the claim must be properly reported and properly documented with a supporting medical record.

•   Ms. McMillan will testify to the claims adjudication process, including the time in which Medicare processes claims and the extent to which claims are, or are not, reviewed by Medicare.  She will testify that it is a physical impossibility for every claim to be reviewed before it is paid by Medicare.  Instead, Medicare is a trust-based system that relies on the provider's representation that claims are true and accurate.

### B.   Medicare Enrollment Process and Form 855

•   Ms. McMillan will explain that "Providers" include clinical laboratories, physicians, and other health care providers who provide services to beneficiaries.  In order to bill Medicare, a provider must submit an enrollment application to Medicare.  The enrollment application contains certification statements that the provider must agree to before enrolling with

Medicare.  Specifically, the certification statement sets forth, in part, that the provider agrees to abide by the Medicare laws, regulations, and program instructions, including the Federal Anti-Kickback Statute, and will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare.

- Ms. McMillan will also explain what a Medicare "provider number" is.  A provider number is assigned to a provider upon approval of the provider's Medicare application.  A provider may use that provider number to file claims with, or "bill," Medicare to obtain reimbursement for services rendered to beneficiaries.  When submitting claims to Medicare for reimbursement, providers certify that: (1) the contents of the forms are true, correct, and complete; (2) the forms are prepared in compliance with the laws and regulations governing Medicare; and (3) the services purportedly provided, as set forth in the claims submissions, are medically necessary.

- Ms. McMillan will discuss the Forms 855 and other documentation submitted by the Satary Labs, including representations contained within these forms as to the Satary Labs' ownership, as well as the certifications to comply with applicable rules and regulations, including the Federal Anti-Kickback Statute, and to not submit false claims.

### C.    Shell Lab Rule

- Laboratories may only bill for testing they reference out to be conducted by other independent laboratories under the 70/30 rule (also known as the "shell lab rule"), which prohibits a referring lab from billing for "more than 30 percent of the clinical diagnostic laboratory tests" that are actually performed by another lab.  *See* 42 U.S.C. § 1395l(h)(5).

### D.    Medicare's Coverage of Laboratory Testing

- Ms. McMillan will testify that this case implicates claims submitted to Medicare for Part B laboratory services, namely, cancer genetic ("CGx") testing.

- Ms. McMillan will explain Medicare's reimbursement policies with respect to such testing and she will testify that Medicare reimburses for each test at rates varying from approximately a few hundred dollars to several thousand dollars for a panel of tests.

- Ms. McMillan will explain that Medicare Part B does not pay for every potential medical service, and instead, many services are expressly excluded from coverage.

- Ms. McMillan will testify that as a condition of Medicare payment, a physician or other Medicare provider must certify that the services performed were medically necessary as required by Title 42, United States Code, Section 1395n(a)(2)(B).

- Ms. McMillan will testify that Medicare generally does not pay for "screening" tests, unless specifically covered by statute, which the genetic tests billed in this case were not. Rather, CGx testing must be "reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A); *see also* 42 C.F.R. § 411.15(a)(1).  Ms. McMillan will explain that for a reasonable and necessary

item or service that is diagnostic in nature, such as x-ray tests, diagnostic laboratory tests (including CGx tests), and other diagnostic tests, such tests must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem.  Ms. McMillan will testify that Medicare does not cover items and services such as those described above that are not ordered by the beneficiary's treating physician because CMS has determined that tests not ordered by the physician treating the beneficiary are not reasonable and necessary.  *See* Title 42, Code of Federal Regulations, Section 410.32(a).

- Certain screening tests are exempted from the general exclusion from coverage, such as routine mammography or colonoscopy exams (among other routine screening exams).  Ms. McMillan will contrast routine screening tests expressly covered under statute from CGx testing, which is not generally eligible for reimbursement by Medicare on the basis that such testing is not reasonable and not necessary, absent a showing that this diagnostic testing meets all of the requirements described above.

- Ms. McMillan will describe various billing codes used to bill for performing CGx tests, including, but not limited to Current Procedural Terminology ("CPT") code 81408.

- Ms. McMillan will discuss and explain that Medicare publishes guidance regarding what services it does and does not cover in a variety of publications, including National Coverage Determinations ("NCDs") and Local Coverage Determinations ("LCDs").

- Even if a genetic test satisfies the applicable statutory and regulatory requirements above, the test must also satisfy applicable LCD coverage limitations.  Ms. McMillan will testify that Novitas is the Medicare Administrative Contractor for the Medicare jurisdiction applicable to Louisiana and other states.  LCDs issued by Novitas and other Medicare contractors limit coverage of specific genetic tests.

- Ms. McMillan will also address under what circumstances Medicare considers telemedicine to be a reimbursable expense and what requirements must be met in order for Medicare to approve telemedicine consultations.

- Ms. McMillan will also explain Medicare's rules related to providers' record-keeping requirements and requirements related to documenting medical necessity in the patient record.  Specifically, Ms. McMillan will explain that Medicare requires ordering/referring physicians to document medical necessity and other coverage for genetic testing.  Medicare regulations require health care providers enrolled with Medicare to maintain complete and accurate patient medical records reflecting the medical assessment and diagnoses of their patients, as well as records documenting actual treatment of the patients to whom services were provided and for whom claims for payment were submitted by the physician.

### E.    Part B Billing in This Case

- Ms. McMillan will apply her knowledge of Medicare rules and regulations regarding claims and reimbursement for CGx tests to the facts of this case.

- Ms. McMillan will answer hypothetical questions drawn from the facts of this case regarding how Medicare coverage guidelines are applied in different scenarios.

- Ms. McMillan will testify regarding summary exhibits explaining billing data and billing patterns in this case.  Among other billing patterns, Ms. McMillan may testify to the following and may use summary exhibits to explain these trends:

  - Ms. McMillan will explain that the Satary Labs frequently billed for tests referenced out to other labs.  Ms. McMillan will further use summary exhibits to explain patterns pertaining to genetic testing billing in this case, including patterns pertaining to the number and types of genetic testing billed by the Satary Labs for each patient, the diagnosis codes associated with such billing, and the extent of any physician-patient relationship documented in billing data associated with the referring physician.  Ms. McMillan will testify to other billing patterns, such as the location of beneficiaries compared to ordering physicians.

  - Ms. McMillan will quantify and summarize the amounts billed and paid for various types of testing by the Satary Labs, for particular beneficiaries, as well as by the top referring providers who referred testing to the Satary Labs.

- Ms. McMillan will convey specific claims information for the claims charged as health care fraud counts in the Indictment, such as the claim number, date of service, billing date, amount billed, procedure codes billed, and associated diagnoses codes reflected in the billing data. Ms. McMillan may also explain to the jury additional information about the Satary Labs' billing for the beneficiaries identified in the health care fraud counts beyond the specific claims charged, as well as information about their prior treatment history with the referring physician, as evidenced in claims data produced to the Defendant.

Compensation – Ms. McMillan has been performing work pursuant to a contract with the

U.S. Department of Justice, Criminal Division.  Ms. McMillan has been awarded a contract in the

amount of $15,000 relating to her work in this matter.  A copy of the contract will be produced to

Defendant.  Ms. McMillan has not yet billed the Government for her services.  It is expected that

Ms. McMillan will receive additional compensation for her time preparing for trial, traveling, and

testifying at trial.  The United States will compensate Ms. McMillan for her time at the rate of

$500 per hour.

2.        **Genetic Testing Testimony – Dr. Anthony Magliocco**

The Government intends to call Dr. Anthony Magliocco, or another witness, to testify regarding cancer, the nature of CGx testing, and the medically appropriate and inappropriate uses of these tests.

Qualifications – Dr. Magliocco has a medical degree from the University of Alberta and is licensed to practice medicine in the state of Florida. He specializes in pathology and laboratory medicine and is the CEO and President of Protean BioDiagnostics, which is a medical lab focused on precision medicine for cancer patients. This facility provides comprehensive testing services for cancer doctors including cancer genetic testing services. This is a CAP CLIA licensed laboratory. The mission is to make high quality cancer testing available to all patients for whom it is appropriate regardless of where they live to accelerate precision medicine especially in underserviced areas and in disadvantaged patients. Prior to founding this company, Dr. Magliocco held multiple positions at the Moffitt Cancer Center, including serving as chairman of the anatomic pathology department, scientific director of the tissue core (one of the largest tumor banks in the world), director of multiple fellowship training programs, and the principal investigator of a laboratory that hosted a research program at Moffitt. Dr. Magliocco has served as a professor of oncology and of pathology at two universities (Calgary and USF). Dr. Magliocco has also been appointed as Professor of Pathology at UCF, effective January 2022. He has published over 200 articles on cancer research. He founded the Hereditary Cancer Program in Saskatchewan and received special recognition from the Canadian Cancer Society to support this project.

Dr. Magliocco has extensive experience treating patients with cancer, including interpreting the results of CGx tests, using these tests in treating patients, and consulting patients about CGx testing. As a result of these and other experiences, Dr. Magliocco has become familiar

with CGx testing, including the purposes of these tests, the clinical uses of the tests, and the medically appropriate and inappropriate uses of these tests. Dr. Magliocco has previously testified in federal court as an expert in CGx testing. Dr. Magliocco's CV and prior testimony will be produced to Defendant.

Bases for Testimony – As a result of his extensive experience, Dr. Magliocco has become familiar with CGx testing, including the purposes of these tests, the clinical uses of the tests, and the medically appropriate and inappropriate uses of these tests.

Summary of Anticipated Expert Testimony – The Government anticipates that Dr. Magliocco's testimony will cover the following topics and include the following opinions:

## A.   Background on Cancer and CGx Testing

- Dr. Magliocco will explain what cancer is. He will testify that cancer is an abnormal growth of the body's cells that can invade local tissue and disrupt the function of those tissues. Cancer can spread to other organs and cause death.

- Dr. Magliocco will explain what CGx testing is. Namely, CGx testing is a process of measuring the genetic information within the cells to determine if the genetic information is correct or has errors (i.e., mutations) in it. Such errors can be inherited or they can be acquired.

- Some families are cancer-prone and certain genes or mutations can determine the risk of an individual acquiring cancer throughout their lifetime. Genetic testing can determine if a patient is at higher risk of developing cancer and is often used in younger individuals to determine if they have inherited a high risk of cancer from their family members. CGx testing can also be used in people who have cancer to determine the best course of treatment.

- As a general matter, it is not appropriate to use these tests simply out of curiosity. Instead, the tests should be used for a medical decision-making purpose. Thus, it is essential that the tests be ordered by a medical professional who is actually treating the patient and uses the results in the patient's treatment.

## B.   Medically Appropriate & Inappropriate Uses of CGx Tests

- In a patient where an inherited cancer syndrome is suspected, a CGx test may be indicated as a tool to assist treating physicians gather information, discuss treatment options, and assist patients with making informed decisions about their care. CGx testing should only be ordered to compliment a complete care program managed by one or more physicians or appropriately trained health care providers with the expertise to treat the patient. Managed by a

physician treating these patients, the information obtained from CGx testing can play a meaningful role in providing quality care.

- Dr. Magliocco will also testify that there is currently little or no evidence that the use of CGx testing that broadly targets the general population, and especially the elderly, has any clinical value.  Such broad-targeted campaigns are not currently endorsed by the Association of Molecular Pathology (AMP), of which Dr. Magliocco is a member.

- Age plays a role in determining whether or not a CGx test is medically appropriate. Genetic testing in younger people provides a window of opportunity to modify the person's risk of developing cancer.  As a person ages, the ability to modify that risk diminishes.

- Dr. Magliocco will answer hypothetical questions, including hypothetical questions drawn from the facts of this case, to further explain what would be, in his opinion, medically appropriate and inappropriate uses of these tests.

- CGx testing results are complex and can be inconclusive in nature such that they require the skills of a properly trained physician or other properly trained and certified health care providers to accurately interpret them in a manner that is useful to the patient.  Absent involvement by a competent treating physician, there is an unreasonable risk that patients could misinterpret CGx testing results, which could lead them to make premature and unwarranted medical decisions, or conversely to take an apathetic approach to their health based upon a false sense of security. Information revealed by CGx testing can also exact psychological tolls on patients absent proper management by a trained physician.

- Dr. Magliocco will explain that CGx testing results can also be misleading.  For example, a negative result does not mean that a particular patient will not develop cancer, nor does it mean that the patient has a reduced overall risk for the future development of cancer during the course of his or her lifetime (approximately 1 in 3 chance).  Absent comprehensive genetic counseling, a patient could misinterpret a negative test result to their future detriment.

- Dr. Magliocco will testify that the potential benefits of CGx testing outweigh the risks and such testing is medically indicated in a limited number of high-risk patients, such as those with a current diagnosis of cancer or those patients having multiple immediate family members with suspected inherited cancer syndrome.  Suggestive inherited cancer syndrome means multiple members of a family, more than one generation, cancer at a young age (*i.e.*, younger than 50), and multiple cancers in a single individual (*i.e.*, breast and ovarian cancer in a woman).  Cancer-free patients having a single relative with a vague history of cancer does not qualify as suggestive inherited cancer syndrome or familial cancer syndrome.

- Dr. Magliocco will testify that when a treating physician decides that it is in his or her patient's best interest to receive CGx testing and subsequently orders it, the testing should be accompanied by comprehensive pre- and post-testing genetic counseling provided by a genetic counselor, physician, or health care provider with appropriate training and experience in the area of genetics.  Genetic counseling is a service provided by a properly credentialed medical provider who helps to explain the purpose of a genetic test, how the test will be done, what the results will

look like, what different results might mean, and what the implications of those results might be in terms of how they might affect treatment of a current cancer. If screening or risk modification strategies are available, genetic counseling is also useful to explain to patients the implications related to insurance reimbursement, as well as what impacts, if any, CGx testing results might have on other immediate family members, especially children.

- Dr. Magliocco will testify that, as a treating physician, he is familiar with the importance of thoroughly documenting his patients' medical charts. Dr. Magliocco will testify that the purpose of a medical chart is to document the patient encounter, record the information reviewed, and document a future plan of care for the patient. Proper charting is vital to continued care of patients because health care providers see patients in episodes over a short period of time. When it comes to CGx testing, patients' medical charting should thoroughly document the basis for ordering CGx testing, which CGx test was deployed, as well as contain information about how the decision to conduct genetic testing fits into the referring physician's treatment plan for the patient.

### C.    Specific Opinions about CGx Testing in this Case

- Dr. Magliocco may also review documents produced to the Defendant and offer opinions on those documents based on his extensive relevant training and experience as described above and in Dr. Magliocco's CV (to be provided to the defense).

- For example, Dr. Magliocco may offer opinions on the testing purportedly conducted on specific patients in this case, including opinions regarding whether testing of specific patients was medically appropriate, based on his experience and the principles discussed herein.

- Dr. Magliocco may also create or refer to summary exhibits.

Compensation – Dr. Magliocco has been performing work pursuant to a contract with the U.S. Department of Justice, Criminal Division. A copy of the contract will be produced to Defendant. The United States will compensate Dr. Magliocco at the rate of $400 per hour.

### 3.    Genetic Testing Testimony – Dr. Gabriel Alejandro Bien-Willner

In addition, the Government may call Dr. Gabriel Alejandro Bien-Willner, or another witness, to provide testimony and offer opinions similar to those describe above for Dr. Magliocco, as well as to testify as an expert on the MoIDX program at Palmetto GBA, a Medicare contractor.

Qualifications – Dr. Bien-Willner has a medical degree and Ph.D. from Baylor College. He specializes in anatomic pathology and molecular genetic pathology and is licensed in the states

of Missouri and Texas.  Currently, Dr. Bien-Willner serves as the Chief Medical Officer for Palmetto GBA and the Program Director of MolDX, which is a program that seeks to understand the molecular diagnostics landscape and to implement payor controls, coverage, and policy for reimbursements for the Palmetto GBA jurisdictions and other participating jurisdictions, in addition to advising on national coverage for CMS.  Previously, Dr. Bien-Willner served as the Molecular Director for the Precision Medicine Program at the Gibbs Cancer Center and held several positions at Molecular Health, Inc., which is a medical software company.  As a result of these and other experiences, Dr. Bien-Willner has become familiar with CGx tests and other types of laboratory testing.  Dr. Bien-Willner's CV will be produced to Defendant and any compensation provided to him will be disclosed

Bases for Testimony – As a result of his background and extensive experience, Dr. Bien-Willner has become familiar with CGx tests, among other types of laboratory testing, and the MolDX program.

Summary of Anticipated Expert Testimony – The Government anticipates that Dr. Bien-Willner's testimony and opinions will be similar to those describe above for Dr. Magliocco, but also cover the MolDX program at Palmetto GBA.  Dr. Bien-Willner will testify regarding the origin and development of the MolDX program, which was developed to identify and establish coverage and reimbursement policies for molecular diagnostic tests.  Palmetto GBA is the Medicare Administrative Contractor that administers the MoIDX program.  Moreover, Dr. Bien-Willner may be called to testify as a fact witness regarding changes over time in reimbursement for CGx testing by Palmetto GBA.

**4.**    **Financial Transaction Testimony – Michael Petron**

Finally, the Government plans to call Michael Petron, or another witness, to testify about

specific transactions, patterns, and trends, and explain summary and demonstrative exhibits regarding voluminous information, including, but not limited to, Medicare claims data and financial transactions.  Mr. Petron is a Managing Director and leads the Disputes, Compliance, and Investigations Group at Stout Risius Ross, LLC.  Mr. Petron will likely summarize the flow of money in this case, including from Medicare to the Satary Labs and on to various personal and corporate accounts, including those identified in the Indictment.  This testimony will also cover the specific transactions alleged in the Indictment as overt acts supporting the conspiracy to pay and receive kickbacks and bribes (Count 5), as well as the manner and means of the money laundering conspiracy (Count 6).  Mr. Petron will also provide other examples of similar payments and transactions and summarize the total amounts of payments to persons associated with Satary, his patient recruiters, the telemedicine companies involved in the scheme, and others.  Mr. Petron may also discuss patterns and trends in the claims data and bank records.  The Government does not believe that all of this anticipated testimony will not be expert in nature, but it notices it here in an abundance of caution.  Mr. Petron's hourly rate is $395.

## THE PROPOSED EXPERTS' TESTIMONY SHOULD BE ADMITTED WITHOUT ANY *DAUBERT* HEARING

Defendant is charged with conspiring to commit and committing specific acts of health care fraud by submitting and causing the submission of false and fraudulent claims to Medicare for genetic testing that was not medically necessary.  The issues of what constitutes proper genetic testing, particularly the circumstances in which such testing is medically appropriate, the complex nature of these tests, the risks of these tests, the need to properly document patient charts when ordering these tests, and the need to properly explain and integrate the results of these tests into patient care, are integral to the fraud alleged in the Indictment.  What these genetic tests are, and what constitutes proper uses of these tests, are not common knowledge.  The proposed experts will

13

provide the jury with an overview of genetic testing and an outline of how these tests are supposed to be used. They will also identify indications of possible fraud in the documentation they review in connection with this case. The experts' explanation of Medicare's coverage of laboratory testing, as well as the representations that laboratory owners make to Medicare, will assist the jury in evaluating whether the tests in this case were fraudulently billed to Medicare.

With the experts' testimony as a roadmap, combined with the Government's fact witnesses who have first-hand knowledge of what actually happened at the Satary Labs, the jury will have the proper context to determine whether testing was medically appropriate, the red flags the Defendant would have been aware of when billing for these tests, and whether Medicare was defrauded. The proposed experts will thus provide (a) a baseline understanding from which the jury can judge for themselves whether the Defendant committed health care fraud and wire fraud as charged in the Indictment, and (b) specific examples of such fraud for the jury to evaluate as well.

The Government is aware of only one other criminal genetic testing case that has gone to trial to date. In *United States v. Ivan Scott*, 19-cr-00209-PGB (S.D. Fla.), both Dr. Magliocco and a Medicare witness were admitted as experts, without objection from the defense. In *Scott*, which involved allegations of health care fraud pertaining to CGx testing that was billed to Medicare, Dr. Magliocco and the Medicare witness (Stephen Quindoza), who occupied a role similar to Ms. McMillan, testified to nearly identical issues as will be covered in their testimony in this case.

## <u>NOTICE OF NON-EXPERT WITNESSES</u>

In addition to the above expert testimony, the Government intends to call other witnesses whose testimony will not be expert in nature, but which the Government notices here in an abundance of caution.

To meet its burden of proof at trial, the Government will be required to introduce Medicare claims data, Medicare enrollment documentation, and Medicare rules and regulations, including rules and regulations specific to genetic testing.  The use of non-expert program witnesses is common in health care fraud cases, and lay witness testimony repeatedly has been used to educate the jury about the basics regarding the programs at issue in a given case.  *See, e.g.*, *United States v. Mazcuri*, Case No. 4:16-CR-213 (S.D. Tex.) (witness from CMS testified as non-expert about Medicare's rules and regulations).  The following witnesses will testify as lay witnesses, and the United States does not believe that their testimony must be noticed as expert testimony under Federal Rule of Evidence 702, but in an abundance of caution, notices it here.  The following disclosures are not intended to exhaustively set forth these witnesses' testimony or the topics of their testimony.

*First*, the Government may call one or more Medicare witnesses to introduce documents maintained by Medicare in the ordinary course of business, such as Medicare claims data and Medicare enrollment documentation, and to testify regarding the Medicare claims submission process and use of interstate wires, unless the parties are able to reach a stipulation regarding the authenticity and admissibility of this evidence.  The Government believes that this anticipated testimony will not be expert in nature.

*Second*, the Government may call one or more investigators from Medicare contractors that are responsible for conducting audits and investigations, including investigators who conducted audits of the Satary Labs.  The Government believes that the anticipated testimony of these witnesses will not be expert in nature.

*Third*, the Government may elicit testimony from, and introducing exhibits through, certain witnesses, such as a case agent and a financial analyst.  For example, a case agent is expected to

introduce into evidence data and records obtained via search warrant, subpoena, or otherwise, such as Secretary of State documents, audit documentation, patient files, employee files, emails, and other records.  The case agent may also introduce summaries and demonstratives regarding patterns and trends in the claims data and the substantive counts of the Indictment and associated claims to Medicare.  Further, an agent may testify regarding certain immigration programs that Defendant was involved with.  Finally, a financial analyst may provide summary testimony regarding voluminous bank records pursuant to Rule 1006 and introduce demonstratives pursuant to Rule 611.  The Government believes that the anticipated testimony of these witnesses will not be expert in nature.

*Fourth*, the Government may call primary care providers for some or all of the beneficiaries associated with the medically unnecessary genetic testing.  Such testimony will be based on their personal knowledge of their patients' medical histories.  The Government believes that the anticipated testimony of these witnesses will not be expert in nature.

## CONCLUSION

WHEREFORE, the Government notices its potential expert witnesses, provides information about its lay witnesses in the interests of full disclosure, and respectfully requests that the testimony of the proposed experts be admitted without the need for any formal *Daubert* hearing.  The United States will continue to revise this notice and its witness list as needed and provide prompt notice to the Defendant.

Respectfully submitted, this 14th day of February, 2022.

JOSEPH S. BEEMSTERBOER
ACTING CHIEF, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE
CRIMINAL DIVISION, FRAUD SECTION

*s/ Justin M. Woodard*
JUSTIN M. WOODARD
LESLIE GARTHWAITE
Assistant Chiefs
ALEXANDER THOR POGOZELSKI
Trial Attorney
U.S. Department of Justice
Criminal Division, Fraud Section
(202) 262-7868 (Woodard)
(202) 631-6388 (Garthwaite)
(202) 510-2208 (Pogozelski)
Justin.Woodard@usdoj.gov
Leslie.Garthwaite@usdoj.gov
Alexander.Pogozelski@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on February 14, 2022, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to all defense counsel of record.

*s/ Justin M. Woodard*
JUSTIN M. WOODARD