## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br>     Plaintiff, | : <br> : <br> : | Criminal No. 2:19-cr-00197 <br><br> Section "D" |
| vs. | : <br> : | Judge Wendy B. Vitter |
| KHALID AHMED SATARY,<br>     Defendant. | : <br> : | Magistrate (4) <br> Magistrate Judge Roby |

### RESPONSE OPPOSING THE GOVERNMENT'S MOTION TO STRIKE

More appropriately styled as a motion *in limine*, the government's motion seeks not to strike, but to limit, as it concedes the qualifications of each expert Satary proposed. Satary's proposed experts practically mirror the subject matter categories proposed by the government's notice, and those categories are drawn from the indictment. The "speaking" indictment made these issues relevant to the trial, and the government now inconsistently seeks to preclude defense expert testimony and undermine Satary's ability to fairly present a defense. The motion should be denied.

Pursuant to Fed. R. Evid. 702, Satary opposes the government's "omnibus motion to limit or exclude defendant's proposed expert testimony." [Doc. 297]. To support his position that the defense expert testimony is relevant to the triable issues and reliable, Satary shows the following[1]:

### ARGUMENT AND CITATIONS TO AUTHORITY

**I.    The proposed defense experts satisfy Fed. R. Evid. 702 and the proposed categories of expert testimony are not otherwise subject to exclusion under Fed. R. Evid. 403.**

"Defendants are generally free to present any expert testimony that complies with Rule 702." United States v. Kuhrt, 788 F.3d 403, 419 (5th Cir. 2015). "[] Rules 702 and 703 grant

---

[1] Satary's response is accompanied by the contemporaneous filing of an amended defense expert notice, which has revised the proposed content for doctors Roepe, Mechanic and Kelly, as well as Herrmann, thereby mooting several of the government's limitation arguments. *See* [Doc. 299].

expert witnesses testimonial latitude unavailable to other witnesses on the assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147 (119 S.Ct. 1167) (1999) (quoting Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 592 (113 S.Ct. 2786) (1993)).  To be admissible, expert testimony must be relevant and reliable.  United States v. Wen Chyu Liu, 716 F.3d 159, 167 (5th Cir. 2013).  "The basic standard of relevance . . . is a liberal one."  Daubert, 509 U.S. at 587. Reliability requires that the expert, "whether basing testimony upon professional studies or personal experiences, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  Kumho Tire, 526 U.S. at 152.

With this liberal framework (favoring admissibility) in the foreground, this Court should **DENY** the government's motion and admit Satary's proposed expert witness testimony in its entirety, for four reasons.  First, Dr. Roepe's opinion concerning the usefulness of CGx testing is significantly probative on the disputed issue of whether CGx tests can be used to diagnose cancer. Second, Dr. Mechanic's qualifications and experience are sufficiently related to the Medicare regulations governing telemedicine.  Third, Dr. Kelly's expert opinions are legally accurate and Fifth Circuit precedent does not support the government's objection to his qualifications.  Finally, Herrmann's testimony – on Medicare exclusions – is relevant to negate criminal intent, in response to the government's attempt to admit Satary's 2003 conviction as evidence of that same issue.

  **A.** **Dr. Roepe: testimony on the usefulness of CGx testing is highly probative of a disputed factual question and does not constitute "good acts" evidence.**

The government takes no issue with Dr. Roepe's qualifications, or his proffered expert testimony concerning "the nature and function of CGx genomic testing," [Doc. 297-1 at 9],

2

effectively conceding that the vast majority of Dr. Roepe's proffered testimony satisfies Rule 702.[2] Rather, the government narrowly objects to expert testimony on the "usefulness" of CGx testing, on grounds that such testimony would confuse the issues under Rule 403.[3] [Doc. 297-1 at 10]. Not so, because the diagnostic utility of the CGx tests administered to the beneficiaries is inextricably intertwined with the allegations in the indictment, rather than an attempt to introduce extrinsic "good act" evidence of uncharged transactions. The government urges an inappropriate use of Rule 403.

The Fifth Circuit has long held that Rule 403 favors inclusion—it is "an extraordinary remedy that must be used sparingly." Herrington v. Hiller, 883 F.2d 411, 414 (5th Cir. 1989) (citations omitted); *see also* United States v. Brown, 548 F.2d 1194, 1214 (5th Cir. 1977) (Gee, J., dissenting) ("And the language of Rule 403 itself requires tilting the scales in favor of admissibility . . . ."). "The application of Rule 403 must be cautious and sparing. Rule 403 is not designed to even out the weight of the evidence." America Can! v. Arch Ins. Co., --- F. Supp. 3d ---, 2022 WL 1082020, at *6 (N.D. Tex. April 9, 2022) (quoting Baker v. Canadian Nat'l./Ill Cent. R.R., 536 F.3d 357, 369 (5th Cir. 2008) (internal citation omitted))).

Under Rule 403, the "central concern is whether the probative value of the evidence sought to be introduced is substantially outweighed by the risk of unfair prejudice." United States v. Beechum, 582 F.2d 898, 913 (5th Cir. 1978). In Beechum, the Fifth Circuit developed the analysis to determine probative value and degree of prejudice (albeit in the context of extrinsic evidence).

---

[2] Although the government protests that Dr. Roepe is not "qualified to testify regarding Medicare rules and regulations," [Doc. 297-1 at 9], the defense notice did not offer Dr. Roepe for that purpose. *See* [Doc. 278 at 1-3]. In section I of the defense notice, the phrase "Medicare rules and regulations" is not mentioned.

[3] Rule 403 provides: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

Relevant here, the Beechum Court explained that, if the fact which the challenged evidence is offered to prove is highly disputed, Rule 403 likely will not exclude the evidence. Id. at 914.

That is the case here. Here, Dr. Roepe's testimony on the utility of CGx testing is both relevant to, and highly probative of, a disputed issue, to wit: whether CGx testing can be used to diagnose cancer. [Doc. 1 at 7, ¶ 24]. Specific paragraphs in the indictment assume that "CGx testing did not diagnose cancer," id., and this assumption is a foundational premise for the government's conclusion that "Medicare did not cover CGx testing for beneficiaries who did not have cancer or lacked symptoms of cancer." [Doc. 1 at 7, ¶ 24, cl. 2]. Of course, the government's conclusion does not mirror the language of the operative Medicare regulations, 42 C.F.R. §§ 411.15 (a) (1) & 410.32 (a), which have never expressly proscribed CGx tests for patients without symptoms and instead hinge coverage on whether the test was medically necessary for a diagnostic purpose. Thus, the diagnostic utility of a CGx test for asymptomatic beneficiaries is highly relevant and disputed.

The government's argument ignores an essential, disputed factual question (upon which its fraudulent billing argument is predicated) in an attempt to narrow the scope of relevance to the labs billing only. [Doc. 297-1 at 9]. This argument must fail because, based on the allegations, whether CGx testing can be used to diagnose cancer is clearly a "fact of consequence in determining the action." Fed. R. Evid. 401 (b). And, because the extent of CGx utility for diagnosis is in dispute, Dr. Roepe's testimony does not aim for "jury nullification," as the government contends. *Contra* [Doc. 297-1 at 10]. Under Circuit precedent, the government's potential disagreement with the accuracy of Dr. Roepe's testimony is irrelevant—cross examination is the government's remedy. See Moore v. Ashland Chem., Inc., 151 F.3d 269, 276 (5th Cir. 1998) (explaining the proponent does not have to demonstrate that the testimony is correct, only that the expert is qualified and the testimony is relevant and reliable); *see also*

4

Daubert, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). For that reason, i.e., the availability of an adequate remedy to test Dr. Roepe's accuracy (beyond its own expert, Dr. Magliocco, who will testify on the same subject), the risk of confusing the issues is *de minimis*. See [Doc. 263 at 8-10].

Illustrative of the flaws in the government's position, the "good acts" cases cited by the motion are distinguishable because those cases did not address the introduction of positive, probative expert testimony concerning the indicted transaction. For example, United States v. Grimm, 568 F.2d 1136, 1138 (5th Cir. 1978) did not even consider the admissibility of expert testimony (which, important here, is granted more latitude than lay witness opinions). In Grimm, a case alleging the unlawful transportation of vehicles for improper disposal, the question was whether the district court erroneously excluded documents that showed the defendant had paid for seventy-five other vehicles that were not in dispute. The Fifth Circuit affirmed the exclusion of the documents as cumulative of "undisputed testimony that [defendant] had paid other drafts." Id. "Cumulative" was the basis for the exclusion; the opinion did not use the phrase "good acts" once.[4]

In significant contrast, Dr. Roepe's testimony is not cumulative of other lay witness opinion testimony because the diagnostic utility of CGx testing is clearly beyond the ken of the average lay person. There is also no other defense witness who could testify to the nature, function, and utility of CGx testing. Finally, Grimm is further distinguishable in that Dr. Roepe's testimony does not seek to introduce independent transactions of non-criminal conduct—Dr. Roepe's testimony is

---

[4] The government's reliance on the unpublished order in United States v. Crinel, No. 15-61, 2016 WL 5363091 (E.D. La. Sept. 9, 2016) fares no better. Although Crinel was a health care fraud case, the disputed evidence was far distinguishable from Dr. Roepe's proffered expert testimony. In Crinel, the Court excluded evidence of unindicted transactions that were properly billed to Medicare and the fact that the defendant had paid tithes to religious organizations in the community. Conversely, Satary's proposed expert testimony does not implicate Fed. R. Evid. 404 or 405.

5

relevant to the allegations, specifically, to show that the subject CGx tests possessed a legitimate diagnostic quality for the patients who received them. Therefore, because Dr. Roepe's proposed "usefulness" testimony is both relevant and reliable to a disputed factual question, and the government has shown no substantial risk of unfair prejudice, the topic is admissible.

> **B.     Dr. Mechanic's background and professional experience are sufficiently related to the telemedicine regulations presented by the indictment.**

The indictment unequivocally makes telemedicine relevant subject matter in this case, [Doc. 1 at 8, ¶¶ 26-29, at 11-13, ¶ 39-41, 42 (e), at 19, ¶ 53], and the "government does not challenge Dr. Mechanic's qualifications in the area of telemedicine generally." [Doc. 297-1 at 11].

Citing only general principles, the government narrowly objects to the reliability of Dr. Mechanic's testimony concerning Medicare's rules and regulations on telemedicine. [Doc. 297-1 at 11-12]. However, the only *Medicare regulation* cited by section II of the defense notice was 42 C.F.R. § 410.32 (a), [Doc. 278 at 4], and Dr. Mechanic's review of Section 410.32 (a) is more than sufficient to establish reliable "knowledge" of the narrow purpose for which that Section was offered—to show that subsection (a) does not define "consultation." Because "consultation" is not defined by Section 410.32 (a), Dr. Mechanic will testify that operational guidance from the American Telemedicine Association fills the void and instructs the professional telehealth community. [Doc. 278 at 4-5].

To be sure, the government makes no objection to Dr. Mechanic's proposed testimony concerning ATA guidance on the criteria for a telemedicine consultation, and Dr. Mechanic (as the Director of Telehealth from Harvard Medical Facility) is undoubtedly qualified to reliably inform the jury of the ATA criteria for an appropriate visit.[5] As the government well knows, "[t]he

---

[5] Dr. Mechanic will explain that, in the telemedicine context, "consultation" is synonymous with a "visit." [Doc. 278 at 4].

standard for qualifying expert witnesses is fairly liberal; the witness need not have specialized expertise in the area directly pertinent to the issue in question if the witness has qualifications in the general field related to the subject matter in question." America Can!, 2022 WL 1082020, at *3 (citation omitted).

Here, Dr. Mechanic's specialized knowledge of the ATA operational standards for a telemedicine consultation are "sufficiently related" to the topic of Medicare regulations governing telemedicine. That follows because the Medicare regulations inform, and are the basis for, the ATA operative guidance in the professional community. Simply stated, the government's objection to Dr. Mechanic's perceived lack of a specific background with Medicare's telemedicine regulations go to weight, not admissibility. *See* Huss v. Gayden, 571 F.3d 442, 455 (5th Cir. 2009) ("Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility."). Accordingly, Dr. Mechanic's proposed testimony is admissible.

  **C.**   **Dr. Kelly's qualifications are sufficiently related to each of the proposed subject matter categories, his testimony is consistent with published OIG guidance, and the amended notice has mooted any "fact testimony" objections**.

The government's four challenges to Dr. Kelly's testimony invite reversible error by seeking to impair Satary's right to present a complete trial defense. *See* United States v. Stanford, 823 F.3d 814, 836-38 (5th Cir. 2016) (reversing conviction for violation of right to present a complete defense because defendant was denied opportunity to call expert chemist to defend a material element of the indicted crime). Of its four-part litany, the government's challenges fail as a matter of law or have otherwise been mooted by the filing of Satary's amended notice. Specifically, Satary's amended expert notice has eliminated the challenged "fact testimony" and has conformed Dr. Kelly's testimony concerning the labs legal duties (or lack thereof) to the precise language utilized by the applicable OIG Guidance. *See* [Doc. 299 at 5-6].

First, the government writes that Satary "attempts to offer incorrect statements of law to the jury through Dr. Kelly." [Doc. 297-1 at 12]. The government is wrong. It is axiomatic that, in submitting a claim to Medicare for reimbursement, "a laboratory generally may rely on that doctor's order in submitting a claim for reimbursement as medically necessary." United States v. Bertram, 900 F.3d 743, 750 (6th Cir. 2018).

With this general rule in the foreground, the government's argument toes the line of a red herring. Citing an interlocutory order in United States v. Patel, the government deems "incorrect" Dr. Kelly's proposed opinions that (1) the laboratory has no duty to determine medical necessity; and (2) the lab is entitled to rely on the certification of a licensed, consulting physician that a claimed test is medically necessary. *See* [Doc. 297-1 at 13]. But the government's reading of Patel is too broad—while the government may cross Dr. Kelly (or admit through Dr. McMillian) on the labs legal duty to ensure that they do not bill Medicare for medically unnecessary tests, that *separate billing duty* does not change the veracity of Dr. Kelly's proffered testimony, to wit: that the duty to *determine medical necessity* rests with the provider, not the lab. The lab is entitled to rely on the provider's certification, so long as the lab can produce or obtain from the provider documentation to support medical necessity.

Contrary to the government's intimation, Patel did not alter settled OIG guidance that a lab can rely on a licensed physician's determination of medical necessity for an ordered test. 2021 WL 2550477, at *9 ("courts have clarified that laboratories are not required to independently determine the medical necessity of tests ordered by physicians."); *see also* United States ex rel. Groat v. Boston Heart Diagnostics Corp., 296 F. Supp. 3d 155, 159-160 (D. D.C. 2017) (discussing OIG Guidance, 63 Fed. Reg. at 45,077 and holding "laboratory cannot and is not required to determine medical necessity, but rather is permitted to rely on the ordering physician's determination that the laboratory tests billed to Medicare are medically necessary."). In Boston

8

Heart, the District of Columbia reconciled the labs' ability to rely on the medical necessity determination of a licensed physician with the duty to ensure that Medicare is not billed for medically unnecessary tests. That Court explained: "laboratories do not and cannot treat patients or make medical necessity determinations, but should be able to produce or obtain from the treating physician the documentation to support the medical necessity of the service the laboratory has provided." Id. at 159 (quoting 63 Fed. Reg. at 45,079).

After Boston Heart, subsequent opinions have affirmed this understanding of bifurcated responsibility. *See* United States ex rel. Riedel v. Boston Heart Diagnostic Corp., 332 F. Supp. 3d 48, 56 (D. D.C. 2018) ("Even though the Medicare statute requires the laboratory to certify the medical necessity of any test for which it makes a claim for payment, the laboratory is not required to make an independent determination of medical necessity, but rather may rely on the ordering physician's determination."); *see also* United States v. Lab. Corp. of Am. Holdings, Civil No. 9:14-cv-3699-RMG, 2019 WL 236799, at *2-3 (D. S.C. Jan. 16, 2019) (same, and explaining that the lab breaches its separate billing duty when it engages in a scheme to encourage physicians to order medically unnecessary tests). Dr. Kelly's proposed testimony is consistent with this understanding, and Patel's distinguishable posture (i.e., a motion to dismiss the indictment) does not require striking the testimony.

Viewed with this background, Patel is properly read to distinguish between the separate and distinct legal duties to (1) determine medical necessity for tests (which rests with the provider) and (2) ensure that Medicare is not billed for medically unnecessary tests (which rests with the labs). Id. at *9. The government is entitled to admit evidence of this second legal duty, but it cannot bar Satary from informing the jury of the first. The government's first argument fails.

The government's second challenge – seeking to eviscerate the substance of Dr. Kelly's testimony due to his lack of specific experience with CGx testing – merits a succinct response: "It

9

is an abuse of discretion for a trial court to exclude expert witness testimony on the ground that the witness is not qualified to render an opinion at issue because the witness lacks a certain educational or other experiential background." Wen Chyu Liu, 716 F.3d at 167 (quoting 4 JACK B. WEINSTEIN & MARGARET A. BERGER, WEINSTEIN'S FEDERAL EVIDENCE § 702.04(1)(a) (Joseph M. McLaughlin ed., 2d ed. 1997)).  In Wen Chyu Liu, the Fifth Circuit explained that "[a] lack of personal experience—the [government]'s concern here—should not ordinarily disqualify an expert, so long as the expert is qualified based on some other factor provided by Rule 702: "knowledge, skill, experience, training, *or* education." Id. at 168 (emphasis in original).  There, the Court found error in the district court's wholesale exclusion of the defendant's chemical engineering expert, holding that the expert's experience in the general field was enough, notwithstanding his lack of any experience with the specific chemical: CPE.

Under Wen Chyu Liu and its Fifth Circuit progeny, Dr. Kelly's extensive experience as a Director of Medical Laboratories, consulting in the field of laboratory medicine, and responding to CMS investigations is sufficiently related to the subject categories of laboratory operations and regulatory compliance involving CGx testing.  [Doc. 278 at 5-6]; *see* Dixon v. Int'l Harvester Co., 754 F.2d 573, 579-80 (5th Cir. 1985) (holding expert did not lack qualifications to testify about the design of a crawler tractor, based on his review of blueprints and photographs, despite a lack of prior experience approving crawler tractor designs); *see also* Whitehouse Hotel Ltd. P'ship v. C.I.R., 615 F.3d 321, 331 (5th Cir.2010) (affirming the district court's qualification of a licensed real estate appraiser as an expert witness when the case concerned a "specialized" appraisal issue). Like the chemical engineering expert in Wen Chyu Liu, "[Dr. Kelly] is not strictly confined to his area of practice, but may testify concerning related applications; a lack of specialization does not affect the admissibility of the opinion, but only its weight." 716 F.3d at 169 (quoting Wheeler v.

John Deere Co., 935 F.2d 1090, 1100 (10th Cir. 1991)).  The government's second challenge, which provides no specific citation in its sole paragraph on Dr. Kelly's experience, must fail.

The government's third challenge is moot because Satary has amended Dr. Kelly's expert disclosure to revise the challenged paragraphs and limit his expert opinion testimony to records that he has personally reviewed.  [Doc. 299].

Finally, Dr. Kelly's proposed testimony illuminating Medicare's available audit tools does not "blame Medicare[.]"  [Doc. 278 at 7].  Nowhere in the defense notice did Satary indicate an intent to elicit through Dr. Kelly that Medicare should "have detected" any alleged scheme.  *See* [Doc. 278].  Conversely, Satary has denied the existence of any scheme.  Dr. Kelly's testimony concerning Medicare's available tools to review claims is relevant to informing the jury on what Medicare is and how the billing process operates.  To prohibit the jury from learning this information would mislead them concerning the operation of Medicare.

The government's cases on this point are inapposite.  For example, United States v. Kriemer 609 F.2d 126 (5th Cir. 1980) quickly rejected a sufficiency challenge to a wire fraud conviction, the defendant's argument – far distinguishable from Satary's notice – focused on the negligence of the insurance company in failing to look beyond the bordereaux.  Id. at 132.  Like the defendant in United States v. Coscia, Satary has neither raised, nor noticed an intent to raise, a "blame-the-victim" argument.  Unlike the defendant in United States v. Ahmed, Satary has not sought to argue (or elicit through Dr. Kelly) that he is not guilty solely because Medicare paid the claims submitted by the labs.  2016 WL 8732355, at *2.  However, as Cosica held, Satary *would be* entitled to show Medicare's available audit tools claims should the government first introduce McMillan's expert testimony that "it is a physical impossibility for every claim to be reviewed before it is paid by Medicare" and that "Medicare is a trust-based system that relies on the provider's representation that claims are true and accurate."  [Doc. 263 at 4].  The government has intended to do so.

11

Expert testimony to inform the jury of Medicare's available pre-and-post-payment audit tools is further relevant to the "materiality" element of the indicted fraud offenses—that Medicare had full knowledge of the alleged circumstances when it paid the claims.[6] *See generally* United States v. Anderson, 980 F3d. 423, 431-32 (5th Cir. 2020) (rejecting insufficient evidence argument that any misrepresentations of medical necessity did not affect Blue Cross Blue Shield's ability to pay). In the context of the False Claims Act, "though not dispositive, continued payment by the federal government after it learns of the alleged fraud substantially increases the burden on the relator in establishing materiality." United States ex rel Harman v. Trinity Industries, Inc., 872 F.3d 645, 663 (5th Cir. 2017). The Supreme Court has held that, "if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material." *See* United Health Servs. v. United States ex rel. Escobar, --- U.S. --- (136 S.Ct. 1989, 1999) (2016). Likewise, "if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material." Id. A litany of precedent in the False Claims Act context support this understanding.

---

[6] In the related context of the False Claims Act, "plaintiff must prove that the defendant intended that the false statement be material to the Government's decision to pay or approve the false claim." Allison Engine Co. v. United States ex rel. Sanders, 553 U.S. 662 (123 S.Ct 2123, 2126) (2008). The Fifth Circuit employs the "natural tendency" test to determine materiality. United States ex rel. Longhi v. United States, 575 F.3d 458, 470 (5th Cir. 2009). This test asks whether "the false or fraudulent statements either (1) make the government prone to a particular impression, thereby producing some sort of effect, or (2) have the ability to effect the government's actions, even if this is a result of indirect or intangible actions on the part of the Defendants." Id. "All that is required under the test for materiality, therefore, is that the false or fraudulent statements have the potential to influence the government's decisions." The Supreme Court has since elaborated on these factors.

Therefore, because Dr. Kelly's is qualified, and the challenged testimony is both consistent with OIG guidance and within the bounds of relevant rebuttal evidence, the testimony is wholly admissible.

### D. Mr. Herrmann is relevant to the jury's complete understanding of Medicare and to counter the government's evidence of Satary's criminal intent.

The government's relevance argument (that Medicare exclusion criteria is irrelevant because "the government has not alleged that the defendant has been excluded from Medicare") ignores specific allegations in the indictment that Satary "specifically identified [a family member]" as the purported owner of the labs, and that "SATARY owned and controlled [the labs] through others." [Doc. 1 at 9-10]. The indictment further alleges that "SATARY falsely and fraudulently failed to disclose to Medicare that he was the true owner of the Satary Labs, or that he was an individual who exercised operational or managerial control over, or who directly or indirectly conducted, the day-to-day operations of the Satary Labs." [Doc. 1 at 12, ¶ 42 (a)]. An alleged purpose of the count six money laundering conspiracy is to (ii) "conceal and obscure SATARY's ownership of and control over the fraudulent proceeds." [Doc. 1 at 24, ¶ 59].

The indictment's allegations make clear that a central part of the prosecution theory is that Satary surreptitiously named others as the owners of the labs to hide his control. That inference is confirmed by the government's notice of intent to introduce extrinsic act evidence through Fed. R. Evid. 404 (b). *See* [Doc. 237 at 4-5] ("The Government plans to introduce evidence of Satary's prior conviction to explain why he would have concealed his ownership from Medicare in the enrollment applications for Lazarus, Clio, and Performance. An applicant's prior felony conviction is something that Medicare likely would have discovered when considering whether to enroll Satary in a trust-based federal health care benefit program. By omitting any reference to himself in all the relevant Medicare enrollment applications (despite the applications' requirement to

13

disclose anyone with 5% or more ownership stake), and by falsely identifying nominee owners as the true owners for the laboratories, Satary was able to ensure that Lazarus, Clio, and Performance were each enrolled with Medicare without any further scrutiny or limitations."). Simply stated, the government believes that Satary concealed his ownership of the labs to avoid Medicare scrutiny. Based on this position – and given that Satary's statement to the FBI concerning the ownership nominations will be introduced – Herrmann's analysis is relevant to show that there was no applicable Medicare exclusion for Satary to consciously avoid.

The government cannot have it both ways. On the one hand, its notice expressly aims to introduce Satary's prior conviction, over objection, for the purpose of proving criminal intent. [Doc. 237 at 3-4]. But on the other hand, it seeks to prevent Satary from defending the same allegation by exposing the jury to truthful information concerning the existence of, and requirements for, Medicare's mandatory and permissive exclusions. This, the government cannot do. If, as the government contends, Medicare exclusions are irrelevant to a triable issue, then so are Satary's prior conviction and the indictment paragraphs alleging surreptitious concealment of ownership.[7] Conversely, however, if Satary's prior conviction is admissible to show intent, as the government protests, then the government has expanded the scope of relevance to include expert testimony that Satary was at no time excluded from a federal health care program.[8]

**(Continued on the next page with signatures)**

---

[7] On this same basis, Satary has moved to strike the "concealment" paragraphs as prejudicial surplusage in a motion that remains pending. [Doc. 245].

[8] The government's challenges to Herrmann's lack of personal knowledge are mooted by Satary's filing of the amended expert notice. [Doc. 299 at 9-10].

## **CONCLUSION**

For the foregoing reasons, Satary respectfully request this Court to **DENY** the governments motion to strike and included limiting requests.

This 23rd day of May, 2022.

                                                      Respectfully submitted,

*/s/ Scott R. Grubman*
Scott R. Grubman (Ga. Bar #317011)
(admitted pro hac vice)
**CHILVIS GRUBMAN**
1834 Independence Square
Atlanta GA 30338
Telephone: (404) 233-4171
sgrubman@cglawfirm.com
*Trial Attorney for Defendant*
*Khalid Ahmed Satary*

*/s/ Samuel H. Winston*
Samuel H. Winston (La. Bar #34821)
Evan J. Bergeron (La. Bar #33725)
Jeigh L. Britton (La. Bar #39820)
**WINSTON BERGERON, LLP**
1700 Josephine Street
New Orleans, Louisiana 70113
Telephone: (504) 577-2500
Facsmile: (504) 577-2562
sam@winstonbergeron.com
evan@winstonbergeron.com
jeigh@winstonbergeron.com
*Local Counsel for Defendant*
*Khalid Ahmed Satary*

## CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of May, 2022, a copy of the foregoing pleading was served by electronic means through the Court's CM/ECF system on all counsel of record.

This the 23rd day of May, 2022.

*/s/ Scott R. Grubman*
Scott R. Grubman

*/s/ Samuel H. Winston*
Samuel H. Winston