IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br>    Plaintiff, | : <br> : <br> : | Criminal No. 2:19-cr-00197 <br><br> Section "D" |
| vs. | : <br> : | Judge Wendy B. Vitter |
| KHALID AHMED SATARY,<br>    Defendant. | : <br> : | Magistrate (4) <br> Magistrate Judge Roby |

### AMENDED NOTICE OF ANTICIPATED EXPERT WITNESS TESTIMONY

Pursuant to Fed. R. Crim. P. 16 (b) (1) (C) and in response to the government's motion to strike or limit defendant's proposed expert testimony,[1] [Doc. 297], Satary amends his notice of expert witness testimony and notice of non-expert witness testimony.

Specifically, Satary provides formal notice that he intends to qualify and introduce testimony from one or more experts in: (1) the nature and function of CGx genomic testing; (2) genetic testing laboratory operations and Medicare regulations; (3) telemedicine; and (4) Federal health care program exclusions.

This notice summarizes some of the areas about which the proffered expert witnesses will testify as fact witnesses but is not intended to be a complete summary of their potential testimony.

### NOTICE OF POTENTIAL EXPERT WITNESSES

**I.    CGx genetic testing – Dr. Paul Roepe, Ph.D.**

Satary intends to call Dr. Roepe to discuss cancer generally, and to inform the jury of the nature and function of CGx genomic testing.  Dr. Roepe will explain how CGx testing works, its

---

[1]  This amended notice is filed contemporaneously with Satary's response opposing the government's motion on the merits. *See* [Doc. 298].

accepted uses, and how CGx testing can be useful for both treatment and diagnostic purposes in beneficiaries with personal and family history of cancer.

Qualifications – Dr. Roepe is a tenured full-time professor in the Departments of Chemistry and Biochemistry and Cellular Molecular Biology at Georgetown University.[2] Dr. Roepe holds honors as a Burroughs Welcome Scholar and distinguished lecturer at the Walter Reed Army Institute of Research. Dr. Roepe is also a member of the program in Tumor Biology at the Lombardi Cancer Center at Georgetown University Medical Center, a visiting scientist at the National Center for Advancing Translational Science at the National Institutes of Helath, and an adjunct professor of Translational Biology, Medicine, and Health at Virginia Polytechnic Institute and State University.

A copy of Dr. Roepe's current CV has been produced to the government.

Bases for Testimony – As a result of his extensive experience with cancer research and genetic analysis, Dr. Roepe is familiar with CGx testing, including the purposes of these tests, the clinical uses of these tests, and the accepted medically appropriate uses of these tests.

Summary of anticipated expert testimony – Satary anticipates that Dr. Roepe's testimony will cover the following topics and include the following opinions:

- Dr. Roepe will explain what cancer is. Cancer is a disease in which some of the body's cells grow uncontrollably and spread to other parts of the body. Cancer is a genetic disease—that is, a disease caused by changes to genes that control the way cells function, especially how they grow and divide.

- Dr. Roepe will explain what CGx genomic testing is. Cancer genetic (CGx) and pharmacogenetic (PGx) testing are part of a new wave of preventative medicine. These tests asses an individual's DNA sequencing to determine the individual's (1) predisposition for certain types of cancers and response to certain cancer treatments (CGx testing); and (2) ability to metabolize certain medications and, thus, how effective a medication will be for that individual (PGx testing).

---

[2] From 2009 until 2011, Dr. Roepe was the department chair.

- Dr. Roepe will testify that CGx testing is increasing physicians' ability to diagnose cancer can be pivotal for identifying new molecular targets and determining the appropriate treatment choices for individuals with cancer.

- Dr. Roepe will explain that specific types of CGx tests, like Next-Generation Sequencing (NGS), allows scientists for the first time to observe a tumor's genetic make-up.  NGS allows a treating physician to identify what cellular processes have gone awry and to assess their impact on the patient.  Knowing these processes is beneficial, because targeting the altered processes gives the treating physician the best opportunity to stop the mechanisms that are driving the tumor.

**II.     Telehealth – Dr. Oren J. Mechanic, MD, MPH.**

Satary intends to call Dr. Mechanic to discuss telemedicine, telehealth, and the integration of these concepts into the modern administration of healthcare.  Dr. Mechanic will testify to the physician-patient visit performed by the telemedicine providers, financial arrangement with the providers, and the Medicare regulations and operational standards applicable to the telemedicine structure in this case.

Qualifications – Dr. Mechanic is the Director of Telehealth and Assistant Medical Director at the Harvard Medical Faculty Physicians at Beth Israel Deaconess Medical Center (HMFP).  Dr. Mechanic holds additional major administrative leaderships positions and leads the physician organization's Telehealth Executive Steering Committee.  Dr. Mechanic has experience launching and medically directing a virtual urgent care, previously known as BIDMC OnDemand.  Dr. Mechanic has previously served on a Delphi panel as a national expert for telehealth curriculum standards.  Dr. Mechanic speaks nationally on various telehealth-related topics.  Dr. Mechanic has various research interests and stays academically active.  Dr. Mechanic holds a current academic appointment as an affiliate associate professor with the University of Miami Miller School of Medicine, as he practices emergency medicine locally in Miami-Dade County, Florida.

A copy of Dr. Mechanic's current CV has been produced to the government.

3

<u>Bases for Testimony</u> – Dr. Mechanic has expertise in digital health innovation and telehealth.  Dr. Mechanic has experience launching telehealth for a multi-specialty organization and has supported health startups as a mentor and advisor.

<u>Summary of anticipated expert testimony</u> – Satary anticipates that Dr. Mechanic's testimony will cover the following topics and include the following opinions:

### A.     Overview on Telemedicine.

- Dr. Mechanic will testify that telemedicine is a form of virtual care that seeks to bring services to consumers over synchronous ('real time') or asynchronous ('store and forward') telecommunication means.  Telemedicine improves patient access and can reduce healthcare disparities.  Telemedicine can provide patients in both rural and urban areas access to safe, effective, and appropriate care when and where they need it.

- Dr. Mechanic will testify that telemedicine refers to a broad range of health-related, remotely delivered, services including patient care, education, and remote monitoring (e.g., telestroke, teleradiology).

- Dr. Mechanic will explain that virtual care is a broad term that includes both synchronous and asynchronous remote care, whereas a virtual visit refers to the appointment during which the patient and provider are in different locations, communicating via computer, smartphone, tablet, or telephone.

- Dr. Mechanic will testify that telemedicine was motivated by a desire to bring timely care to patients, with potential secondary outcomes of reduction in cost of care, increased efficiency, and improved management of chronic diseases, among other consequences.

- Dr. Mechanic will testify that the quality of healthcare services delivered via telehealth should be held as best as possible to the standards of traditional in-person consultations, within the confines of available technology.

- Dr. Mechanic will illustrate how telemedicine workflow is contemplated by healthcare organizations when considering various payers, such as Medicare.

### B.     Telemedicine consultation.

- Dr. Mechanic will explain general operation standards regarding the use of telemedicine and the Medicare regulations governing the use of telemedicine.

- Dr. Mechanic has reviewed the diagnostic testing Medicare regulation, 42 CFR § 410.32 (a), and will testify that subsection (a) does not define the term "consultation".

- Dr. Mechanic will explain that, in the absence of a regulatory definition, providers may look to the American Telemedicine Association for guidance on the requirements for a telemedicine consultation. Dr. Mechanic will testify that, in the telemedicine context, "consultation" is synonymous with a "visit."

- Dr. Mechanic will explain that the general requirements for a telemedicine visit reflect parts of an in-person visit, including an appropriate history, pertinent prior medical history review, available physiologic data (such as vital signs, if applicable), and available diagnostic images. Documentation also mirrors in-person visits, within the confines of a virtual visit. For example, a physical exam may be limited in video or omitted in telephone visits. The provider can deliver a patient recommendation, diagnosis, testing, or treatment plan as a result of the telemedicine visit.

- Dr. Mechanic will apply his knowledge of the ATA telemedicine standards, and Medicare operational regulations regarding telemedicine, to the facts of this case.

- Dr. Mechanic will answer hypothetical questions drawn from the facts of this case concerning how Medicare regulations and ATA telemedicine standards are applied in different scenarios.

- Dr. Mechanic will testify regarding exhibits and explain the telemedicine consultations conducted in this case. Among other consultation-related details, Dr. Mechanic will testify that:

    (1) the test requisition forms requested information from the beneficiary (personal symptoms, family history, medications) are consistent with the American Telemedicine Association's standard for a visit; and

    (2) Paragraph 10 of each test requisition form included a confirmation of medical necessity clause that was required to be signed by a licensed physician prior to the claim's submission to Medicare.

- Dr. Mechanic will testify that telemedicine providers and in-person providers have an expectation that orders signed by a provider will be filled by the labs.

5

### III. Laboratory Operations and Regulatory compliance – Dr. Brian Kelly, Ph.D, DABCC, FAACC.

Satary intends to call Dr. Brian Kelly to testify concerning the Satary laboratory operations, compliance with Medicare regulations generally, and to the specific laboratory interactions with Medicare in this case.

<u>Qualifications</u> – Dr. Kelly owns and operates BNK Clinical Laboratory Consulting, LLC. Dr. Kelly holds a Certificate of Qualification as a Laboratory Director from the New York State Department of Health.  Dr. Kelly is a current member of the Academy of Clinical Laboratory Physicians and Scientists, American Association for Clinical Chemistry, Growth Hormone Research Society and the Society of Forensic Toxicologists.

As a certified diplomate of the American Board of Clinical Chemistry, Dr. Kelly holds part time positions as the CLIA Laboratory Direct for Five Valleys Urology (Missoula, MT), Granger Medical Clinic (West Valley City, UT), Specialized Treatment Services (Saint Paul, MN), and Michigan Neurology & Spine Center (Port Huron, MI).  Dr. Kelly is also a Clinical Toxicology Specialist with ARUP Laboratories in Salt Lake City, UT.  In this capacity, Dr. Kelly has served as a peer "reviewer" for scientific publications in the following journals: Clinical Biochemistry, Clinical Chemistry, Drug Testing and Analysis, the International Journal of Molecular Sciences, and Pediatric Research.

In the academic context, Dr. Kelly is employed as a community faculty member of Clinical Pathology at the University of Utah, School of Medicine.  Dr. Kelly has previously held research fellow positions at the University of Virginia and the Sports Medicine Research and Testing Laboratory in Salt Lake City, Utah.

<u>Bases for testimony</u> – As a part of his training and experience in the field of laboratory medicine, Dr. Kelly has been involved in test utilization studies at an academic medical center.

6

Dr. Kelly's duties included acting as an intermediary between the physician and the laboratory to identify if a test was medically necessary, or if there were alternatives available that perhaps the physician was unaware of.  More recently, as a Director of Medical Laboratories, Dr. Kelly is regularly involved with staff to achieve regulatory compliance.  Dr. Kelly is a named laboratory director on CLIA certificates and has professional experience with laboratory test utilization.  In his independent consulting business, Dr. Kelly assists small to mid-size clinical laboratories in the implementation of liquid-chromatography, mass-spectrometry based analysis of biological specimens, among other methods, including molecular diagnostics, together with ongoing regulatory oversight.  Dr. Kelly has previously responded to CMS investigations.

<u>Summary of Anticipated Expert Testimony</u> – Satary anticipates that Dr. Kelly's testimony will cover the following topics and include the following opinions:

- Dr. Kelly will testify that he has reviewed the Medicare diagnostic testing regulations, to wit: 42 CFR §§ 410.32, 411.15 (a) (1), and that those regulations define "treating physician" disjunctively.  Under § 410.32 (a), a physician who is treating the beneficiary is not limited to the physician who treats a beneficiary for a specific medical problem, and instead covers the physician who furnishes a consultation.

- Dr. Kelly will testify that he has reviewed the OIG Compliance Program Guidance for Clinical Laboratories.  Under the OIG Guidance, the determination of medical necessity for a diagnostic test rests with the ordering physician, not the laboratory.

- Dr. Kelly will testify that, under the OIG Guidance, the laboratory's duty to ensure that it does not submit claims for medically unnecessary tests does not include an independent obligation to make an independent determination of medical necessity for each test performed and billed.

- Dr. Kelly will testify that, under the OIG Guidance, if a laboratory receives a requisition form containing a licensed physician's statement that he/she furnished a consult and that the test is medically necessary, the laboratory is justified in relying upon that statement to bill Medicare for the test, so long as it can "produce or obtain" from the provider documentation to support the medical necessity of the service the laboratory has provided.

- Dr. Kelly will testify that Medicare has thousands of rules and regulations, which are subject to frequent change. There is no one single place for an individual to find all Medicare regulation: these rules and regulations are in the Code of Federal Regulations, national and local coverage determinations, and administrative guidance.

- Dr. Kelly will testify that Medicare does not provide notice when a rule or regulation is changed.

- Dr. Kelly will testify that, while Medicare does not review every claim before the claim is paid, Medicare does have a host of tools available to conduct such reviews, including pre-payment reviews, post-payment audits, etc.

  Dr. Kelly will testify that rules and guidance regarding how labs can pay sales representatives/distributors changed constantly during the time period alleged in the indictment and significant confusion permeated the industry concerning what was allowed.

- Dr. Kelly may discuss the types of common financial arrangements between clinical labs and sales representatives during the relevant time period.

- Dr. Kelly will testify that laboratories do not set the reimbursement rates for CGx tests. Rather, Medicare sets the reimbursement rate and there is nothing that a laboratory can do to change what they are paid for a specific test.

- Dr. Kelly will review exhibits (specifically, example claim forms that were sent to Medicare by the labs) and testify that, based on his personal review of the associated records, the claims submitted to Medicare by the labs when requesting payment were accurate.

- Dr. Kelly will discuss the Palmetto MOLDX program (https://www.palmettogba.com/moldx).

### IV.     Federal Health Care program exclusion – Thomas E. Herrmann, Esq.

Satary intends to call Herrmann to discuss Medicare exclusions and their history. Herrmann will explain how a person can become excluded from Medicare, the notice regulations for such exclusion, and will explain the statutory and regulatory criteria that must be established to exclude a person from the federal Medicare program.

Qualifications – Herrmann works as the Managing Senior Consultant for Strategic Management Services, LLC. Strategic Management Services, LLC is an industry leader in

8

healthcare regulatory compliance and operations for organizations engaged in Federal Health Care Programs.[3] Herrman is an actively licensed attorney with the District of Columbia Bar.[4] Herrmann has previously served as an Administrative Law Judge with the Medicare Appeals Council within the United States Department of Health and Human Services in Washington, D.C. Prior to becoming a DHHS Administrative Law Judge, Herrmann was employed with the Office of Counsel to the Inspector General as Special Counsel for Legal Policy, as the chief attorney in the administrative litigation branch, and as an OIG trial attorney.

A copy of Herrmann's current CV has been produced to the government.

<u>Bases for Testimony</u> – As a result of his extensive experience with Medicare compliance regulations and operations, Herrmann is familiar with the Medicare exclusions, including the statutory and regulatory bases for these exclusions (42 U.S.C. § 1320a-7 & 42 C.F.R. Part 1001).

<u>Summary of anticipated expert testimony</u> – Satary anticipates that Herrmann's expert testimony will cover the following topics and include the following opinions:

- Herrmann will explain the statutory basis and regulatory criteria for Medicare exclusions.

- Herrmann will explain the mandatory and permissive Medicare exclusion categories and what those categories cover.

- Herrmann will explain the history of the Medicare exclusions.

---

[3] Strategic Management has worked with a broad range of health care organizations to design, implement, manage and improve their compliance programs. Strategic Management Services empowers health care organizations to meet their regulatory compliance requirements by providing specialized services developed by proven industry experts. HEALTHCARE COMPLIANCE CONSULTANTS, compliance.com (last visited April 2, 2022).

[4] Herrmann was previously licensed with the State Bar of Virginia, but now holds an inactive license in that jurisdiction. Herrmann graduated from the George Washington University National Law Center in 1976.

- Herrmann will explain and elaborate upon the Office of the Inspector General's May 8, 2013 advisory bulletin on the effect of exclusion from participation in Federal Health Care Programs.

- Herrmann has reviewed the Medicare exclusion lists and materials and will testify that he located no evidence that Satary has ever been excluded from Medicare, or any other federal healthcare program.

**(Continued on the next page with signatures)**

## **CONCLUSION**

WHEREFORE, defendant Khalid Ahmed Satary amends his notice of potential expert witnesses, provides information about its lay witnesses in the interests of full disclosure, and respectfully requests that the testimony of the proposed experts be admitted without the need for any formal *Daubert* hearing. Satary will continue to revise this notice and its witness list as needed and provide prompt notice to the government.

This 23rd day of May, 2022.

                Respectfully submitted,

                */s/ Scott R. Grubman*
                Scott R. Grubman (Ga. Bar #317011)
                (admitted pro hac vice)
                CHILVIS GRUBMAN DALBEY & WARNER LLP
                1834 Independence Square
                Atlanta GA 30338
                Telephone: (404) 233-4171
                sgrubman@cglawfirm.com
                *Trial Attorney for Defendant*
                *Khalid Ahmed Satary*


                */s/ Samuel H. Winston*
                Samuel H. Winston (La. Bar #34821)
                Evan J. Bergeron (La. Bar #33725)
                Jeigh L. Britton (La. Bar #39820)
                WINSTON BERGERON, LLP
                1700 Josephine Street
                New Orleans, Louisiana 70113
                Telephone: (504) 577-2500
                Facsmile: (504) 577-2562
                sam@winstonbergeron.com
                evan@winstonbergeron.com
                jeigh@winstonbergeron.com
                *Local Counsel for Defendant*
                *Khalid Ahmed Satary*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 23rd day of May, 2022, a copy of the foregoing pleading was served by electronic means through the Court's CM/ECF system on all counsel of record.

This the 23rd day of May, 2022.

                                               */s/ Scott R. Grubman*
                                               Scott R. Grubman

                                               */s/ Samuel H. Winston*
                                               Samuel H. Winston