UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | * | NO.  2:19-cr-00197-WBV-KWR |
|  | * |  |
| v. | * | SECTION: "D" (4) |
|  | * |  |
| KHALID AHMED SATARY | * |  |

\* \* \*

**MEMORANDUM OF LAW IN SUPPORT OF THE GOVERNMENT'S MOTION FOR DETERMINATION THAT CRIME-FRAUD DOCTRINE DEFEATS <u>CERTAIN CLAIMS OF PRIVILEGE</u>**

The United States of America (the "Government"), by and through undersigned counsel, submits this memorandum of law in support of its motion seeking an order from the Court rejecting certain claims of attorney-client and work product privilege and authorizing the release of approximately 287 documents to the prosecution team in this matter.[1] The claims of privilege are contained in privilege logs created both by Khalid Satary (the "Defendant") and by certain companies the Government alleges he controlled through nominee owners. Even if a claim of privilege applies to these documents—and the Government does not believe that all of these documents are subject to a valid claim of privilege—disclosure to the prosecution team of each of these documents is warranted under the crime-fraud exception because the communications were made for the purpose of furthering an illegal act. *See In re Grand Jury Subpoena*, 419 F.3d 329, 335-36 (5th Cir. 2005); *In re Grand Jury Subpoena*, 220 F.3d 406, 410 (5th Cir. 2000) (holding that the attorney-client and work product privileges "can be overcome by the crime-fraud exception where communication or work product is intended to further continuing or future

---

[1] This motion is not intended to be the Government's only challenge to the privilege assertions made by the Defendant and his companies and the Government is not waiving any other objections or arguments regarding privilege claims which it may raise in the future. Although the deadline for motions to be filed under the crime-fraud exception is November 12, 2021, because the Defendant has not yet submitted privilege logs in response to all materials that have been provided to him by the filter team, the Government may seek leave to file additional motions under the crime-fraud exception should the need arise.

criminal or fraudulent activity.") (internal quotations omitted). Specifically, communications between the Defendant and an attorney to his companies ("Attorney 1")[2] facilitated both the concealment of the illicit kickback agreements the Defendant had with his co-conspirators and the Defendant's involvement in the criminal enterprise. Accordingly, the Government requests that the Court review the documents identified in Exhibits A through E and find that the crime-fraud exception defeats any claim of privilege over those documents and release them to the prosecution team.[3] The underlying documents will be furnished to the Court by the Government's filter team.

I. **PROCEDURAL BACKGROUND**

On September 26, 2019, a grand jury sitting in the Eastern District of Louisiana returned a six-count indictment charging the Defendant with conspiracy to commit health care fraud and wire fraud, in violation of Title 18, United States Code, Section 1349 (Count One); health care fraud, in violation of Title 18, United States Code, Section 1347 (Counts Two – Four); conspiracy to defraud the United States and pay and receive illegal health care kickbacks, in violation of Title 18, United States Code, Section 371 (Count Five); and conspiracy to launder monetary instruments, in violation of Title 18, United States Code, Section 1956(h) (Count Six).

The following day, the Government executed premises search warrants on the Defendant's laboratories and related companies in New Orleans, Georgia, and Oklahoma. Soon thereafter, the Government also executed a search warrant on a single email address believed to be used by the Defendant. In recognition of the fact that these searches potentially implicated attorney-client privileged materials, all search warrant materials were processed and reviewed for potential

---

[2] In an abundance of caution, Attorney 1 is anonymized herein. Attorney 1's name is being provided to the Court and Defendant in Exhibit F, which is being filed under seal.
[3] The Government has included as Exhibits A through E to this motion lists of the specific documents which it asserts are covered by the crime-fraud exception. The Exhibits are separated, as described in more detail *infra*, according to certain categories of communications between the Defendant and Attorney 1 and others. These Exhibits are derived from Defendant's privilege assertions in his privilege logs.

2

privilege by a filter team of agents and prosecutors. While the filter review was ongoing, the Government produced other discovery to the Defendant, beginning on October 18, 2019, weeks after the indictment. The Government, through both the prosecution team and filter team, has continued to produce discovery since that time.

## II.    FACTUAL BACKGROUND

To provide appropriate context for the facts giving rise to application of the crime-fraud exception, it is necessary to first provide background regarding the Defendant's criminal conduct, including the mechanics of his Medicare fraud scheme and the lengths to which he went to conceal his ownership in the various entities he used to carry out the crimes alleged in the indictment.

### A.    Medicare and Cancer Genomic Testing

Medicare is a federal health insurance program for individuals 65 and older, people with disabilities, and those with end-stage renal disease. As with most health insurance programs, doctors typically first provide services to patients, and then they bill Medicare for the costs of those services. It is a trust-based system, relying on doctors and other health care providers to submit only truthful and accurate bills, or "claims," for services provided. Among the requirements for reimbursement by Medicare is that the patient actually needed the medical treatment or service that the provider billed.

For more specialized (and expensive) services, such as cancer genomic testing ("CGx"), Medicare imposes additional requirements for reimbursement. CGx testing is a type of test that can identify whether a person's genetic makeup contains mutations that are predisposed to cancer. However, Medicare only pays for a CGx test when a doctor determines that the patient needs the test to assist with the patient's treatment, as, for example, when a doctor orders a CGx test for a patient who has been diagnosed with cancer and the doctor needs to understand whether the patient

has any genetic mutations that explain the diagnosis or may inform treatment options. *See* Indictment ¶¶ 23-24; *see also* 42 C.F.R. § 410.32(a) (Medicare will reimburse a CGx test only when "ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem."). Medicare does not, for obvious reasons, cover CGx testing when someone just wants to know more about their DNA.

Once a doctor has ordered a CGx test, the test itself is performed by a qualified laboratory using the DNA sample obtained from the patient. After the test is performed, the lab generates a report describing the results. To make use of the results, the lab sends the report to the ordering doctor, who reviews the results and discusses them with his or her patient.

That's how it should work.

### B.  The Defendant's Criminal Conspiracy and Scheme to Defraud Medicare

As alleged in the indictment, the Defendant turned this process on its head. He purchased several labs, including Clio Laboratories LLC, in Lawrenceville, Georgia ("CLIO"); Lazarus Services LLC, in New Orleans, Louisiana ("LAZARUS"); and Performance Laboratories LLC, in Oklahoma City, Oklahoma ("PERFORMANCE," together with CLIO and LAZARUS, the "SATARY LABS").[4] *See* Indictment ¶¶ 10, 31-33. In or around January 2017, he enrolled CLIO with Medicare; in or around December 2018, he enrolled PERFORMANCE in Medicare; and in or around January 2019, he enrolled LAZARUS in Medicare. *Id.* ¶¶ 31-33.[5] By enrolling

---

[4] Though the evidence overwhelmingly confirms that the Defendant was the true and beneficial owner of the SATARY LABS, he concealed this role. He accomplished this by listing nominee owners on the companies' Medicare enrollment applications and corporate and bank records.

[5] Medicare enrollment applications require the disclosure of any individuals with a 5% or greater direct or indirect ownership interest. The Defendant omitted his name in the Medicare enrollment paperwork, falsely certifying in the enrollment forms that the nominee owners were the true owners of the companies. This allowed the Defendant to hide his previous federal felony conviction—a fact important to Medicare when considering whether to enroll someone in a trust-based federal health care benefit program.

4

each lab with Medicare, the Defendant ensured they were eligible to submit claims for reimbursement. The Defendant then focused on obtaining the DNA samples and test orders (known as requisitions) that were required to submit claims to Medicare. He accomplished this, not by marketing to doctors who might need to order CGx tests during the course of treating their patients, but by paying tens of millions of dollars in kickbacks to co-conspirators in exchange for DNA samples and doctor's orders that allowed his labs to fraudulently bill Medicare hundreds of millions of dollars for the expensive and unnecessary CGx tests.

At a high level, the Defendant's scheme operated as follows: First, patient recruiters found Medicare beneficiaries and convinced them, through a variety of deceitful methods, to provide DNA samples. For example, some of the patient recruiters operated telemarketing call centers through which they ran aggressive telemarketing campaigns designed to convince beneficiaries to agree to accept the expensive, but medically unnecessary, genetic tests, believing them to be free or no cost.[6]  *Id.*  Others held so-called "health fairs" and seminars at which the recruiters convinced beneficiaries to submit DNA samples for the genetic tests. *Id.* Either way, with the Defendant's full knowledge, the patient recruiters told the beneficiaries that the genetic tests were helpful "preventive" or "screening" tests that could determine whether the beneficiaries had DNA mutations that put them at an increased risk of developing cancer. *Id.* ¶ 42(e). What the patient recruiters did not tell the beneficiaries—but which the Defendant knew—was that "preventive" or "screening" CGx tests are typically not covered by Medicare. *Id.* ¶ 23. Nor did the patient recruiters reveal that, more often than not, no doctor would ever see the test results, if the tests

---

[6] At the SATARY LABS, the value of the samples differed depending on whether they could be billed as a "personal history" case or a "family history" case. Samples obtained from individuals with a personal history of cancer were reimbursed at a higher rate by Medicare than those only with a family history (whose legitimate coverage for the test was almost non-existent).

were actually run on a beneficiary's sample in the first place.

With the DNA samples in hand, and an agreement with the SATARY LABS that they would be paid a kickback for each sample that could be billed to Medicare, the patient recruiters paid a telemedicine company to obtain a doctor's signature on each genetic test (as Medicare required), regardless of the doctor's specialty or familiarity with CGx testing. This payment, too, was an illegal kickback, inducing the referral of medical services paid for by Medicare. These payments were necessary for the scheme, however, because without them, the SATARY LABS could not claim that a doctor had approved their billing Medicare for the expensive genetic tests. In addition to having no valid physician-patient relationship with the beneficiaries whose DNA samples were collected, the telemedicine company doctors typically signed off on the tests without even speaking to the beneficiaries and generally did not even review the test results (if they received them). Suffice to say, in nearly all cases the telemedicine company doctors did not use the test results in the course of treating or diagnosing the patients' illnesses, symptoms, or diseases, as required by Medicare.

This was a highly lucrative scheme. As alleged in the indictment, between January 2017 and August 2019, the SATARY LABS billed Medicare approximately $513 million and were paid approximately $149 million for the unnecessary testing of more than 28,000 people.

To carry out his scheme, the Defendant enlisted the aid of many co-conspirators, several of whom been charged with or pleaded guilty to participating in the scheme. For example, one individual admitted in the factual basis of his plea agreement that he "was a patient broker who referred beneficiaries to laboratories"—including the SATARY LABS—"in exchange for bribes and kickbacks." *See United States v. Joseph Ricciardi*, No. 19-CR-60277, Dkt. No. 22 (S.D. Fla. Dec. 13, 2019). This patient broker understood that the genetic tests were "not ordered by a

physician treating the beneficiary for any specific medical problem, symptom, illness or diagnosis," but instead that patients were "recruited through call centers to receive the tests." *Id.* He also understood that Medicare was paying for the tests, and accordingly, that the kickbacks he received, including from the SATARY LABS, were unlawful. *Id.* Another participant in the conspiracy described how he facilitated getting doctors' signatures on the orders for CGx tests. *See United States v. James L. Simmons*, No. 19-CR-60273-KMM, Dkt. No. 35 (S.D. Fla. Feb. 28, 2020). His company arranged for "consultations provided by telemedicine doctors…[who] were not treating the beneficiary for any specific medical problem, symptom, illness, or diagnosis, and were not going to use the results in the management of the beneficiary's specific medical problems." *Id.* Rather, he admitted that "patient brokers sold the genetic tests and doctor's orders to laboratories"—including the SATARY LABS—"who then billed Medicare for the tests." *Id.*

    C.    **Attorney 1's Involvement**

Attorney 1 began working for the SATARY LABS in or around December 2018 in an in-house capacity. Based on Attorney 1's position and role, and according to documents listed in the privilege logs provided by the Defendant and the SATARY LABS, Attorney 1 was involved in all aspects of the businesses. *See generally* Exhibits A through E.

In the spring and summer of 2019, with the assistance and involvement of Attorney 1, the Defendant established new companies to help to conceal his illegal conduct, including Alpha Medical Consulting ("ALPHA") and Nexus Telehealth ("NEXUS"). He did this around the time that law enforcement and regulators began more closely scrutinizing the genetic testing industry.

The Defendant established ALPHA in an effort to conceal the otherwise obvious kickback relationship the SATARY LABS had with his patient recruiters. Prior to ALPHA's creation, the

7

SATARY LABS contracted with and paid the patient recruiters directly, on a per sample basis, for their samples and signed doctors' orders, disguising the payments using contracts that falsely characterized the kickbacks as "marketing services."  Beginning in March of 2019, the Defendant started using ALPHA as an intermediary, once again in the name a nominee owner, to make it appear as though the SATARY LABS were not contracting directly with the patient recruiters.  In fact, ALPHA just added a layer to the kickback relationship.  By paying ALPHA with its millions of dollars in Medicare fraud proceeds, and then having ALPHA pay the patient recruiters for the DNA samples and accompanying doctors' orders, it was effectively the same scheme it had always been.  In addition, and with the direct involvement of Attorney 1, ALPHA and the patient recruiters executed sham contracts that falsely claimed to pay the patient recruiters by the hour for services rendered.  In fact, ALPHA continued to pay the recruiters per DNA sample (with an accompanying doctor's order), as the SATARY LABS had previously done, and varied the kickback payment based on the type of genetic test billed and its expected amount of reimbursement.[7]

NEXUS was a telemedicine company the Defendant also created in an effort to conceal the overall criminal conspiracy.  The traditional telemedicine scheme involves a patient recruiter or lab paying a doctor, who has no relationship to the patient at issue, for each prescription he or she signs.  NEXUS proposed, instead, to bill patients a co-pay of $10 for consultation with a doctor.  Then NEXUS would, in theory, compensate the doctors using the patient-generated revenue, rather than based on each signed prescription (an illegal kickback).  But this structure was a façade

---

[7] The payment amount for samples (*i.e.*, the kickback) was based on Medicare's reimbursement level for the type of CGx test.  Because Medicare paid more for personal history of cancer testing, the SATARY LABS and ALPHA paid the patient recruiters more for personal history testing as compared to family history.  Personal history refers to a previous cancer diagnosis in the patient whose sample was obtained.  Family history refers to the patient having a relative of any kind who had cancer.

8

because no mechanism was ever put in place to collect payments from patients.  Once again, Defendant hid his true role in NEXUS by enlisting a nominee owner—this time, Attorney 1's son—to serve as its CEO and President.

### III.      APPLICATION OF THE CRIME-FRAUD EXCEPTION

####    A.      Legal Authority

The attorney-client privilege and work product doctrine do not apply when a client consults a lawyer for the purpose of furthering an illegal act.  *See In re Grand Jury Subpoena*, 419 F.3d 329, 335-36 (5th Cir. 2005); *In re Grand Jury Subpoena*, 220 F.3d 406, 410 (5th Cir. 2000) (holding attorney-client and work product privileges "can be overcome by the crime-fraud exception where communication or work product is intended to further continuing or future criminal or fraudulent activity.") (internal quotations omitted).  To establish a prima facie case that the crime-fraud exception applies, a preponderance of the evidence must show the existence of a crime or fraud and that legal advice was obtained in furtherance of an illegal or fraudulent act. *See In re Grand Jury Subpoena*, 419 F.3d at 336; *In re Int'l Sys. & Controls Corp. Sec. Litig.*, 693 F.2d 1235, 1242 (5th Cir. 1982).  In making this determination, courts examine evidence of the client's knowledge and intent to further the illegal act at the time the communication was made. *See United States v. Neal*, 27 F.3d 1035, 1048 (5th Cir. 1994) ("[T]he privilege ends when a client *consults* an attorney seeking advice that will promote intended or ongoing criminal activity."); *In re Grand Jury Proceedings*, 680 F.2d 1026, 1028-29 (5th Cir. 1982) ("Lawyers' skills may not be employed, even without their knowledge, in furthering crimes.").

The government need not show that an attorney was aware of the criminal enterprise or that their services were being used in furtherance of the fraud.  In other words, whether the attorney is aware that the advice sought is to further a crime, or agrees to participate in the crime

or fraud, is irrelevant.  *See Neal*, 27 F.3d at 1048-49 ("[T]he mere fact that an attorney does not agree to participate with a client in criminal activity planned or ongoing at the time the client solicits advice is not dispositive regarding whether the attorney-client privilege can be invoked. . . . Instead, the privilege ends when a client *consults* an attorney seeking advice that will promote intended or ongoing criminal activity.") (internal citations omitted); *United States v. Soudan*, 812 F.2d 920, 927 (5th Cir. 1986).   Indeed, the crime-fraud exception applies "regardless of whether [the attorney] knew at the time the true purpose of the [communication] . . . ."  *Soudan*, 812 F.2d at 927.

Further, the crime-fraud exception applies only to future or intended criminal acts, not to communications regarding past misconduct.  *In re Grand Jury Subpoenas*, 561 F.3d 408, 412-13 (5th Cir. 2009) (applying the exception where the criminal conduct at issue was "ongoing" and "occasional backward looks were only part of a forward looking scheme that drew on [previously obtained advice]"); *United States v. Gordon-Nikkar*, 518 F.2d 972, 975 (5th Cir. 1975) ("It is beyond dispute that the attorney-client privilege does not extend to communications regarding an intended crime.").  The focus of the Court's inquiry is on the Defendant's intent.

This prima facie showing need not rise to the level of proof necessary to show that a defendant is guilty of the crime charged.  *See, e.g.*, *In re Grand Jury Subpoena*, 220 F.3d at 410 (holding that the crime-fraud exception applied and stating that "[w]hile the targets of this investigation may have valid defenses that preclude indictment or conviction for fraud or criminal environmental violations, the existence of a potential defense does not mean that the district court reversibly erred."); *United States v. Cleveland*, No. Crim. A. 96-207, 1997 WL 232538, at *4 (E.D. La. May 8, 1997) ("A finding that the Government has made a *prima facie* showing that the relationship between attorney and client was intended to further illegal activity is not tantamount

10

to a finding that the defendant is guilty."); *In re Feldberg*, 862 F.2d 622, 626 (7th Cir. 1988) (holding that the standard for the prima facie showing "is not whether the evidence supports a verdict but whether it calls for inquiry").  *Cf. United States v. Chen*, 99 F.3d 1495, 1503 (9th Cir. 1996) (stating that the "test for invoking the crime-fraud exception to the attorney-client privilege is whether there is reasonable cause to believe that the attorney's services were utilized in furtherance of the ongoing unlawful scheme" and that in this context "reasonable cause" means "more than a suspicion but less than a preponderance of evidence.") (internal quotations omitted).

Before engaging in the requested *in camera* review of allegedly privileged documents to determine the applicability of the crime-fraud exception, the Court "should require a showing of a factual basis adequate to support a good faith belief by a reasonable person . . . that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies."  *United States v. Zolin*, 491 U.S. 554, 572 (1989) (internal citation omitted).  Further:

> Once that showing is made, the decision whether to engage in *in camera* review rests in the sound discretion of the district court.  The court should make that decision in light of the facts and circumstances of the particular case, including, among other things, the volume of materials the district court has been asked to review, the relative importance to the case of the alleged privileged information, and the likelihood that the evidence produced through *in camera* review, together with other available evidence then before the court, will establish that the crime-fraud exception does apply.

*Id*.  The showing necessary to justify *in camera* review "need not be a stringent one," and is "a lesser evidentiary showing" than is needed to ultimately overcome the privilege.  *Id*.

### B. The Crime Fraud Exception Applies Here, and the Court Should Conduct an *In Camera* Review

The crime-fraud exception defeats the Defendant and SATARY LABS' attorney-client and other privilege claims with regard to certain items identified in their privilege logs.  The Government has shown by a preponderance of the evidence that a crime occurred, satisfying the

11

first part of the test. *See In re Grand Jury Subpoena*, 419 F.3d at 336. The grand jury's return of the indictment against the Defendant alone meets this requirement. *See United States v. Johnson*, No. 17-201, 2018 WL 6242491, at *8 (E.D. La. Nov. 29, 2018) ("[A]n indictment 'fair upon its face' and returned by a 'properly constituted grand jury' … 'conclusively determines the existence of probable cause' to believe the defendant perpetrated the offense alleged.") (quoting *Gerstein v. Pugh*, 420 U.S. 103, 117 n.19 (1975)). The Government has also satisfied the second prong of the test because the Defendant sought several types of advice from Attorney 1 in furtherance of illegal or fraudulent acts. *See In re Grand Jury Subpoena*, 419 F.3d at 336.

*First*, documents where the Defendant consulted Attorney 1 about concealing his role with the SATARY LABS, NEXUS, and ALPHA are not privileged under the crime-fraud doctrine. *See* Exhibit A. The indictment alleges that the Defendant's concealment of his ownership and control of the SATARY LABS was central to the scheme. *See* Indictment ¶ 42(a). The Defendant accomplished this by omitting any reference to himself in all the relevant Medicare enrollment applications, despite the applications' requirement to disclose anyone with 5% or more ownership stake, and by falsely identifying nominee owners as the true owners for the SATARY LABS, ALPHA, and NEXUS. For NEXUS, the nominee owner was Attorney 1's own son. It is clear from certain documents listed in the privilege logs (excerpted in Exhibit A) that during the course of the conspiracy the Defendant communicated with Attorney 1 about the SATARY LABS' fraudulent Medicare applications, the ownership and "organizational structure" of the SATARY LABS, and the "transfer of ownership" process, among other related issues. For example, two emails from the privilege log with the subject line "Re: Medicare application" were sent in November 2018, right before the Defendant enrolled PERFORMANCE and LAZARUS into the Medicare program, in December 2018 and January 2019, respectively. Other entries on the

privilege log similarly demonstrate that the Defendant consulted Attorney 1 regarding the ownership of the SATARY LABS and related companies (such as asking Attorney 1 to review "purchase agreements," "bills of sale," or "transfer of ownership forms"). Given that the Defendant and his companies are now claiming that these documents contain requests for legal advice sent to Attorney 1, as well as advice received from Attorney 1, the Government has met its burden to show that the Defendant sought advice from and involved Attorney 1 in the concealment of his ownership and control of the SATARY LABS, ALPHA, and NEXUS. *See Neal*, 27 F.3d at 1048-49 ("The privilege ends when a client *consults* an attorney seeking advice that will promote intended or ongoing criminal activity."). The Government submits that the documents listed in Exhibit A to this motion fall into this category and represent communications the Defendant made in furtherance of an essential component of his criminal scheme: the concealment of his involvement.

*Second*, discussions between the Defendant and Attorney 1 and/or others about contracts the Defendant used to conceal the illegal kickback payments he made are covered by the crime-fraud doctrine. *See* Exhibit B. The indictment alleges that "sham contracts and documentation [] disguised the illegal kickbacks and bribes as payments from the SATARY LABS for purported marketing services." *See* Indictment ¶ 42(d). The bogus nature of the ALPHA contracts is demonstrated by its own employees, who confirmed that the "hourly" rate referenced in the contracts was determined based on the price they paid per sample, not by actual hours worked. For example, one ALPHA employee explained in a recorded conversation with another colleague:

> You're...you're invoicing ALPHA for work effort hours. So, at the end of the day, if you send in a personal cancer sample, a CGx sample and the patient had personal history, you're going to invoice us nine hours. And we pay $200 an hour. Every single contract that every one of our people has says that you invoice us for work effort and we pay you $200 an hour. So, if it's two samples that they sent in, in

13

> the last week, they will invoice us work effort to reflect those two samples…it's, um, personal history we pay nine hours. If it's family history, we pay six, so that comes out to 1200.[8]

As shown in certain descriptions of documents in the privilege logs (excerpted at Exhibit B), the Defendant communicated with Attorney 1 about all of these sham contracts during the course of the conspiracy. For example, a number of email subjects refer to electronic signatures for contracts or "contract requests" from individuals who have since pleaded guilty to accepting kickbacks from the SATARY LABS. Others have email subject lines of "Capping the Hourly Rate" and "FINAL FLAT FEE SALES REP CONTRACT," apparent references to the sham contracts. Therefore, any discussions the Defendant had with Attorney 1 about drafting the sham "marketing" or "hourly" contracts, getting co-conspirators to sign the sham contracts, or providing invoices pursuant to the sham contracts fall under the crime-fraud exception. *See Neal*, 27 F.3d at 1048-49. The Government submits that the documents listed in Exhibit B to this motion fall into this category of concealing kickback payments, which directly relate to several of the charged crimes in the indictment, including the conspiracy to defraud the United States and to pay and receive kickbacks.

*Third*, documents where the Defendant communicated with Attorney 1 about the best way to ensure claims submitted to Medicare by the SATARY LABS would be paid, regardless of medical necessity, are covered by the crime-fraud doctrine. *See* Exhibit C. The Defendant's billing for CGx tests without regard to medical necessity was part of the manner and means of the crimes charged, and it is central to the charges of health care fraud and wire fraud. *See, e.g.*,

---

[8] This discussion reflects how the Defendant and his labs broke CGx samples into personal versus family history samples. The personal history samples purportedly justified the use of billing codes that resulted in higher reimbursements from Medicare than the family history samples, which explains why ALPHA paid "nine hours" (or $1,800) for personal history and only "six hours" (or $1,200) for family history.

14

Indictment ¶ 42(b). As a trust-based program, claims billed to Medicare are not generally reviewed before they are paid. Review of claims occurred, if ever, as part of an audit where providers must provide documentation supporting the audited claims. Consistent with its own rules and regulations, however, Medicare is more likely to pay a claim if it meets the program's requirements for CGx testing. These requirements are often detailed in publications called local coverage determinations ("LCDs"). Among the requirements discussed in LCDs are the types of diagnoses which *could* qualify someone for a CGx test, including diagnosis codes. The privilege log includes a number of documents (excerpted as Exhibit C) which specifically reference these LCDs and a widely-used diagnosis code—Z80.0—in the subject lines of the emails. Having a detailed understanding of which codes he needed to use to deceive Medicare enabled the Defendant to collect payment for tests that he knew were medically unnecessary and illegally procured by kickbacks. *See Neal*, 27 F.3d at 1048-49. No privilege claim for records discussing the diagnosis codes or LCDs, and thus the manner in which the Defendant ensured Medicare would pay for the SATARY LABS' unnecessary CGx testing, can overcome the crime-fraud doctrine. The Government submits that the documents listed in Exhibit C to this motion fall under this category.

*Fourth*, documents where the Defendant communicated with Attorney 1 about the establishment of NEXUS are covered by the crime-fraud doctrine. *See* Exhibit D. As explained above, in 2019 the Defendant established NEXUS, a telemedicine company, using Attorney 1's son as the nominee owner. NEXUS was supposed to earn money from payments it collected from patients who provided samples. If this actually happened, it would avoid payment of illegal kickbacks to the telemedicine companies (and their doctors). But as an ALPHA employee explained in a recorded conversation, this was yet another sham. NEXUS never actually intended to collect the $10 from beneficiaries:

15

> One of the main reasons we're promoting NEXUS is the rep groups are not paying for the telehealth… That's what's under huge scrutiny right now. We feel it's coming to a halt. So, initially, a rep group could pay … a telehealth... Then that came under scrutiny… So, at NEXUS they don't take a dime from ... from a rep group. Not a dime. So, the patient is charged $10, which is billed to their home and they can ... they can pay it in two installments if they want. And there ... there's no collection arm, so they are not gonna turn them over to collections for not paying their $10 for the consult. And then from what I understand, the physician is billing for the office visit.[9] So, there's no rep group paying anybody for telehealth, which is the way it should be.

Several documents listed in the privilege log (excerpted as Exhibit D) reference "Nexus Telehealth" and "Nexus Telehealth formation." [10] The Defendant's communications with Attorney 1 or other attorneys about the creation, organization, and/or operation of NEXUS, which was designed to further conceal and promote the illegal scheme outlined in the indictment, cannot be protected from disclosure by the attorney-client privilege. *See Neal*, 27 F.3d at 1048-49. The Government submits that the documents listed in Exhibit D to this motion fall under this category.

*Fifth*, documents where the Defendant communicated with Attorney 1 about the use of reference labs are covered by the crime-fraud doctrine. *See* Exhibit E. Medicare requires that labs bill for work that only they performed, with some narrow exceptions. One such exception is that a lab is permitted to bill Medicare for up to 30% of tests that the lab "referred" to another lab that actually conducted the test. *See* 42 U.S.C. § 13951(h)(5)(A) (also known as the "Shell Lab Rule," stating that a lab may not refer out more than 30% of its tests and still bill Medicare for those tests). Based on the privilege log, the Defendant is claiming privilege over a number of documents (excerpted as Exhibit E) reflecting discussions about his use of a reference lab and contracts the Defendant signed with reference labs. The crime-fraud doctrine defeats any claim

---

[9] In truth, the physicians were not billing for the visit because, under Medicare rules regarding telehealth consultations at the time, physicians could only bill for telehealth visits under strict requirements discussed in the indictment. *See* Indictment ¶¶ 26-29.

[10] Other documents reference the name of another telemedicine company that the SATARY LABS had been using before establishing NEXUS in an apparent effort to replace that telemedicine company.

of privilege because the Defendant's use of an attorney's advice about establishing reference lab agreements with other labs to take the place of the work that the SATARY LABS were legally obligated to perform (*i.e.*, referring more than 30% of the tests they billed to reference labs) was part of the overall criminal scheme, and cannot be cloaked with the protection of attorney-client privilege. *See Neal*, 27 F.3d at 1048-49. The Government submits that the documents listed in Exhibit E to this motion fall under this category of intentionally subverting Medicare's reference lab regulations.

## CONCLUSION

For the reasons stated herein, the Government respectfully requests that the Court conduct an *in camera* review of the documents listed in Exhibits A-E and enter an order finding that the crime-fraud exception invalidates any assertion of attorney-client or work product privilege, or, alternatively, that the documents at issue are not privileged.

Respectfully submitted,

DUANE A. EVANS
UNITED STATES ATTORNEY
EASTERN DISTRICT OF LOUISIANA

JOSEPH S. BEEMSTERBOER
ACTING CHIEF
U.S. DEPARTMENT OF JUSTICE
CRIMINAL DIVISION, FRAUD SECTION

By:   /s/ *Leslie S. Garthwaite*
LESLIE S. GARTHWAITE
ALEXANDER THOR POGOZELSKI
JUSTIN WOODARD
Trial Attorneys
United States Department of Justice
Criminal Division, Fraud Section
1400 New York Avenue, NW

Washington, DC 20005  
Tel: (202) 631-6388  
E-Mail: Leslie.Garthwaite@usdoj.gov

## CERTIFICATE OF COMPLIANCE WITH LOCAL CRIMINAL RULE 12

Pursuant to Local Criminal Rule 12, the Government conferred with counsel to the Defendant, Scott Grubman, Esq., and counsel to the laboratories, Melissa Jampol, Esq., who both advised that their clients oppose this motion.

## CERTIFICATE OF SERVICE

  I, Alexander Thor Pogozelski, hereby certify that on November 12, 2021, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

                 */s/ Alexander Thor Pogozelski*
                 Alexander Thor Pogozelski
                 Trial Attorney