UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA     *      19-CR-197
                                 *
versus                           *      Section D
                                   *
KHALID AHMED SATARY        *      December 12, 2022
                                   *
* * * * * * * * * * * * * * * * *


NOTICE TO APPEAR/SHOW CAUSE HEARING BEFORE
THE HONORABLE WENDY B. VITTER
UNITED STATES DISTRICT JUDGE


<u>Appearances</u>:


For the United States         U.S. Department of Justice
of America:                   Criminal Fraud Section
                                   BY:    JUSTIN M. WOODARD, ESQ.
                                         ALEXANDER POGOZELSKI, ESQ.
                                   1400 New York Avenue NW
                                   Washington, DC 20005


For Khalid Ahmed Satary:      Chilivis Grubman, LLP
                                   BY:    SCOTT R. GRUBMAN, ESQ.
                                   1834 Independence Square
                                   Atlanta, Georgia 30338


For Khalid Ahmed Satary:      Garland Samuel & Loeb, PC
                                   BY:    AMANDA R. CLARK-PALMER, ESQ.
                                   3151 Maple Drive
                                   Atlanta, Georgia 30062

Appearances:

For Khalid Ahmed Satary:       M. KYLE WINCHESTER, ESQ.
                               1800 Peachtree Street NW
                               Suite 300
                               Atlanta, Georgia 30327


Also Participating:            Carl Lietz, Esq.


Official Court Reporter:       Toni Doyle Tusa, CCR, FCRR
                               500 Poydras Street, B-275
                               New Orleans, Louisiana 70130
                               (504) 589-7778


Proceedings recorded by mechanical stenography using computer-aided transcription software.

**INDEX**

Page

Dawn Satary

Direct Examination By The Court          54

Cross-Examination By Mr. Woodard         59

Cross-Examination By Mr. Lietz           62

Redirect Examination By The Court        66

**<u>PROCEEDINGS</u>**

**(December 12, 2022)**

THE COURT:  Please be seated.

*United States of America v. Khalid Satary*, case 19-197.  Let's everybody make appearances.

For the government, please tell me who is present.

MR. WOODARD:  Yes, Your Honor.  Good afternoon. Justin Woodard for the United States along with my colleague, Alexander Pogozelski.  At the table, if that's acceptable to the Court, is Special Agent Brian Frank with Health and Human Services.  We also --

THE COURT:  I'm sorry.  You are going too fast, Mr. Woodard.

MR. WOODARD:  Yes, Your Honor.

THE COURT:  Your special agent is who?

MR. WOODARD:  His name is Brian Frank.

THE COURT:  Brian Frank.

MR. WOODARD:  Then we invited another agent, who is based in Houston with the FBI.  He is, I believe, on the Webex. His name is O'Neil Brown, a special agent with FBI.

THE COURT:  Agent Frank is with the FBI?

MR. WOODARD:  He is with Health and Human Services.

THE COURT:  Oh, I'm sorry.

Agent Brown, you're on Zoom or by audio?

**SPECIAL AGENT BROWN:**  Yes, Your Honor, and also video.

**THE COURT:**  And video.  Thank you.

Thank you, Mr. Woodard.

**MR. WOODARD:**  Yes, Your Honor.

**THE COURT:**  Counsel for Mr. Satary.

**MR. GRUBMAN:**  I'm sorry.  Your Honor, for Mr. Khalid Satary, this is Scott Grubman on Zoom.  I have my co-counsel Amanda Clark-Palmer as well as Kyle Winchester, all for Mr. Khalid Satary.

**THE COURT:**  Mr. Grubman, is Mr. Satary present with you?

**MR. GRUBMAN:**  He is not, Judge.  We have been unable to get in touch with him.

**THE COURT:**  Melissa, would you call in the hallway for Khalid Satary --

**THE DEPUTY CLERK:**  Yes, ma'am.

**THE COURT:**  -- because I'm about to declare him a fugitive from justice.

Melissa, at my request did you just go into the hallway and call the name Khalid Satary?

**THE DEPUTY CLERK:**  Yes, ma'am.

**THE COURT:**  Did anybody respond?

**THE DEPUTY CLERK:**  No, ma'am.

**THE COURT:**  Is anybody in the hallway?

**THE DEPUTY CLERK:** No, ma'am. There is no one in the hallway.

**THE COURT:** This past Friday, December 9, the Court filed into the record a notice to appear and filed an order to appear -- they are in the record at R. Doc. 338 and 339 -- for a hearing today. I ordered that Khalid Satary, the defendant in this matter, appear in court. He has not appeared in court.

Mr. Grubman or anybody for Mr. Satary, I would like to hear further. When is the last time you were in touch with your client?

**MR. GRUBMAN:** The last time we were in touch with our client was Wednesday, November 30. It looks like the last time I was in touch with the client based on -- I'm looking right now -- my text messages was Wednesday, November 30, and Ms. Clark-Palmer was on the call too. I'm sorry that we are in different places.

Ms. Clark-Palmer, does that comport with your memory as well on the date?

**MS. CLARK-PALMER:** Yes, it does.

**THE COURT:** Without breaking any privileges or advising me what was communicated, it's my understanding from a conversation with you that you have been trying to get in touch with your client since that time and have been unable to get in touch with him. Is that correct, Mr. Grubman and Ms. Clark-Palmer?

04:18

**MR. GRUBMAN:** Correct.

**MS. CLARK-PALMER:** (Nods head.)

**MR. GRUBMAN:** Correct.

**THE COURT:** Can you tell if his phone is operational?

**MR. GRUBMAN:** I cannot tell exactly, although it does appear as though it is not going through.

**THE COURT:** I understand you have spoken to his son, who I made third-party custodian, and that's Mr. Jordan Satary. In your discussions with Mr. Jordan Satary, he indicated that he did not know where his father was; is that correct?

**MR. GRUBMAN:** Yes, Your Honor.

**THE COURT:** On October 8, 2019, when this case was indicted, a $500,000 secured cash bond was set by the Court. It's in the record at R. Doc. 28. Mr. Satary agreed that the bond may be forfeited if he failed to appear for court proceedings or failed to comply with the conditions set forth in his conditions of release.

At that time I held a hearing in this court and I allowed Mr. Jordan Satary, Mr. Khalid Satary's adult son, to be named third-party custodian of his father. Mr. Jordan Satary testified under oath before me that he agreed to act as his father's third-party custodian. He specifically agreed to supervise Mr. Satary, use his best effort to assure Mr. Satary's presence at all court proceedings and, further, to notify the Court if Mr. Satary violated any condition of

release or was no longer in Mr. Jordan Satary's custody.

I have the order setting conditions of release, which is in the record at R. Doc. 30-1, signed by Mr. Jordan Satary, setting forth those conditions that he agreed to as third-party custodian. In order to have Mr. Satary, the defendant, released, he did provide a $500,000 cash bond, and he was released from custody on October 9, 2019.

On November 21, 2019, the Court granted Mr. Satary's motion to amend the bond conditions to allow him to travel both to New Orleans and to Houston so long as he notified his Atlanta pretrial services officer. That's in the record at R. Doc. 39.

Again, on October 1, 2021, the Court granted Mr. Satary's motion again to amend his bond conditions to allow him to travel throughout the lower 48 states as long as he notified a probation officer. I also clarified at that time that while Jordan Satary remains third-party custodian over his father, Mr. Satary, he need not live in the same household.

Finally, on October 1, 2021, I required Mr. Satary, the defendant, to verify with a pretrial services officer his compliance with his conditions and that he cannot work in the health care or medical field, which was one of the conditions that I imposed when I allowed him to be released from custody pending trial.

Today is December 12, 2022. As I just

indicated, Mr. Satary has been noticed to appear at this hearing. His attorneys do not know where he is, have not had communication with him since November 30, and he has not appeared in court. I have already issued a warrant for his arrest and that warrant remains outstanding. Mr. Satary is now a fugitive.

Before me at this time, I have ordered Mr. Jordan Satary to appear in court today to discuss his role as third-party custodian for his father and what he knows about his father's whereabouts. Is Mr. Jordan Satary present in court?

MR. LIETZ: Good afternoon, Your Honor. He is present today. My name is Carl Lietz. I am from Atlanta, Georgia, and I am here representing Jordan this afternoon, Judge.

THE COURT: Sir, tell me your name again. Mr. Carl Lietz?

MR. LIETZ: Yes, Your Honor. It's Carl, with a C, Lietz, L-I-E-T-Z.

THE COURT: Thank you, Mr. Lietz. Mr. Satary is present in court today.

MR. LIETZ: Mr. Jordan Satary is present in court today. He is also here with his mother as well. She is sitting in the courtroom.

May I just add a couple of things into the

record, if I may, Your Honor?

**THE COURT:**  Yes, yes.

**MR. LIETZ:**  We received notice of the Court's two orders on Friday.  The two orders that I'm talking about are the ones that you referenced previously.  I believe you said one is docketed at 338, the one that ordered the defendant to show up here this afternoon.  We also received the order to show cause, which I think we are going to talk about in a minute.

As it relates to that first order, docket 338, I just wanted the Court to know that since receiving that order, Mr. Jordan Satary has made efforts himself to get his father to appear in court today.  Those efforts included phoning him at the number that he had for him -- I think the government can verify that those phone calls were made -- sending a text message to him, and also emailing him.

He has made every effort he knows to make to get his father here in court today.  He is not happy that his dad is not here.  He made efforts before that to actually get in touch with his father, and maybe we will get into some of that today, Your Honor.  The defendant in this case has put his son in a very bad position.

I wanted to talk just maybe briefly -- I'm certainly not trying to take over.  I know you've got some questions, but I just wanted to at least clarify one thing that

the Court mentioned and perhaps just offer a little bit more information, if I may, Judge.

**THE COURT:**  You may, Mr. Lietz.

**MR. LIETZ:**  Thank you.  I think that the Court's show cause order and what you said today, Your Honor, set out the history related to the third-party custodial situation very well.  There's just a couple of things I want to point out.

As I understand it, the hearing was initially held in here on October 8, 2019.  It was at that time that the defendant's previous lawyer volunteered to have Jordan Satary, then a 25-year-old young man, serve as the third-party custodian.  It was something that wasn't presented to him before the hearing, something he learned about at the hearing, but the Court made it very, very clear on the record what you were expecting from him.

I'm not trying to suggest to you that he didn't understand what he was supposed to do.  What I am trying to suggest to you is he really had no idea that he was going to be volunteered for that position, really had no opportunity to say no; but regardless of that, he said yes, and he signed onto the role that he was asked to perform at that time.

That role commenced on October 8, 2019, and the Court made very clear at the time what that role involved, and so did the order setting conditions of release, which were spelled out, I believe, in document 30, where he signed his

name to those various things that are laid out.

A couple of key points that I just want to make, Judge, because I think -- hopefully you will bear with me for a second. I do believe this is leading somewhere.

Number one, at the time that order was signed -- and the Court verified this on the record. I have taken a look at the transcript. One of the first questions the Court asked Mr. Jordan Satary when he was under oath is, "Are you living in the same place? Do you live in the same house as your father?" and he answered that question affirmatively. They were living in the same place.

As a result of that conclusion that they were living in the same place, the Court imposed the three requirements that you have talked about earlier. One is basically to supervise. Two is to make sure you use every effort you can make to get your dad to show up in Court. That's basically the second one. The third one is to notify the Court immediately if your dad violates a condition of release or if he is no longer in your custody.

That was signed on -- I think the Court said October 8, 2019, and at the time the Court may remember the government was -- well, they didn't agree to the bond. But shortly thereafter, as the Court also noted, less than two months after that, the Court consented to a bond amendment which loosened up significantly on the defendant's travel.

Initially, the Court was very clear that he was to stay within the state of Georgia unless given permission in advance.  Not long after that, the government -- not these two prosecutors here, some other prosecutors.  I think one was a Mr. Loper -- agreed less than two months later to loosen up on those bond requirements and to allow the defendant more leeway with respect to his travel.

This is the point I was really trying to get to, Judge, and you mentioned it a little bit earlier.  I think this is very significant.  This is where I'm going to need, frankly, some guidance from you, Your Honor.

On October 1, 2021, almost a year ago the parties came to the Court with an agreement, a consent order, asking you to do a couple of things which were key as it relates to Jordan Satary's responsibilities with respect to his father.  One of those things was to -- and I'm reading from document 198 -- allow the defendant in this case to basically travel unrestricted throughout the United States.  That was an agreement that was reached by the defendant's lawyers and the government.

The government presented that agreement to the Court.  Based on the representations of the parties, the Court signed an order stating, "Defendant may travel throughout the lower 48 states so long as he notifies his probation officer prior to his travel, including dates of travel."  I think the

reason offered in the motion is that the defendant was promoting concerts throughout the United States and needed to be at these various venues throughout the United States to promote those concerts.  That's the employment that he was engaged in at the time.

So the other part of that, which I think is key -- and again this is based on the agreement that the parties presented to the Court, not something the Court obviously thought of on its own -- asked if the condition could be amended to no longer require the father and the son to live together.  In that same order, based on what the parties asked the Court to do, the Court ordered, "The custodian requirement is amended to make clear that defendant's custodian, Jordan Satary, need not live in the same household as defendant."

Based on all of that, what we have as of October 1, 2021, is a situation where -- the way that I'm reading this, Judge, and the way that I felt like the Court was reading it at the time -- and, again, I don't know what your intentions were, Judge.  This is where I'm going to need some help from you.  You said, "Jordan Satary remains defendant's third-party custodian to ensure the presence of defendant at any and all court proceedings."  So you made it very clear at that point, "Look, you're still the custodian as it relates to ensuring that your dad comes to court."

I honestly don't know what the Court's intention

was with respect to the first requirement that was originally imposed which was, number one, again, that he was required to supervise his father.  I do not think it's at all feasible for him to supervise his father if his father is allowed to travel freely throughout the United States basically unrestricted.  I don't see how he can supervise him in that setting.

Again, he is not living with him anymore, so the supervision requirement -- that's sort of up to what the Court thinks, I think, at some level, as well as the requirement that he notify the Court if he is no longer in Jordan Satary's custody.  Certainly by allowing him to live somewhere else, travel freely, unrestricted, those sort of things, I think that essentially took him out of Jordan Satary's custody.

Of course, the Court was very, very clear, very clear in that order that Jordan Satary was, no matter what, required to ensure the presence of his father at any and all court proceedings.  That requirement was clearly not eliminated.

He has done what he could to get his dad here today.  Based on what the government has told me -- and I don't know a lot here.  I think I probably know less than anybody here.  His father is obviously not here.  He has put his son in a terrible position.  I would suggest to the Court that his son was put in a terrible position initially, but he signed onto that obligation and for a long period of time, ever since 2019

up until now, has satisfied his obligations.

The only other thing I will add is just to reiterate that I think those obligations changed in October of 2021 when the parties came to the Court and asked you to change things up significantly, Judge.

THE COURT: All right, Mr. Lietz. I would like to hear from your client, from Mr. Satary.

MR. LIETZ: Let me ask you this, Judge, and I'm sorry. I have had conversations with the government, and I have some concerns about letting him answer questions for a couple different reasons.

One, I'm not entirely sure what the nature of the hearing is. We certainly have no objection and think it would be appropriate for him to be removed as the third-party custodian. We would agree with that. I know that the Court's order setting this show cause hearing, that we are here to show cause why he shouldn't be removed. We would like for him to be removed. Certainly we are not here to dispute that.

The nature of the concerns relate to, number one, I'm not entirely clear what the nature of the hearing is. Also, just to be real candid, the Court said in the order setting this for a hearing that, "It has come to the Court's attention that Jordan Satary may not be in compliance with the terms of his third-party custodian agreement."

I'm not sure what the Court meant by that. To

the extent that you intend to question him about those concerns without providing us notice in advance, I don't know that I would be doing my job for him to allow him to answer those questions. On top of all that, the government told me last night that apparently there's an investigation concerning health care fraud over in Houston, Texas, and I have not received any assurance from them that Mr. Jordan Satary is not a subject in that investigation or a subject in the investigation concerning the whereabouts of his father.

So I'm not trying to be overly careful, but at the same time I think -- because his father has put him in a bad position and I'm not sure exactly what the Court is going to ask or what the answers would be, I'm not entirely clear or comfortable allowing the Court to ask him questions.

THE COURT: On Friday of last week, December 9, I had a previously scheduled status conference with all the attorneys in Mr. Satary's case. It had previously been scheduled -- which, by the way, ironically, Mr. Khalid Satary has always been present or by phone on every status conference. It was something I think he wished to do, and his attorneys asked early on if he could be present. For the first time, he was not present on the phone during the conversation.

The point of the status conference was to select a new trial date because his attorneys have requested a continuance because his attorney Ms. Clark-Palmer had a

conflict with a trial that she had beginning in Georgia in January.  That was the entire point of the status conference, to select a new trial date.

Immediately upon the beginning of the status conference, Mr. Satary's attorney Mr. Grubman asked if he could interrupt because he had information to provide.  That's when he disclosed to the Court that he had been unable to contact his client and had not been in contact with his client -- I don't think he gave me a date specific, but it had been at least a week at that time.

That is what prompted my order for Jordan Satary, as third-party custodian to Mr. Khalid Satary -- that's what prompted both my orders: number one, to order Khalid Satary in so that I know whether he was going to show up, which we have determined that he is not; and then, secondly, to find out exactly what Mr. Jordan Satary knows, because one of the responsibilities for Mr. Jordan Satary is to assure his father's appearance and to notify the Court immediately if the defendant violates a condition.  My understanding from Mr. Grubman -- and he can speak to this -- is that he spoke to Mr. Jordan Satary and --

Mr. Grubman, is that right?  Why don't you tell me what you said on the phone about what Mr. Jordan Satary advised.

MR. GRUBMAN:  Yes.  I simply, with Mr. Lietz'

permission, contacted Mr. Jordan Satary and asked him if he had been in contact with his dad, at which point he said he had not been in contact with his father since I think the same day that -- the last day I had been in contact with his father.  He told me he didn't know where his father was.

It's really everything Mr. Lietz said.  He told me that his father had left him in a very bad position in various different ways; and that he was trying to and would continue to try to find his father and, if he did, he would let us know.  At that time I told him he should probably -- I knew he had had a lawyer from a while back, and I said he should probably just reach out to Mr. Lietz.  I haven't talked to him since.

**THE COURT:**  With that, Mr. Lietz, where I am with this is primarily finding out if he knows where his father is, but secondly he had a responsibility to notify the Court if his father violated any condition.  Being a fugitive and not appearing is a violation of the conditions of his release.  I would like to find out more about when he last spoke to him and when he realized that his father was gone.

**MR. LIETZ:**  I understand, Judge, why you want to get to the bottom of this, and I don't blame you one bit.  A couple of things you may or may not know because I don't know what the government shared with you.

The government sent FBI agents, one or more

agents, to Jordan Satary's home on the 6th of December. They went to his home in the morning of December 6. I can't speak for them, but I think that they would say that he was very cooperative in the sense that he didn't have to talk to them. He answered all their questions. Whatever they asked, he answered. Now, the government, if they disagree with that, it may make sense to call the agent. I know that that would provide the Court more information.

What I do know is that later that same day, on December 6, they called him back with some additional questions, and he answered those questions as well. At no point during either of these interviews did he stop answering their questions, say that he wouldn't answer any additional questions, anything like that. That was on December 6, and he explained to them what he knew, when he last saw his father. All that was discussed with them.

We talked with, I did, the prosecutors today and basically asked them, "Are there any more questions that you have? Is there anything else that he can do to be helpful?" If there's things that he can do to be helpful, we are willing to consider it. The concern that I have -- again, I go back to the order where you said it's come to your attention that he may not be in compliance with the terms of the custodial agreement. I'm not trying to just keep saying the same thing, but it seems like that agreement was amended in October of

2021.

**THE COURT:** Mr. Lietz, the agreement was, even your reading, that he assures that his father appears in court. His father is not here.

**MR. LIETZ:** I hundred percent agree.

**THE COURT:** Okay.

**MR. LIETZ:** I can proffer to the Court that he has made every effort since this hearing was set to get his father there. He has done everything that he knew to do to get his father to court today. He has done that.

If the government is of the view that he somehow violated this third-party custodial agreement -- and, again, I'll be candid. I've been doing federal criminal defense for a long time, but I have never encountered anything like this. The fact of the matter is if his dad were in court, if the government wanted to revoke his father's bond, we would be proceeding under 18 U.S.C. § 3148. They would have to put up evidence. We would get notice of what they are saying. We would get an opportunity to cross-examine their agents.

If there is a claim that he violated the third-party custodial agreement, I think the government -- if that's their position, we need to hear evidence. I'm not comfortable just having him stand up here and asked questions. I don't know what the questions are. I don't know what the answers are going to be necessarily because I don't know what

the questions are.

He is willing to cooperate.  He already cooperated twice.  If there's a way to work out additional details with them, we will, but I think at this point I would not be doing him a service if I allowed him to just stand up under oath and answer the Court's questions.  That has nothing to do with the fact -- I don't think he would be dishonest.  I don't think he would be deceitful.  I don't think he would be uncooperative.  But me standing here as his lawyer, I'm not in a position to allow him to do that.  I'm trying to be as respectful as I can, but I can't do that, Judge.

THE COURT:  Ms. Contreras, the probation officer --

THE PROBATION OFFICER:  Yes, Your Honor.

THE COURT:  This is Iris Contreras, United States probation officer.

Have you been in touch with the probation officer in Houston who was supervising Mr. Satary?

THE PROBATION OFFICER:  Yes, I have, Your Honor.

THE COURT:  Did Mr. Jordan Satary advise the probation officer that he was unable to locate his father?

THE PROBATION OFFICER:  No, he did not.

THE COURT:  Did he advise you in the probation office?

THE PROBATION OFFICER:  No.

THE COURT:  Did he advise, to your knowledge, any

court official that he could not locate his father and didn't know where he was?

THE PROBATION OFFICER:  No, Your Honor.

MR. LIETZ:  May I ask her some questions?

THE COURT:  Of course you may.

MR. LIETZ:  What's your name again?

THE PROBATION OFFICER:  Iris Contreras.

MR. LIETZ:  So it's my understanding based on what I have heard -- and I'm not sure how much of this is accurate, but at some point the government went to a judge somewhere and got a warrant for the defendant -- that Satary, I'm going to call him the defendant -- got a warrant to arrest the defendant.  Are you familiar with that?

THE PROBATION OFFICER:  Yes, I am.

MR. LIETZ:  When was that warrant obtained?

THE PROBATION OFFICER:  I don't have that in front of me, but that was obtained maybe about a week or two ago, about two weeks ago.

MR. WOODARD:  November 23.

MR. LIETZ:  So on November 23 a warrant was obtained for the defendant's arrest?

THE PROBATION OFFICER:  Correct.

MR. LIETZ:  It's my understanding at sometime after that warrant for his arrest was obtained that the probation officer supervising the defendant in Houston called the

defendant on the phone and said, "I would like for you to come in."

THE PROBATION OFFICER:  Correct.

MR. LIETZ:  That meeting was set for what day?

THE PROBATION OFFICER:  December 1.

MR. LIETZ:  That's Thursday, December 1.

THE PROBATION OFFICER:  Yes.

MR. LIETZ:  I think this goes without saying, but I'm assuming, when the defendant was called, he wasn't told, "There's a warrant out for your arrest."

THE PROBATION OFFICER:  Correct.

MR. LIETZ:  So as of Thursday, December 1, the defendant had a meeting set up with his probation officer in Houston, Texas, correct?

THE PROBATION OFFICER:  Correct.

MR. LIETZ:  What happened at that meeting?

THE PROBATION OFFICER:  He did not appear.  The defendant did not appear.

MR. LIETZ:  So on Thursday, December 1, the defendant did not appear?

THE PROBATION OFFICER:  Correct.

MR. LIETZ:  Is that right?

THE PROBATION OFFICER:  Correct.

MR. LIETZ:  Did anyone go out and attempt to arrest the defendant at that point?

THE PROBATION OFFICER:  No.  It is my understanding there was a special agent looking for the defendant.  I don't know what communication happened from thereon.  I understand that Officer Salinas from Houston, Texas, did communicate with Special Agent Brown as far as trying to locate the defendant.

MR. LIETZ:  It's my understanding -- correct me if I'm wrong -- that after that meeting didn't take place because the defendant didn't show up on Thursday, December 1, that agents then went to the defendant's home on December 6.

THE PROBATION OFFICER:  I don't have any knowledge of that information.

MR. LIETZ:  So you're not aware of that?

THE PROBATION OFFICER:  I'm not aware of that.

MR. LIETZ:  Are you not aware of the fact that agents also went to Jordan Satary's home on December 6?

THE PROBATION OFFICER:  I was not aware of that.  I do want to mention that the defendant did give a reason regarding Mr. Jordan Satary as not appearing to his meeting in Houston, Texas.

MR. LIETZ:  Wait.

THE PROBATION OFFICER:  So Mr. Satary at one point on December 1 --

MR. LIETZ:  Let me stop you right there.  I just want to make sure I know what Satary we are talking about.

THE PROBATION OFFICER:  Defendant.

MR. LIETZ:  So the defendant was supposed to show up on December 1.  Go ahead, ma'am.

THE PROBATION OFFICER:  Later, after not appearing on December 1, the defendant was in communication with Officer Salinas in Houston, Texas, and informed Officer Salinas in Houston, Texas, that he was unable to appear due to Jordan Satary being in the hospital.

MR. LIETZ:  Oh, okay.  So the dad told the probation officer that he couldn't appear because his son was in the hospital?

THE PROBATION OFFICER:  That's correct.

MR. LIETZ:  Which we know to be a flat-out lie.

THE PROBATION OFFICER:  Well, we have to ask Mr. Jordan Satary if he was or was not in the hospital.

MR. LIETZ:  What did he say about the specifics of why he was in the hospital?

THE PROBATION OFFICER:  He just said he would reschedule another visit with another date and after that was nonresponsive.

MR. LIETZ:  Was another date scheduled?

THE PROBATION OFFICER:  No, because he never called back.

MR. LIETZ:  Did he say what the nature of the condition was?

THE PROBATION OFFICER:  No, he did not.  He just said

he was in the ER.

MR. LIETZ:  I'm sorry I cut you off.  Did he say what hospital?

THE PROBATION OFFICER:  No, he did not.

MR. LIETZ:  Did the probation officer ask?

THE PROBATION OFFICER:  I believe not.

MR. LIETZ:  Let me get this straight.  As of Thursday, December 1, there was a federal warrant for the arrest of the defendant in this case?

THE PROBATION OFFICER:  Correct.

MR. LIETZ:  As of Thursday, December 1, the defendant told the probation officer that his son was in the emergency room and he couldn't go to see the probation officer?

THE PROBATION OFFICER:  Correct.

MR. LIETZ:  But yet the probation officer didn't ask, "What hospital are you in?"

THE PROBATION OFFICER:  Correct.

MR. LIETZ:  The probation officer didn't set up another meeting for the defendant to come in?

THE PROBATION OFFICER:  Correct.

MR. LIETZ:  Is it fair to assume that the probation officer basically just took the defendant's word for it?

THE PROBATION OFFICER:  Well, he had no other way to communicate with the defendant after that.

MR. LIETZ:  Let me ask you this.  In connection with

a probation officer's job to supervise a defendant, a probation officer has to make him or herself very familiar with the bond paperwork, correct?

THE PROBATION OFFICER:  Correct.

MR. LIETZ:  All of the conditions of release that the judge set?

THE PROBATION OFFICER:  Correct.

MR. LIETZ:  In this particular case, the probation office was aware that the judge actually set a third-party custodial agreement in place with respect to Mr. Jordan Satary?

THE PROBATION OFFICER:  Yes.

MR. LIETZ:  Can you tell me, after learning that the defendant said that his son was in the hospital, when somebody from the probation office, either here or in Houston, called Mr. Jordan Satary?

THE PROBATION OFFICER:  No, there was no communication to Mr. Jordan Satary.

MR. LIETZ:  So nobody called the third-party custodian?

THE PROBATION OFFICER:  That is correct.

MR. LIETZ:  Why would that be?

THE PROBATION OFFICER:  There could be several reasons.  The last time they did speak to the third-party custodian was under another officer, Mr. Mike Cannon -- that was in March of 2022 -- just to kind of get information, build

rapport.  That should have been Mr. Salinas' next step.  I don't know if his office has a protocol or policies in place on how they operate.  The case is not in my jurisdiction and to which I did not call Mr. Jordan Satary.

MR. LIETZ:  Again, I'm not faulting you, but what you said is very important.  There were previous occasions when somebody from the probation office reached out to Jordan Satary?

THE PROBATION OFFICER:  Correct.

MR. LIETZ:  Because, again, he was the third-party custodian?

THE PROBATION OFFICER:  Correct.

MR. LIETZ:  The probation office wanted to have a good rapport with him?

THE PROBATION OFFICER:  Correct.

MR. LIETZ:  To be able to rely on him and communicate with him?

THE PROBATION OFFICER:  Correct.

MR. LIETZ:  As a result of wanting that, the probation office had Mr. Jordan Satary's phone number?

THE PROBATION OFFICER:  Yes.

MR. LIETZ:  As far as you know, there were no difficulties that your office had ever getting in touch with Mr. Jordan Satary?

THE PROBATION OFFICER:  That is correct.

MR. LIETZ:  It's just that this particular occasion from December 1, when the dad said he couldn't show up to an appointment that was previously set, nobody actually made an effort to call Jordan Satary?

THE PROBATION OFFICER:  Correct.

MR. LIETZ:  Based on what you know about his prior experience, is it fair to say Jordan Satary would have -- you had the number, correct?

THE PROBATION OFFICER:  He would have called -- I mean spoken to me, yes.

MR. LIETZ:  There's no indication that he wouldn't have spoken to you?

THE PROBATION OFFICER:  That's correct.

MR. LIETZ:  Based on the work that you have done in connection with your job as a probation officer in this case and getting ready for this hearing, when was Jordan Satary first notified that his dad was subject to a federal arrest warrant?

THE PROBATION OFFICER:  I don't have any information on that.

MR. LIETZ:  I think you said that you're not aware of the fact that federal agents went to Jordan Satary's home on December 6?

THE PROBATION OFFICER:  That's correct.

MR. LIETZ:  Which is obviously five days after the

04:53

meeting that was supposed to take place.

THE PROBATION OFFICER:  Correct.

MR. LIETZ:  You don't have any evidence or information to suggest that anybody reached out to Jordan Satary before December 1?

THE PROBATION OFFICER:  Correct.

MR. LIETZ:  You can't obviously sit here today and say anything about when Jordan Satary knew that his father had basically absconded from his bond.

Do you know how many court appearances the defendant has had in this case starting from when the judge initially issued this bond back in 2019 up until this day?

THE PROBATION OFFICER:  Several.

MR. LIETZ:  Several?

THE PROBATION OFFICER:  I would say several.  I have seen the docket and it was lengthy, so longer than normal.

MR. LIETZ:  His lawyers have filed a lot of motions in this case, right?

THE PROBATION OFFICER:  Correct.

MR. LIETZ:  They have had to come to court a lot of times.  It's probably fair to say that he has been to court dozens of times?

THE PROBATION OFFICER:  More than a dozen times.

MR. LIETZ:  More than a dozen times, and there has never been one instance until today that the defendant has not

showed up?

THE PROBATION OFFICER:  Correct.

MR. LIETZ:  So would you agree that up until today Jordan Satary has done a good job getting his dad to court?

THE PROBATION OFFICER:  Yes.

MR. LIETZ:  Thank you for your time, ma'am.  I appreciate that.

THE COURT:  Mr. Woodard, do you have any questions for Ms. Contreras?

MR. WOODARD:  Just briefly, Your Honor.

Were you aware that Mr. Jordan Satary was interviewed by federal agents on December 6?

THE PROBATION OFFICER:  No, I was not.

MR. WOODARD:  Did you know that Jordan Satary told agents that he had last spoken to his dad on December 2, which was the day after Khalid Satary was supposed to appear to probation?

THE PROBATION OFFICER:  No.

MR. WOODARD:  Did you know a car that registered to Jordan Satary was pinging in California a day after Mr. Khalid Satary was supposed to appear to probation in Houston?

THE PROBATION OFFICER:  No, I was not.

MR. WOODARD:  It wasn't just the probation office investigating this case; is that right?

THE PROBATION OFFICER:  That is correct.

04:55

**MR. WOODARD:** It was also a team of federal agents?

**THE PROBATION OFFICER:** Correct.

**MR. WOODARD:** Who are gathering information to this date about this investigation, talking to the third-party custodian, and other things?

**THE PROBATION OFFICER:** Yes.

**MR. WOODARD:** May I have a moment, Your Honor?

**THE COURT:** Of course.

**MR. WOODARD:** Ms. Contreras, did you review a memo supporting an arrest warrant for Khalid Satary prepared by the government?

**THE PROBATION OFFICER:** Yes, ma'am.

**MR. WOODARD:** Do you remember Jordan Satary being mentioned in that memorandum?

**THE PROBATION OFFICER:** Yes, ma'am.

**MR. WOODARD:** Do you remember -- and you don't have to get into details -- whether it mentioned that Jordan Satary --

**MR. LIETZ:** Judge, certainly pursuant to Jencks I would like to see a copy of that.

**MR. WOODARD:** That's attorney work product prepared by the government.

**MR. LIETZ:** Well, I don't think the government can ask about something that I haven't seen and ask the Court to rely upon it if they are not going to give me a copy.

04:56

**THE COURT:** For purposes of this hearing, what is the relevance of that?

**MR. WOODARD:** Your Honor has made clear that a violation of the third-party custodian agreement would be knowing that Mr. Jordan Satary's father was violating conditions of his bond. Evidence presented in support of the arrest warrant for Khalid Satary referenced Jordan Satary's living in Houston and at least being named on documents related to the Houston labs, Your Honor.

**THE COURT:** My focus is on the defendant's nonappearance and his obligation to have him appear in court, and I would like to keep the focus to that.

**MR. WOODARD:** Understood Your Honor. Withdraw that last series of questions. No further questions, Your Honor.

**THE COURT:** Ms. Contreras, I think you said this before. I just want to be clear. Mr. Jordan Satary's attorney asked you if anyone from the government advised you that they had spoken to Jordan Satary. Did Jordan Satary contact any probation officer or any court personnel to advise that he could not locate his father?

**THE PROBATION OFFICER:** No, Your Honor.

**MR. LIETZ:** May I have a brief follow-up?

**THE COURT:** Yes.

**MR. LIETZ:** Just to get the chronology clear, the meeting was supposed to take place on December 1, correct?

THE PROBATION OFFICER:  Correct.

MR. LIETZ:  You're not aware of the fact that agents went to Jordan Satary's home on December 6, correct?

THE PROBATION OFFICER:  Correct.

MR. LIETZ:  So clearly as of December 6, if the agents went there as of that date, they had already talked to Jordan Satary, correct?

THE PROBATION OFFICER:  But we are different entities.  So Mr. Jordan Satary is still obligated, whether speaking to any other law enforcement agent, to still contact either myself or Officer Salinas.

MR. LIETZ:  Obligated to do what, now?  I didn't --

THE PROBATION OFFICER:  To contact either myself or Officer Salinas.

MR. LIETZ:  For what reason?

THE PROBATION OFFICER:  For reasons of the bond.

MR. LIETZ:  What was the obligation that he had to contact you?

THE PROBATION OFFICER:  If he is unable to have any communication with his dad or he doesn't know where his dad is.  So if he believes that, you know, his dad is missing or even -- missing.  It couldn't be absconding.  Let's just say his dad was in a car accident or something and missing.  He still is to notify us.

MR. LIETZ:  Now, did you have a chance to look at the

order that the judge signed back on --

THE PROBATION OFFICER:  I did.

MR. LIETZ:  Okay.  You are aware of the fact that based on the agreement that the parties submitted to the Court that the defendant was no longer required to live with his son?

THE PROBATION OFFICER:  Living is one thing.  Still having communication is another.

MR. LIETZ:  Well, you are not saying that he had to talk to his dad every day, are you?

THE PROBATION OFFICER:  I'm saying that the moment he was suspicious of his dad's whereabouts or -- the moment his dad's whereabouts became unknown to him, there was an obligation on him to contact myself or Officer Salinas.

MR. LIETZ:  When did his dad's whereabouts become unknown to him?

THE PROBATION OFFICER:  That's what we need to find out.

THE COURT:  That's exactly what we are trying to get to, Mr. Lietz.

THE PROBATION OFFICER:  That's what we need to find out.

MR. LIETZ:  Okay.  Well, you are not saying that he knew -- I thought you were saying that he didn't satisfy his obligations of the Court to reach out.

THE PROBATION OFFICER:  That's what we are saying.

So the moment he is under the impression that his father's whereabouts are unknown, his obligation is to reach out to myself or to Officer Salinas.

**MR. LIETZ:** Okay. You are aware of the fact that, under the bond conditions that were amended, his dad was allowed to travel freely throughout the United States?

**THE PROBATION OFFICER:** That is correct.

**MR. LIETZ:** When did the probation office try to reach out to the dad after the dad canceled the meeting on December 1?

**THE PROBATION OFFICER:** I don't have a specific date on that, but there was another contact made by Officer Salinas to the defendant's phone number in which it was going straight to voice mail.

**MR. LIETZ:** Okay. When did anybody notify the judge here of this issue, the probation office?

**THE PROBATION OFFICER:** November 21, 22, around there.

**MR. LIETZ:** Ma'am, I don't think I have any more questions. Thank you. I appreciate it.

**THE PROBATION OFFICER:** May I be excused?

**THE COURT:** Yes, yes. Thank you, Ms. Contreras.

Mr. Lietz, that's the issue for the Court. My issue is what you started with when you came to the podium saying that the defendant has left his son in a very difficult

situation. He has absconded.

MR. LIETZ: Yes.

THE COURT: You have acknowledged that. Defendant's counsel acknowledged that last week, which is what brought all this to our attention. What I am trying to get at is what does your client know about his disappearance and when did he find out about it because he did have an obligation to notify the Court, and there's no evidence that he did that.

MR. LIETZ: Okay. I hear you, but I don't think there's any evidence that he knew his dad had absconded. There's no evidence. We haven't heard any evidence. It's one thing for the government to come in and meet with you ex parte and tell you whatever they want to tell you. I'm not suggesting that they wouldn't tell you something that they don't believe. But if they have evidence to present, let them present evidence.

I do not believe that Jordan Satary has any obligation, as we sit here today in connection with this order to show cause, specifically an order to show cause why his third-party status should not be revoked -- I don't believe we have any obligation to present evidence. We agree that his third-party status should be revoked simply because he made every effort since Friday to get his dad here. His dad is not here. There's no purpose in even having him a third-party custodian. Yes, his father has put him in a bad position, but

I frankly think it seems -- if they have evidence of that, let them put the evidence up.

THE COURT:  Mr. Woodard, do you want to call anyone? Do you want to call the agent?  Because it appears clear that Mr. Jordan Satary has chosen not to assist or to say anything to the Court.

MR. LIETZ:  Let me say this, if I may, Judge. Jordan Satary -- if they put up evidence -- I hope they do because I hope it will be --

THE COURT:  Let me just go back on what you said when you just indicated that if the Court were going to hear and just rely on ex parte communications with the government -- which I'm not certain why you say that, but I find that that's unfounded because I want to make clear what brought all this to light is the defendant's attorney who, in communication with all of us, brought this to my attention.  He is the one who advised that the defendant had absconded and he had not been able to get in touch with him for over a week.

MR. GRUBMAN:  Your Honor, if I may, this is Scott Grubman for the defendant.  I think maybe what Mr. Lietz is referring to, I did tell Mr. Lietz that during our pretrial conference --

THE COURT:  Status conference.

MR. GRUBMAN:  -- the government requested an ex parte conference with the Court, which was granted.  So I think

that's probably what he is referring to.

**THE COURT:** After the fact the government requested or asked if I wanted additional information about the arrest warrant, after you notified me that you had been unable to get in touch with your client and we realized that he may have absconded.

**MR. LIETZ:** Judge, may I say this? I'm not suggesting that either the government or certainly the Court did anything wrong, but what I am suggesting or what I am saying is the agents went to Jordan Satary's home on December 6. He told them everything that he knew about his father.

According to their own reports, he told them that the last time he saw his dad was on Friday, December 2. Friday, December 2, according to the government's own reports, is the last time that he saw his father. I can also tell the Court --

**THE COURT:** So you're saying, Mr. Lietz, that Mr. Satary knew from December 2 until at least December 6, when the agents went to his house, that his father was gone.

**MR. LIETZ:** I'm saying --

**THE COURT:** That just goes right back to what I'm saying, that he didn't notify the Court.

**MR. LIETZ:** I'm saying, Judge, if you want to accept that as true -- that's what the government's report says. I'm

happy with the Court accepting that as true for purposes of this hearing.  I'm not entirely sure what the purpose of the hearing is at this point, but let me just say I disagree substantively.

So let's assume that he knew on December 2.  He didn't talk to his dad on December 2.  We now know that his father told the probation office that his son was in the hospital, which I can tell the Court is a lie.  That's a flat-out lie.  We also know that the probation office had Jordan Satary's phone number, had contacted him many times before.  He was always cooperative.

Jordan Satary, let's assume he knew as of December 2 he couldn't get in touch with his dad.  His dad had permission to travel throughout the entire country without even getting permission in advance.  He could travel where he wanted, when he wanted in the lower 48 states without even having to get permission from the probation officer.

What Jordan Satary also told the agents, I believe, is he doesn't check in with his father every day.  He is not living with him anymore.  The nature of the relationship was they didn't talk every day or even every other day.  Some days they talked regularly; some days they didn't.  They didn't live in the same house, so it wasn't unusual to Jordan Satary to go several days without speaking with his father.

I believe he told the agents that or something

to the effect.  If the government wants to put that evidence up, that's fine.  He wants to be cooperative.  If there's a way we can work this out, we will work it out.  We will be cooperative.

The problem I have is that the government stood up in court today and said they have Jordan's name on some documents concerning a health care fraud investigation down here.  Yesterday they told me they had no evidence that Jordan put his name there.  His dad has put his name there.  His dad put his wife's name there.  His dad has put many people in a bad position, including his son.

The Court obviously wants to find the defendant. We want the Court to find him too, but I don't want the son to be held responsible for that; because I don't believe he did anything wrong, but I am not comfortable allowing him just to answer questions.  I don't think any lawyer in my shoes would allow anything like that.  I'm sorry, Judge.  He wants to be cooperative.  He would come up here and answer questions.

THE COURT:  What was the last communication he had with his father?

MR. LIETZ:  My understanding, based on the report that the government provided me, was that he explained to the agents --

THE COURT:  I don't need to have the report regurgitated to me.

**MR. LIETZ:**  Friday, December 2 is what the report says.  I'm relying on the report for that.

**THE COURT:**  Your client is raising his hand.

**MR. JORDAN SATARY:**  If I may just have a word with him.

**THE COURT:**  Put on the music, Melissa.

(Off the record.)

**MR. LIETZ:**  Your Honor, my understanding is that the last time he saw -- well, the last time he communicated with his father was on Thursday, December 1, or Friday, December 2.  There are some things that we could look at to confirm that.

The other thing I wanted to mention -- and I can certainly give the Court a copy of this and the government -- is that on November 11, 2022, Jordan Satary was involved in a wreck, and the police report in connection with that wreck shows that his vehicle was towed on Friday, November 11, 2022.

The information that we have would also show that on -- I believe it's a Tuesday.  Don't quote me on that, but it definitely was November 15, 2022.  Jordan Satary, because his car had been towed as a result of the accident, he didn't have a vehicle, rented a Toyota Highlander on November 15, 2022.  I think the government previously told me that the rental occurred sometime close in time to his dad, I'll say, absconding, but the rental occurred on November 15, 2022.

**MR. WOODARD:** Your Honor, if I could object to -- and this will be the last time I call Mr. Lietz before a hearing to try to work things out because that's not something I said.

To get to the chronology, Your Honor, December 2 apparently is the last time Jordan spoke to his dad. In a statement to the government, he stated that on the weekend of December 3 through 4, he dropped the rental car off at Khalid Satary's home. Either he talked to Mr. Khalid Satary that day or Mr. Khalid Satary was not present. Either way, he did not inform anyone about Mr. Khalid Satary's absence. Our phone toll records show that he has not tried to contact his father until yesterday, December 11.

We think that as an officer of the Court, the Court obviously has the ability to question -- I'm sorry, a custodian who owes an obligation to the Court, and the Court can question Mr. Jordan Satary.

**THE COURT:** Mr. Grubman is trying to get our attention.

**THE DEPUTY CLERK:** Can you hear me now, Mr. Grubman?

**THE COURT:** One moment.

Ms. Clark-Palmer, can you hear?

**THE DEPUTY CLERK:** Can you hear anything now?

**THE COURT:** Can they dial in on the phone number? Can you disconnect the Zoom and have them dial in?

We are working on the IT issues.

(Recess.)

**THE COURT:**  Mr. Pogozelski.

**MR. POGOZELSKI:**  Yes.  If I may just make a few remarks on behalf of the government, Your Honor.

The whole purpose of a third-party custodian requirement, as the Court obviously knows, is to provide additional incentive for a defendant not to violate bond or flee, and a third-party custodian willingly undertakes that obligation.

As the Court repeated earlier, Mr. Jordan Satary was advised in open court about that obligation and his father understood, as the Court said, "You're putting your son's name on the line."  The defendant is not here.  As the third-party custodian, Mr. Jordan Satary is obligated to answer the Court's questions about whether he actually violated any of the conditions of his placement as a third-party custodian.

Ironically -- I know it's a different district -- I had a similar issue very recently in October with a third-party custodian.  In our bond order, it clearly said the third-party custodian is subject to contempt if it is determined they have violated their obligations as a third-party custodian.

It's his job to get up and tell us and answer questions whether he did his job as a third-party custodian.  The government doesn't have to present any evidence about that.

**MR. LIETZ:** Judge, may I respond briefly to that? I think the thing that the government is either forgetting or ignoring is that in October of 2019, the government came to the Court and said, "We are okay not requiring the defendant to live with his son anymore. We know that that was the requirement originally, but we are okay with that not occurring anymore. By the way, Judge, as the government, we are okay allowing him to travel throughout the United States with no permission in advance."

**THE COURT:** Wait. I don't think that's right. That's not what the order says. It says with notice.

**MR. LIETZ:** What the order says is that he has to --

**THE COURT:** It says, "Defendant may travel throughout the lower 48 states so long as he notifies his probation officer prior to his travel, including dates of travel."

**MR. LIETZ:** I agree, but what I said -- and I'm sorry. He didn't have to get the permission of his probation officer. To get permission, you have to submit your travel plans generally, as I understand it, 10 days in advance. All he had to do was notify his probation officer to let the probation officer know where he was going, when he was going, and there was no 10-day requirement before that.

To the extent the government has authority that Jordan Satary is obligated to come into court and answer these questions at this point, I think they should produce that

authority.  I would like to see that authority.  I don't think that authority -- I haven't seen it.  I guess I can't say it doesn't exist, but it sounds like the other case that the government was involved in was different because the language of the order may have been different, but to the extent that there's a --

**THE COURT:**  Well, we have the Court order that Jordan Satary signed.

**MR. LIETZ:**  Absolutely.

**THE COURT:**  It says that he agrees to notify the Court immediately if the defendant violates a condition of release or is no longer in the custodian's custody.

**MR. LIETZ:**  I agree with that, which again that was amended.  How could his father be in his custody anymore after the government gave him permission to live somewhere else and travel freely?

**THE COURT:**  It was never amended to take out that it was his responsibility to notify the Court.  Where was that taken out?  Show me.

**MR. LIETZ:**  My understanding of what was left in just simply comes from the order that you signed on the 1st of October where you said, "Jordan Satary remains defendant's third-party custodian to ensure the presence of defendant at any and all court proceedings."

**THE COURT:**  Oh, Mr. Lietz.  Oh, Mr. Lietz.  I don't

know you at all.  I have got R. Doc. 30, which has three pages of what Jordan Satary agreed to do.

MR. LIETZ:  Yes, Judge.

THE COURT:  Those aren't all listed.  Is your argument that all of those have now been removed because they were not put in an amended order?

MR. LIETZ:  No, Judge.  My argument is this.  When you signed that, document 30, you required the defendant to live with his son.  That was a requirement.  You also required --

THE COURT:  And I lifted that.

MR. LIETZ:  -- Jordan Satary to supervise his father. That was also a requirement.  My only point is I'm not sure what the nature of those requirements would have been after the government agreed to allow Jordan Satary to live separately from his father and to travel freely.  How in the world is he supposed to supervise his dad, have his dad in his custody if his dad is living somewhere else?

THE COURT:  Nobody is saying that, are we?

MR. LIETZ:  I'm not sure.

THE COURT:  Did anyone say anything about custody? I'm saying it again.  I think I have said it five times.  His obligation was to notify the Court immediately if the defendant violates a condition of release or if he is no longer in custody.  He has not done that.  We have got the evidence now

from the probation officer that he, Mr. Jordan Satary, never notified anyone on his own.

MR. LIETZ:  Let me ask a follow-up.  I think you said that his obligation was to notify the Court if he, the father, was no longer in Jordan's custody.

THE COURT:  If he violates a condition of release or is no longer in the custodian's custody.  That's what the paperwork says.

MR. LIETZ:  Respectfully, if he is living -- I'm not even sure what it would mean for him to be in his son's custody after the government agreed for him to live somewhere else.

THE COURT:  What about violating a condition of his release?

MR. LIETZ:  I'm with you on that.  I'm not saying that that has been removed.  I think if he became aware of his dad violating a condition of his release, certainly.  Also, you very clearly said in the order that he was to make every effort to get his dad to show up in court.  That's clearly not eliminated.

THE COURT:  You have said that he was aware that his father was incommunicado and/or absconded somewhere around December 2.

MR. LIETZ:  No, I never said he was aware that his dad absconded.  He didn't know his dad absconded until December 6 when the agents came looking for him.

THE COURT:  Okay.  December 6.

MR. LIETZ:  December 6.  The agents came looking for him December 6.  By the way, nobody called him from the point in time where his dad was supposed to show up and told them that Jordan was in the hospital.  He knew his dad absconded on December 6 when the agents came out to his house and told --

THE COURT:  When did he notify the Court?

MR. LIETZ:  When did he notify the Court?  I mean, presumably the Court knew as of December 6 when the agents came out to his house.

THE COURT:  When did he notify the Court?

MR. LIETZ:  I don't know that he did notify the Court because he learned it after the Court learned it.  The Court learned about it certainly by December 6.

THE COURT:  So if you find something out by some other avenue, then he doesn't have any responsibility because the Court should have known it?  He had a responsibility.  So what I intended today was very clear because I didn't notice a contempt hearing.  That was not the intent today, but now I will notice a contempt hearing.

MR. LIETZ:  Judge, I wish you wouldn't do that.

THE COURT:  Well, there's a way to do this, Mr. Lietz.  I've made very clear what I want to know is what he knew about his father disappearing.

I'm not going to allow anyone to question him

about any other parts of an arrest warrant that is out for his father.  If you would like to regroup with your client about that -- and we can take it question by question, but I want to know what he knew and when he knew that his father was gone.

**MR. LIETZ:**  I can answer that.

**THE COURT:**  You're not Jordan Satary.  You didn't come before me and get put under oath and be made a third-party custodian so that his father could be released from jail.  He did, and he is the one that's going to answer me about it.

**MR. LIETZ:**  I agree.  His lawyer volunteered him on the spur of the moment, but he knew what he was getting into because the Court was real clear about that.  I understand what the Court is saying.

Look, let me backtrack a little bit.  When the agents came out to see him on December 6, to his home at around 7:00 a.m. in the morning, and said, "Hey we are looking for your dad.  We don't know where he is," he was very concerned, mainly about his family and everything his dad left behind.  Being a relatively young individual -- I'm not making excuses for him, but probably he should have picked up the phone and called the probation office and basically said, "I don't know where my dad is.  I know you guys are looking for him.  I don't know where he is," and I'm sorry.  He wasn't thinking in those terms, Judge, when he learned on December 6.

**THE COURT:**  Let's --

**MR. LIETZ:** -- that his dad has absconded.  I mean, this young man has had a lot of stuff put on him.  I understand everybody is very upset with his father, and there is nobody more upset than he is.  He is.  I'm sorry, but the government did agree to let the man travel freely throughout the United States.

**THE COURT:** With notice to the probation officer, which I haven't gotten into whether he has violated that, the defendant.

**MR. LIETZ:** Right.

**THE COURT:** I'm going to put this aside for a moment --

**MR. LIETZ:** Yes, ma'am.

**THE COURT:** -- because my focus is on Khalid Satary right now, although my focus will be back on Jordan Satary.

I understand Mr. Satary's wife is here.

**MR. LIETZ:** That's his ex-wife.

**THE COURT:** His ex-wife.  Let me hear from her.  Call her.

**MR. LIETZ:** That's Jordan's mother.

**THE COURT:** What does she know?  I want to know where Khalid Satary is.

**MR. LIETZ:** I don't represent her.

**THE COURT:** What's your name, ma'am?

**MS. SATARY:** Dawn Satary.

05:35

THE COURT:  Come up.

MR. LIETZ:  Judge, I don't know to the extent what the questions are going to be --

THE COURT:  You don't represent her.

MR. LIETZ:  You're right.

THE COURT:  Come up.

MR. LIETZ:  I would ask the Court to advise her to the extent that the Court thinks it's appropriate.

THE COURT:  Ma'am, come up to the witness stand.

MS. SATARY:  Yes.

THE COURT:  Let me be clear.  You are not in trouble.  You are not in trouble.

MS. SATARY:  Yes, ma'am.

THE COURT:  Nobody is looking to charge you with anything.  You are not in trouble.  We are looking for -- is it your ex-husband?

MS. SATARY:  Yes.

THE COURT:  I want to find out what you know about his whereabouts.  Does that give you some comfort?

MS. SATARY:  Yes.

THE COURT:  Come over here, ma'am.

DAWN SATARY,

having been duly sworn, testified as follows:

THE DEPUTY CLERK:  Please be seated and then state and spell your name for the record, please.

DAWN SATARY - DIRECT

THE WITNESS:  My name is Dawn Satary.

DIRECT EXAMINATION

BY THE COURT:

Q.   Ms. Satary, you are the ex-wife of the defendant, Khalid Satary.

A.   Yes, ma'am.

Q.   When is the last time you were in communication with him?

A.   I have not been in communication with him.

Q.   Speak into the microphone because the court reporter --

MR. LIETZ:  I can't hear anything.

THE COURT:  Right.  Just speak into that.

BY THE COURT:

Q.   When is the last time you were in communication with your ex-husband, Khalid Satary, who is the defendant?

A.   I have not been in communication with him.

Q.   Ever?  What does that mean?  When was the last time you were in communication with your ex-husband?

A.   I saw him only one time at an office and that's it.  I don't recall when the date was.  Maybe in May of 2022.

Q.   We are in 2022, so May --

A.   Yes, May.

Q.   -- of this year about --

A.   May.

Q.   -- is the last time you saw him?

A.   Yes.

DAWN SATARY - DIRECT

**Q.**   Have you had any communication with him -- texts, phone, email -- any other communication from him since that time?

**A.**   No, ma'am.

**Q.**   Where do you live?

**A.**   I live with Jordan Satary.

**Q.**   What's the address?

**A.**   15755 Tanya Circle, Houston, Texas.

**Q.**   Where does Khalid Satary live?

**A.**   In Houston, Texas.

**Q.**   How far away from where you live with Jordan?

**A.**   Maybe 10 miles or 15 miles.

**Q.**   How often did Jordan Satary see Khalid Satary?

**A.**   I don't know.  I was not present when he would see him.  I don't know when.

          **MR. LIETZ:**  Judge, I'm sorry.  I just can't hear back here.

          **THE COURT:**  You have to speak up, ma'am.

          **THE WITNESS:**  Sorry.  I don't know how often he would see him.  Being that I'm not in the same household, I don't know when.

**BY THE COURT:**

**Q.**   Do you know where Khalid Satary is now?

**A.**   No, ma'am, I do not.

**Q.**   Do you know what city or state he is in?

**A.**   No, ma'am, I do not.

DAWN SATARY - DIRECT

**Q.** Has anyone attempted to contact you on his behalf?

**A.** No, never.

**Q.** Do you have any relationship with his current wife?

**A.** I know her.

**Q.** When is the last time you spoke with her?

**A.** Maybe two weeks ago.

**Q.** What was the purpose of that conversation?

**A.** I was dropping off some school supplies for her child, and just the discussion was about the event that she had attended and I did not attend that event.

**Q.** What event?

**A.** It was a concert held in Houston and it was about the -- just general conversation about her attendance at that event. That was it.

**Q.** Was Khalid Satary, to your knowledge, in the home when you were talking with his wife?

**A.** No.  No.

**Q.** How do you know that?

**A.** I mean, I did not physically see him in the home.

**Q.** Did you rent the rental car with your son, Jordan Satary?

**A.** No, I did not.

**Q.** When did he rent that?

**A.** A few days after he had his accident, his car accident.

**Q.** Does he still have the rental car?

**A.** To my knowledge, yes, but it's not in his possession.

DAWN SATARY - DIRECT

Q.   What happened to the rental car?

A.   I don't know.

Q.   When is the last time you saw the rental car?

A.   I don't know the date.

Q.   So what is --

A.   I only saw it the first day that he obtained it.

Q.   Jordan lives with you?

A.   Yes.

Q.   So what's he driving if he got a rental car and is not driving that?

A.   He is driving a Mercedes.

Q.   Whose Mercedes?

A.   I don't know whose it is.  I mean, it's -- I don't know whose it is.  I mean, his father was using that vehicle before.

Q.   I'm sorry, his father was using what vehicle?

A.   The Mercedes vehicle.  He was using the Mercedes, but Jordan had the Mercedes because we had an event and he needed to be able to transport the artist to and from the airport.  So he was using that vehicle to be able to pick up and take off and deliver the people for the event that we had.

Q.   Why wouldn't the rental car have done that?

A.   Because it's just a status having the Mercedes and picking up these high-end artists in a nice car, you could say.

Q.   When was that?  How long ago?

A.   December 2 and 3.

DAWN SATARY - DIRECT

Q.   Is that when he got the Mercedes from his father?

A.   Yes.

Q.   Do you know what day?

A.   No, I don't.

Q.   It was either December 2 or 3?

A.   Yeah.  I can't remember which day the people were arriving exactly.

Q.   What was the event?

A.   A concert.  Arabic singer.

Q.   Concert for what function?  Was it a fundraiser?  What was it?

A.   No, it was just a concert.  Jordan promotes concerts for Arabic singers, so it was for that event.

Q.   Do you know how the exchange of the cars occurred on December 2 or 3?

A.   No, I do not.

Q.   When did you learn that Khalid Satary was missing?

A.   On the day of them arriving in our home in the morning.

Q.   That was the first you knew that he was missing?

A.   Yes, ma'am.

Q.   Did Jordan tell you when he learned he was missing, when he learned that Khalid Satary was missing?

A.   No.  I believe it was the same day, in fact.

Q.   Was he still driving the defendant Khalid Satary's Mercedes at that time?

DAWN SATARY - CROSS

A.   Yes.

Q.   Do you know if he ever tried to get his rental car back?

A.   I don't know about that.

Q.   Do you have a decent relationship with Khalid Satary?

A.   No, not at all.

THE COURT:   Does anybody have any questions for --
I'm sorry, was your last name Satary?

THE WITNESS:   Dawn Satary.

THE COURT:   Dawn Satary.

Mr. Woodard, do you have questions for Ms. Satary?

MR. WOODARD:   Yes.   Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. WOODARD:

Q.   Ms. Satary, I believe you mentioned you saw Khalid in May 2022.  Is that right?

A.   Yes.

Q.   In an office building?

A.   Yes.

Q.   What city and state?  Was that in Houston?

A.   Houston, Texas.

Q.   What kind of office building was that, if you remember?

A.   Just an office.

Q.   Like what kind of business was it, if you could tell?

MR. GRUBMAN:   Judge, could I chime in here?

DAWN SATARY - CROSS

Ms. Satary is not my client.  I have never met the woman.  I can't imagine that Mr. Woodard's question has anything to do with where Mr. Satary is now.  It sounds more like it's probably more likely related to what they have under investigation, which the Court said she would not allow him to get into.  So I would object to all these questions and ask that Mr. Woodard be instructed to move on to relevant questions.

THE COURT:  All right.  Mr. Woodard, I have advised Ms. Satary that she is not in trouble and, as far as I know, she is not under investigation.  If she is, then she does need to be advised that she has a right to have an attorney.  So if you have any information about that, please advise me because I will advise her of that.

Second to that, I do want the focus to be exactly what I said, if she has any knowledge about the whereabouts of her ex-husband, Khalid Satary.

MR. WOODARD:  Completely understood, Your Honor.  Mr. Khalid Satary is known to have numerous different businesses, and I was trying to understand what this business might be and who he may have been associating with for leads, but I will move on, Your Honor.

BY MR. WOODARD:

Q.   Ma'am, you mentioned you live with Jordan, right?

A.   Yes.

DAWN SATARY - CROSS

**Q.**   How frequently would Jordan talk to his dad, Khalid Satary?

**A.**   I mean, I don't know that because, I mean -- I don't hold his telephone in my hand, so I do not know.

**Q.**   Would you hear him talking to Khalid Satary from time to time?

**A.**   Time to time, yes, but I don't listen to the content of their discussion.

**Q.**   Do you know how often Jordan would go to visit Khalid Satary at his home?

**A.**   I don't know.

**Q.**   Did you ever talk to Khalid Satary about where he might go if he were to go abroad?

**A.**   No, absolutely not.

**Q.**   Who is paying for the rental car?

**A.**   Jordan.

**Q.**   Jordan Satary?

**A.**   Yes.

**Q.**   Is that rental car still outstanding today?  It's still being rented?

**A.**   I don't know.

**Q.**   Is it a Mercedes-Maybach that is Khalid Satary's car?

**A.**   I don't know who is the owner of the vehicle, but he was using that vehicle at one point in time.

**Q.**   Okay.  Is that the same car that was at your house

DAWN SATARY - CROSS

recently?

A.   Yes.

Q.   Do you know what Jordan did with the rental car around that time?

A.   I do not know.

MR. WOODARD:   No further questions.

May I have just a moment, Your Honor?   I'm sorry.

BY MR. WOODARD:

Q.   Ma'am, do you know if Jordan Satary has one phone or more than one cell phone?

A.   Only one to my knowledge.

MR. WOODARD:   Okay.   Thank you, ma'am.

THE COURT:   Mr. Grubman or Ms. Clark-Palmer, do either of you have any questions?   It's your case.

MR. GRUBMAN:   No, Your Honor.

MR. LIETZ:   Could I ask a few, Judge?

THE COURT:   Mr. Lietz.

MR. LIETZ:   Thank you, Judge.   I will be brief.

CROSS-EXAMINATION

BY MR. LIETZ:

Q.   Just a couple of questions, ma'am.   Are you aware of the fact that at some point Jordan got into a wreck in the automobile that he was driving at the time?

A.   Yes, I am.

DAWN SATARY - CROSS

**Q.** How did you become aware of that?

**A.** He telephoned me on the day of the accident, and I was on the scene.

**Q.** On the scene after he telephoned you?

**A.** Yes.

**Q.** Why did you go to the scene?

**A.** It's my son and he was in a pretty bad accident.

**Q.** Do you recall when this occurred, roughly?

**A.** The same day that Jordan said.  I can't remember the exact date of it, the accident.  It was raining on a weekend, on a Friday night.

**Q.** Was he able to drive his vehicle away from that scene of that accident?

**A.** No.

**Q.** By the way, do you remember the month that this occurred?

**A.** November.

**Q.** Before or after Thanksgiving?

**A.** Before.

**Q.** So as a result of getting a call from him, I understand you to say you went to pick him up because his car needed to be towed.  Is that correct?

**A.** Correct.

**Q.** How soon after that did he get a car from a rental company, if you recall?

**A.** I think it was about three or four days after the

DAWN SATARY - CROSS

accident.

Q.   Okay.

A.   I think.

Q.   How long did he drive that car, from a few days after the accident till roughly when, ma'am?

A.   I mean, it was in his possession.  He was driving it regularly.

Q.   You talked about -- because the judge asked you some questions about this -- an event that I believe you said occurred on December 3.  Do you recall that?

A.   Yes.

Q.   Can you tell us a little bit more about that event.

A.   It's just a concert.  It's an Arabic singer.  She came into town.  She has her group with her.  It's just a performance, a live performance, a live concert.

Q.   Who was promoting this concert?

A.   Jordan Satary.

Q.   Jordan?  What's the name of the artist?

A.   Nawal El Zoghbi.

Q.   You said something about this person's status.

A.   She is a famous Arabic singer.

Q.   Famous where?

A.   In Lebanon.

Q.   Does she have a band that she travels with?

A.   Yes.

DAWN SATARY - CROSS

**Q.** Where was this event to take place on December 3?

**A.** In Houston, Texas.

**Q.** I think you talked about Jordan getting a Mercedes, swapping out a Mercedes for the rental car. Do you recall talking about that?

**A.** Yes. Yes.

**Q.** Can you tell us a little bit more about the purpose of that. Why did he do that, if you know?

**A.** Just to go and pick up these people from the airport and transport them to the event -- to the hotel, to the event, and back again to the airport.

**Q.** Okay.

**A.** And while they're in town. I think they were in town maybe two or three days.

**Q.** Two or three days?

**A.** I believe so.

**Q.** Was Jordan the one that was sort of responsible for showing them around while they were there?

**A.** Yes.

**Q.** I believe you said that Jordan learned about Khalid absconding, you believe, because the agents came to the house?

**A.** Correct.

**Q.** Did you hear any of those conversations?

**A.** I was in the house when they arrived.

    **MR. LIETZ:** I don't have any more questions. Thank

DAWN SATARY - REDIRECT

you, Your Honor.

Thank you, ma'am.

THE WITNESS:  Sure.

REDIRECT EXAMINATION

BY THE COURT:

Q.   Ms. Satary --

A.   Yes, ma'am.

Q.   -- did Jordan ever go to the hospital?

A.   Yes.  We went to the emergency room.

Q.   The day of the accident?

A.   Yes.

Q.   Did he stay in the hospital?

A.   No.  He went to the ER and was released.

Q.   Did he ever go back into the hospital?

A.   No, but he has been seeing a chiropractor two or three times a week, I believe, since the accident.

Q.   You heard the testimony today from the probation officer saying that Khalid said he couldn't come to the probation office in Houston because Jordan was in the hospital.  As far as you know that was just a lie?

A.   Yes, but he was in the hospital on the day of the -- well, it's not a hospital.  I mean, it's an ER, emergency room.  He did go for evaluation, but was released that day.

Q.   That accident was in November?

A.   Yes, ma'am.

Case 2:19-cr-00197-WBV-KWR   Document 345   Filed 12/19/22   Page 67 of 79

67

DAWN SATARY - REDIRECT

**Q.**   Because we are talking about December 1 is when he was due at probation.

**A.**   Oh, okay.

      **THE COURT:**  Ms. Satary, thank you for testifying.

      **THE WITNESS:**  Yes, ma'am.  Thank you.

      **THE COURT:**  Now the question is:  Will your client testify to what he knows about his father's whereabouts?

      **MR. LIETZ:**  I think he wants to cooperate, but I don't think I would advise him to testify because I don't think you can say to him the same thing that you said to Ms. Satary, which is that the information that he provides can't be used against him.  You didn't say that directly to her, but that was basically what you said to her, Your Honor, and I'm sure she appreciated that.  I don't think the Court can say the same thing to him.

      If the Court can say the same thing, then certainly I would talk to him.  I probably would advise him to testify if the Court can say that his answers will not be held against him; but if they are going to be held against him, I would advise him not to testify.

      I would also say that to the extent the government has questions -- I mean, don't hear me saying, hey, we won't try to help find the dad, we won't answer additional questions at a later date.  But to the extent his answers today are going to be held against him, I would honestly just have to

advise him, as his lawyer, not to answer those questions.

THE COURT:  Mr. Lietz, what is the last text message on any phone that Jordan received from his father?

MR. LIETZ:  I think that the agents -- the agent would be able to answer that because they looked at the text messages.  I don't know the answer to that, Judge.  I'm not sure.

THE COURT:  Can you consult with your client.  Will he be willing to answer that?

MR. LIETZ:  Well, as long as his answer won't be held against him.  I'm concerned that --

THE COURT:  Well, first of all, you're going to be saying it and not him.  If you are saying he is willing to cooperate -- I'm asking questions solely related to the whereabouts of Khalid Satary.  Is he willing to answer that through you?

MR. LIETZ:  Is it safe to assume that the answer to that will not be held against him?

THE COURT:  I'm not in a position to say that.  I'm asking the question:  Are you willing to ask your client to tell you when is the last text message on any phone device he received from his father, period?

MR. LIETZ:  Based on what the Court just said recently, the last statement you made about not being able to give us that assurance, at this particular time, respectfully,

no, Your Honor.

THE COURT:  So when you stood before me and said he is willing to cooperate -- I just asked a very narrow question directed at the whereabouts of Khalid Satary, and you're advising me that he will not provide that information?

MR. LIETZ:  Judge, he did share that information with the government.  The agents talked to him about that.  The reports they have given me say that he showed them those text messages.  When I say that he is willing to cooperate, I think I would be not doing a good job for him if I let him cooperate and his answers could be held against him.

I understand why everybody wants to know this information and wants to know where his dad is.  He wants to know that as well.

THE COURT:  Is there anything else from the government?

MR. WOODARD:  We just maintain that the Court has the authority to order these questions be answered.  We would also note, given the representations of cooperation, we have a consent form that the agents could execute today with Jordan to turn over his phone to be imaged by the government to answer the Court's questions if Mr. Jordan Satary would so consent.

THE COURT:  Would he be willing to turn over his phone for a government inspection?

MR. LIETZ:  I will certainly talk with him about

that, I will review that consent form and I will advise him on that. I'm not in a position to answer that, as we sit here in court, without seeing the form and without having additional conversations with the government.

Judge, if there's anything I said that upset you, I'm sorry.

THE COURT: Mr. Woodard, this hearing is done. This is not the last hearing because I did not notice a contempt hearing, but now I believe that will be the next step. You will get notice.

MR. LIETZ: Well, I wish the Court would give me an opportunity to speak with him and learn more about the situation myself and perhaps --

THE COURT: To speak with who?

MR. LIETZ: Jordan.

THE COURT: You can have all the time you want right now.

MR. LIETZ: I need more than just today.

THE COURT: I'm not having the contempt hearing today.

MR. LIETZ: Oh, I understand that.

THE COURT: That's exactly why I'm saying that.

MR. LIETZ: Yes.

THE COURT: That's why I've tried to be clear. My focus today was to find Khalid Satary. The only purpose in

bringing Jordan Satary here was to find Khalid Satary. Now, he is not willing to do that. He is not willing to provide any information as to his responsibilities.

I put him under oath and made him responsible. So now I am in a position where, because of what you have said, I have no other recourse but to notice a contempt hearing because he is not complying. You can stand here all you want and say he is willing to cooperate. I asked you a very narrow question, and he is not willing to cooperate. More important, from everything I can tell, he didn't fulfill his obligations as third-party custodian.

**MR. LIETZ:** Judge, we got notice of this hearing last Friday.

**THE COURT:** That's why I'm not holding him in contempt. That's why I'm going to give you plenty of time.

**MR. LIETZ:** Friday afternoon. Between late Friday afternoon, 4:00 or 5:00 Atlanta time, I have been told that there's a separate investigation. The government has stood up in court today and said Jordan Satary's name appears on some of the documents. The government has talked to him two times, and he has cooperated with them and told them everything he knows. Everything. That is not sufficient. They still believe that there's something else.

To the extent that he can help them find his dad, he is willing to do that, but he is not willing to do it

by answering questions in open court when the answers to those questions could be held against him, either in connection with an underlying fraud which the government is investigating, the disappearance of his father, or a violation of a bond order.

The Court has already concluded before hearing -- it sounded like that there's already been a conclusion reached that he violated the order.

THE COURT:  That was the purpose of the hearing.  All I've got is the testimony from the probation officer that he did not notify them of anything.  He hasn't notified the Court. I have, what brought this to light, counsel for the defendant who said that Jordan Satary advised them that he was aware that Mr. Satary was missing.

MR. LIETZ:  I'm not sure what counsel for the defendant advised the Court.  Counsel for the defendant --

THE COURT:  That they communicated with Jordan Satary, who knew his --

MR. LIETZ:  Well, Mr. Grubman will probably be a witness if we have a contempt hearing because I can tell you this --

MR. GRUBMAN:  To be clear, Your Honor, if I could --

MR. LIETZ:  -- Mr. Jordan Satary did not tell Mr. Grubman that he was aware that his father had absconded.

MR. GRUBMAN:  Correct.

MR. LIETZ:  He did not say that.

THE COURT:  That he was missing.  I didn't say absconded.

MR. LIETZ:  He did not tell him that he was missing.

MR. GRUBMAN:  May I say something for the record? This is Scott Grubman.

Can y'all hear me, by the way?

THE COURT:  Yes.  Yes.

MR. GRUBMAN:  I agree with Mr. Lietz, Your Honor. With all due respect, the only time that Mr. Jordan said he knew that his dad was missing is after the FBI knocked on the door.  I don't represent Jordan Satary, but I do feel compelled to say that my argument would be who was he to tell.

If he only found out when the FBI knocked on the door and the probation office and all them, as agents of the Court executing an arrest warrant, then to argue that he would then have the responsibility to turn around and reinform the Court, whose agents informed him, with all due respect, Your Honor, I think that would be nonsensical.

Mr. Jordan Satary did not tell me that he knew where his dad was or that he knew his dad was missing until the FBI, as agents of the Court, and other law enforcement, as agents of the Court executing a search warrant, knocked on Mr. Jordan Satary's door.  So I just want to make that clear.

I would be happy to come testify, but that would be my testimony at the hearing.

**THE COURT:** Just to be clear, I never said and I wasn't saying that he said he knew he was missing at any time beforehand. I'm saying the exact same thing. Mr. Grubman advised the Court that he spoke with Jordan Satary, and Jordan Satary had told him that his father was missing. I'm saying the same thing. I'm saying he did not advise the Court of that.

**MR. LIETZ:** The thing about it is, Judge, normally when the government makes an allegation, they come into court and they present evidence. The only evidence that the Court has here today is that Jordan Satary learned about his father being missing on December 6. That's the only evidence. That's it right now; that when the agents came out to him, he learned that his dad was gone.

I said to you earlier that perhaps he should have picked up the phone and called the probation office or somebody. I think Mr. Grubman's point is well-taken. In hindsight, maybe he should have done that, but the only evidence before this Court is that he did not learn of that until December 6.

We now know the reason that he rented a car. We now know the reason he was driving a Mercedes. If he was going to help his dad abscond, I can't imagine that he would rent a car in his own name and give his dad that car to drive and abscond in.

06:06

**THE COURT:**  The hearing is concluding.

Mr. Grubman and Ms. Clark-Palmer, you have requested from this Court several times, because of Ms. Clark-Palmer's conflict, that the trial date be continued, which obviously was all part of last week.  This case will now be put in fugitive status.  Any assurance or any request that I made to you to hold any date open, such as January 30, which Ms. Clark-Palmer respectfully objected or asked that I reconsider, I am reconsidering now.  There are no trial dates. He is a fugitive.  When he is arrested then, then we will regroup on that.  Is that clear?

**MR. GRUBMAN:**  Yes, Your Honor.  Thank you.

**THE COURT:**  You're welcome.

Anything further from the government?

**MR. WOODARD:**  Just a question, Your Honor, if the Court is setting a follow-up hearing.

**THE COURT:**  I will file something in writing.

**MR. WOODARD:**  Thank you, Your Honor.

**MR. LIETZ:**  May I just clarify?

**THE COURT:**  Yes, sir.

**MR. LIETZ:**  For what purpose?  Contempt?

**THE COURT:**  You'll see it when it comes.

**MR. LIETZ:**  Okay.

**THE COURT:**  If you would like to have any other discussions between counsel and the Court, I am open to them.

Until then, I will issue whatever orders I need to issue for noncompliance.

MR. LIETZ:  I don't see how he can cooperate with the government with a contempt hearing over his head.

THE COURT:  Now, Mr. Lietz, it wasn't contempt before, and I haven't issued an order.  Will he cooperate?  You keep going back and forth and anything I say, then you are, like:  Oh, well, now if it's contempt, now he can't cooperate; now if it's this, he can't cooperate.

You have just been saying that he is -- throwing out the word "cooperate," and he hasn't given any cooperation.  So it's very clear in anything today that he is not willing to cooperate at all to help find his father.

MR. LIETZ:  Well, what I need to make clear is that I am the one asking him or advising him.  I don't know if the Court would consider giving us some time to talk to the government and perhaps reporting back to the Court in a week maybe.  Maybe we can make some progress with the government.  If the Court doesn't want to wait to do that, I certainly understand.  I'm trying to offer that as a possibility for what I think the Court's ultimate interest is.  To the extent that --

THE COURT:  That was my interest.  I made very clear what my interest was.  My interest was not to punish Jordan Satary.  My interest was very narrowly and seriously focused,

and thus the time crunch from finding out Friday that Mr. Satary was missing to today, to noticing him here to find out if he had any love at all for his family and cared that Jordan Satary was coming in here to find out where Khalid Satary is.

I have this order, and I'm the one who questioned Jordan Satary. I'm the one who put him as third-party custodian. He is the one who testified before me in some detail that he would be responsible for this. Now that he is not cooperating, now I need to take the next step.

**MR. LIETZ:** Well, Judge --

**THE COURT:** I didn't want to do that before.

**MR. LIETZ:** I don't want you to do it either, but part of the reason is, based on the order that you wrote on Friday and then based on things that were said today, it seemed like the conclusion was already reached that he violated your previous order. I felt like that's what you were communicating.

**THE COURT:** If I was communicating that, then why would I have held a hearing today?

**MR. LIETZ:** Well, I'm only saying that based on that one sentence in the order that -- and I don't have it right in front of me, I'm sorry, but it said something like -- it was a sentence -- I think it was at the very end of a paragraph, maybe the first paragraph, very last sentence.

THE COURT: What it said is, R. Doc. 340 --

MR. LIETZ: Yes.

THE COURT: -- "It has come to the Court's attention that Jordan Satary may not be in compliance with the terms of his third-party custodian agreement."

MR. LIETZ: Right.

THE COURT: That is in no way a foregone conclusion because the next sentence sets it for a hearing to determine that.

MR. LIETZ: No, I agree exactly with the way that you quoted it. I thought I heard you saying some things earlier in this hearing that the conclusion was that he has violated it. I mean, again, the only evidence is the evidence we have. I wish the government would put the -- you know, they could put up the agent as well.

Anyway, I'm sorry. I feel like I'm bothering you at this point, Judge. If you give us some time to talk to the government, maybe at least several days, maybe there's a path forward short of what maybe you had thought about earlier.

THE COURT: I'm not going to stop you from doing that, but I'm telling you you are saying one thing, but you are not doing it. All you have said is he is willing to cooperate, and he has not been willing to cooperate. If you want to speak with the government about cooperation and provide some information that will assist them to find Khalid Satary, then I

will see what happens.

MR. LIETZ:  Based on everything I know, he doesn't have that kind of information.  He does not know where his father is.  He told the agents that.  He has no idea where his father is.

Unfortunately, I think the Court is right.  His father -- let's just say that his father is not showing the degree of love and concern and care that a father should show.

THE COURT:  No.  He throws his son under the bus and perhaps in contempt so that he can walk free.  I don't know what kind of individual does that and puts any child in that position, an adult child or anyone else, but that's what your father has chosen to do.

Court is in recess.

MR. LIETZ:  Thank you, Your Honor.

MR. WOODARD:  Thank you, Your Honor.

THE DEPUTY CLERK:  All rise.

(Proceedings adjourned.)

* * *

## CERTIFICATE

I, Toni Doyle Tusa, CCR, FCRR, Official Court Reporter for the United States District Court, Eastern District of Louisiana, certify that the foregoing is a true and correct transcript, to the best of my ability and understanding, from the record of proceedings in the above-entitled matter.

/s/ Toni Doyle Tusa
Toni Doyle Tusa, CCR, FCRR
Official Court Reporter